# 24-809-cv

## United States Court of Appeals
### for the
## Second Circuit

TIMOTHY REIF, DAVID FRAENKEL, as Co-Trustee of the Leon Fischer Trust for the Life and Work of Fritz Grünbaum, MILOS VAVRA,

*Plaintiffs-Counter-Defendants-Appellants,*

— v. —

THE ART INSTITUTE OF CHICAGO,

*Defendant-Counter-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-COUNTER-DEFENDANTS-APPELLANTS AND SPECIAL APPENDIX

DENNIS E. GLAZER
*Attorneys for Plaintiffs-Counter-*
*Defendants-Appellants*
15 Kensington Road
Bronxville, New York 10708
(914) 450-4960

RAYMOND J. DOWD
CLAUDIA G. JAFFE
JEFFREY F. KINKLE
DUNNINGTON, BARTHOLOW & MILLER LLP
*Attorneys for Plaintiffs-Counter-*
*Defendants-Appellants*
230 Park Avenue, 21st Floor
New York, New York 10169
(212) 682-8811

CP COUNSEL PRESS     (800) 4-APPEAL • (329557)

## **PRELIMINARY STATEMENT**

PRELIMINARY STATEMENT ............................................................1

STATEMENT OF JURISDISCTION ................................................3

STATEMENT OF THE CASE...........................................................4

    A.   Factual Background ...............................................................4

        1.  The Artwork was in Grünbaum's Collection When He was Murdered in a Concentration Camp..........................................5

        2.  Allied and Post-War Warnings on Nazi-Looted Artworks and AIC's Bad Faith Acquisition of the Artwork ....................................7

        3.  Litigation Concerning Grünbaum's Stolen Artworks ..........................10

            a.  *Bakalar v. Vavra*.............................................11

            b.  *Reif v. Nagy*....................................................13

            c.  Works from the 1956 Kornfeld Catalogue Returned to the Grünbaum Heirs...........................................14

    B.    Procedural History ...............................................................15

SUMMARY OF THE ARGUMENT .................................................19

STANDARD OF REVIEW ................................................................21

ARGUMENT ......................................................................................23

    I.    Reversal is Warranted Because the District Court Failed to Draw Inferences Favorable to the Grünbaum Heirs on a Rule 12(b)(6) Pre-Answer Motion to Dismiss ...........................................23

A. The District Court Failed to Weigh Pre-War Evidence of Fritz Grünbaum's Ownership of *Russian Prisoner* Favorably to the Grünbaum Heirs When Determining Whether the Grünbaum Heirs Alleged AIC's Bad Faith Acquisition in 1966 .........................................24

B. The District Court Failed to Weigh U.S. Government Warnings Favorably to Grünbaum's Heirs When Determining Whether Grünbaum's Heirs Alleged AIC's Bad Faith Acquisition in 1966 .........33

C. When Assessing Collateral Estoppel and Laches, the District Court Overlooked Allegations Distinguishing the *Bakalar* Case .....................35

II. Reversal Is Warranted by the *Erie* Doctrine Because the District Court Failed to Follow New York Law Applied By The Appellate Division To Fritz Grünbaum's Stolen Art Collection ...............................................40

A. The Appellate Division's Decision in *Reif v. Nagy* Binds the District Court........................................................................................................42

B. The District Court's Failure to Follow the Appellate Division has Undermined the Dual Aims of the *Erie* Doctrine..................................45

1. The District Court's Decision Violates the *Erie* Doctrine Because Grünbaum's Art Collection Cannot Be Stolen in State Court and Not Stolen in Federal Court............................................................46

III. Reversal is Warranted Because Congress Revived Time-Barred Claims When It Passed the HEAR Act ....................................................................48

A. The HEAR Act is a Broad Remedial Statute Reviving Otherwise Time-Barred Actions ..............................................................................49

B. The Grünbaum Heirs' Claims Were Time-Barred by Mid-1969 and Thus Saved By the HEAR Act ...............................................................53

IV. The District Court Mistakenly Inferred From a 2006 Demand That a 2006 Claim to *Russian Prisoner* Would Have Been Timely.....................53

CONCLUSION .................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*,
    362 F. App'x 151 (2d Cir. 2010) ..........................................................36
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................21
*Atchison, Topeka & Santa Fe Ry. Co. v. Buell*,
    480 U.S. 557 (1987).............................................................................51
*Bakalar v. Vavra*,
    237 F.R.D. 59 (S.D.N.Y. 2006) ...................................................... 37, 39
*Bakalar v. Vavra*,
    500 F. App'x 6 (2d Cir. 2012) ........................................................ 12, 47
*Bakalar v. Vavra*,
    619 F.3d 136 (2d Cir. 2010) ................................................................44
*Bakalar v. Vavra*
    819 F. Supp. 2d 293 (S.D.N.Y. 2011) .......................................... *passim*
*Balintulo v. Ford Motor Co.*,
    796 F.3d 160 (2d Cir. 2015) ................................................................22
*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................21
*Brown v. Mitchell–Innes & Nash, Inc.*,
    No. 06-CV-7871, 2009 WL 1108526 (S.D.N.Y. Apr. 24, 2009) ........................26
*Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*,
    56 F.3d 359 (2d Cir. 1995) ...................................................................37
*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
    637 F.3d 169 (2d Cir. 2011) ................................................................22
*Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*,
    988 F.3d 127 (2d Cir. 2021) ......................................................... 22, 40
*Davis v. Carroll*,
    937 F. Supp. 2d 390 (S.D.N.Y. 2013) ................................................26
*Deere & Co. v. MTD Prod., Inc.*,
    No. 00 CIV 5936 LMM, 2001 WL 435613 (S.D.N.Y. Apr. 30, 2001)...............39
*Erie R. Co. v. Tompkins*,
    304 U.S. 64 (1938)................................................................................42
*Frankel v. Cole*,
    313 F. App'x 418 (2d Cir. 2009) .........................................................22

iii

*Geisler v. Petrocelli,*
  616 F.2d 636 (2d Cir. 1980) ..................................................22

*Grosz v. Museum of Mod. Art,*
  772 F. Supp. 2d 473 (S.D.N.Y.) ...........................................27

*Guar. Tr. Co. of N.Y. v. York,*
  326 U.S. 99 (1945) ................................................................45

*Hanna v. Plumer,*
  380 U.S. 460 (1965) ..............................................................45

*Harris v. City of New York,*
  186 F.3d 243 (2d Cir. 1999) ..................................................22

*In re Washington Square Slum Clearance, Borough of Manhattan, City of New York,*
  5 N.Y.2d 300  (1959) ............................................................42

*Isaly v Boston Globe Media Partners, LLC,*
  650 F.Supp 3d 106 (S.D.N.Y. 2023) ....................................36

*Kunstsammlungen Zu Weimar v. Elicofon,*
  678 F.2d 1150 (2d Cir. 1982) ...............................................27

*Lane Bryant, Inc. v. Tax Comm'n of City of New York,*
  21 A.D.2d 669 (1st Dept. 1964) ............................................40

*Maple Med., LLP v. Scott,*
  191 A.D.3d 81 (2d Dept. 2020) .............................................43

*Matter of Flamenbaum,*
  22 N.Y.3d 962 (2013) ...........................................................47

*Matter of New York Cnty. DES Litig.,*
  89 N.Y.2d 506 (1997) ...........................................................51

*Mhina v. Bank of Am., N.A., Corp.,*
  No. 23-96-CV 2023 WL 6873045 (2d Cir. Oct. 18, 2023) ..........21

*Mountain View Coach Lines, Inc. v. Storms,*
  102 A.D.2d 663 (2d Dept. 1984) ...........................................45

*Nelson v. HSBC Bank USA,*
  87 A.D.3d 995 (2d Dept. 2011) .............................................51

*Pahuta v. Massey-Ferguson, Inc.,*
  170 F.3d 125 (2d Cir. 1999) ..................................................42

*Pentech Int'l, Inc. v. Wall St. Clearing Co.,*
  983 F.2d 441 (2d Cir. 1993) ..................................................42

*Post v. 120 E. End Ave. Corp.,*
  62 N.Y.2d 19 (1984) ..............................................................51

*Premier Cap., LLC v. Best Traders, Inc.,*
  88 A.D.3d 677 (2d Dept. 2011) .............................................38

iv

*Reif v. Nagy*,
  38 N.Y.3d 908 (2022) .................................................................... *passim*
*Reif v. Nagy*,
  61 Misc. 3d 319 (N.Y. Sup. Ct. 2018) ..............................................13
*Reif v. Nagy*,
  175 A.D.3d 107 (1st Dept. 2019) ............................................... *passim*
*Republic of Turkey v. Christie's Inc.*,
  527 F. Supp. 3d 518 (S.D.N.Y. 2021) ..................................... 26, 29, 34
*Selevan v. N.Y. Thruway Auth.*,
  584 F.3d 82 (2d Cir. 2009) ..............................................................21
*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
  531 U.S. 497 (2001) ........................................................................46
*Solomon R. Guggenheim Found. V. Lubell*,
  77 N.Y.2d 311 (1991) ............................................................... 25, 34
*Sonterra Cap. Master Fund Ltd. v. UBS AG*,
  954 F.3d 529 (2d Cir. 2020) ............................................................23
*Swain v. Brown*,
  24 N.Y.S.3d 598 (1st Dep't 2016)............................................. 27, 55
*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ............................................................23
*Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*,
  17 F.3d 38 (2d Cir. 1994) ................................................................40
*U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*,
  33 N.Y.3d 72 (2019)........................................................................52
*West v. Am. Tel. & Tel. Co.*,
  311 U.S. 223 (1940)........................................................................42

Statutes

28 U.S.C. § 1291 .............................................................................3, 5
28 U.S.C. §§ 1332 and 1441 .................................................................3
Holocaust Expropriated Art Revocery Act of 2016, Pub. L. 114-308 ............ *passim*

Rules

Fed. R. Civ. P. 12(b) .......................................................................1,3
N.Y. C.P.L.R. § 203(a) .....................................................................26
N.Y. C.P.L.R. § 214(3) .....................................................................26

Other Authorities

Austrian Civil Code § 1237 ........................................................................6
S. Rep. No. 114-394..................................................................................51

Plaintiffs-Appellants, the heirs of Fritz Grünbaum, a Jewish cabaret performer murdered in the Dachau Concentration Camp in Dachau, Germany ("the Grünbaum Heirs"), appeal from a final judgment of the Southern District of New York (Koeltl, J.) denying leave to amend the complaint and granting a pre-answer motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds of statute of limitations, collateral estoppel and laches.

## PRELIMINARY STATEMENT

This is an action based on diversity jurisdiction for declaration of title, conversion, and replevin of the artwork Egon Schiele's *Russian Prisoner of War* ("*Russian Prisoner*" or the "Artwork"), stolen by the Nazis from Fritz Grünbaum during the period 1938-1941 when Grünbaum was kidnapped from his home in Vienna, Austria and imprisoned and murdered at Dachau. *Russian Prisoner* is currently in the possession of Defendant-Appellee Art Institute of Chicago ("AIC" or "Defendant"). AIC concedes that *Russian Prisoner* belonged to Fritz Grünbaum prior to the Nazi takeover of Austria on March 13, 1938 ("the Anschluss").

The Grünbaum Heirs commenced this action, based on New York state law, in New York State Supreme Court, New York County as related to *Reif v. Nagy*, 175 A.D.3d 107 (1st Dept. 2019) ("*Reif v. Nagy*"). In *Reif v. Nagy,* a case commenced in 2015, the Appellate Division, First Department concluded that artworks from Grünbaum's collection (including *Russian Prisoner*) as depicted in a 1956 catalogue

1

produced by the Swiss art dealer Eberhard Kornfeld (the "1956 Kornfeld Catalogue") were stolen from Grünbaum and that the Grünbaum Heirs' claims for conversion and replevin could proceed against the possessor. By removing this action to the Southern District of New York, AIC consented to venue.

This appeal arises from the District Court's pre-answer dismissal of this action pursuant to opinions making findings of fact and reaching conclusions of law diametrically opposed to those of the Appellate Division in *Reif v. Nagy*, concluding that Fritz Grünbaum's art collection, including *Russian Prisoner* was not stolen. Rather than drawing favorable inferences from the Grünbaum Heirs' allegations, the District Court impermissibly drew negative inferences against the Grünbaum Heirs to conclude that this action was barred by the statute of limitations, collateral estoppel, and laches. In reaching these conclusions, the District Court impermissibly required the Grünbaum Heirs to disprove an unpleaded statute of limitations defense that was not apparent from facts alleged on the face of the complaint.

In passing the Holocaust Expropriated Art Recovery Act of 2016 ("HEAR Act"), Congress sought to open the nation's courts to Nazi-era claims to ownership of artworks and to ease procedural hurdles for Holocaust victim families. Requiring a claimant to disprove an unpleaded statute of limitations defense on a pre-answer motion to dismiss is both inconsistent with the HEAR Act and this Court's

jurisprudence on resolving pre-answer motions to dismiss pursuant to Rule 12(b) of the Federal Rules of Civil Procedure on statute of limitations grounds.

Because federalism and the *Erie* Doctrine require that a litigant should not get a different result by moving from a state to a federal venue and require that a district court show deference to an intermediate appellate court's legal determinations, the District Court's decisions should be reversed. The very same artwork cannot be found to be stolen in state court and shortly thereafter found not to be stolen in federal court.

## STATEMENT OF JURISDICTION

The District Court had subject matter jurisdiction over this action under 28 U.S.C. §§ 1332 and 1441 (diversity) because it was timely removed from Supreme Court, New York County. This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because the District Court entered judgment dismissing the action on February 28, 2024, and Plaintiffs-Appellants filed a timely notice of appeal on March 27, 2024.

## STATEMENT OF THE CASE

### A.  Factual Background

Plaintiffs are co-heirs of the estate of Fritz Grünbaum, a Viennese Jewish cabaret performer and prominent art collector born in Brno, Moravia. [A-2197].[1] Grünbaum was well known to the Nazis as an outspoken anti-Nazi performer (he was the subject of the Broadway and Hollywood productions of the musical-drama *Cabaret*). Before the Nazis murdered him, Grünbaum had assembled an art collection of over 400 works, including approximately 80 works by Egon Schiele. [A-2204]. This collection included the watercolor drawing entitled *Russian Prisoner of War* (1916), the artwork at issue here. [A-2192; A-2202-03]. The Nazis expropriated Grünbaum's collection while holding Grünbaum in the Dachau Concentration Camp in Germany in 1938 before they murdered him. Eventually, *Russian Prisoner* made its way to AIC in 1966. The Grünbaum Heirs initiated this action to recover the Artwork from AIC, which acquired the work in bad faith under New York law.

---

[1] Citations in this section are to the [Proposed] Second Amended Complaint ("Complaint") unless otherwise noted, which can be found in the Appendix at A-2192. The Appendix is cited to as [A-__]. The Special Appendix is cited to as [SA-__].

4

### 1. The Artwork was in Grünbaum's Collection When He was Murdered in a Concentration Camp

In 1925, the Würthle Gallery in Vienna, where the Viennese art dealer Otto Kallir (1894-1978) worked before founding Neue Galerie in 1923, displayed artworks from Fritz Grünbaum's art collection, including *Russian Prisoner*, and recorded the participating works in a catalogue from the same year ("1925 Würthle Gallery Catalogue"). [A-2201]. The Artwork is specifically identified by name and owner in the 1925 Würthle Gallery Catalogue. [A-145 *et seq*.] In 1928, in the context of Kallir organizing a memorial exhibition at the Hagenbund to commemorate the tenth anniversary of Schiele's death, Kallir visited Grünbaum's apartment to view Grünbaum's collection. Grünbaum and Kallir corresponded about which Schiele works the show would include. [A-2202-03]. Correspondence between Grünbaum and Kallir (the "1928 Correspondence") shows Kallir's familiarity with Grünbaum's art collection and that Grünbaum lent Kallir 21 Schiele drawings and watercolors, including *Russian Prisoner*, for the memorial exhibition. [*Id.*].

The Nazis invaded Austria on March 12, 1938. Grünbaum attempted to escape to neighboring Czechoslovakia, but the Gestapo arrested him on March 22, 1938, imprisoning him in various concentration camps, including Buchenwald and Dachau. [A-2197]. On April 27, 1938, the Nazis passed a law requiring Jews with property valued over 5,000 Reichsmarks to declare their property to the Nazi regime

quarterly under penalty of imprisonment. Under the law, such property was available to Field Marshal Göring to implement the Reich's Four Year Plan. [A-2198].

On July 16, 1938, the Nazis forced Grünbaum to sign a power of attorney in the Dachau Concentration Camp (the "Dachau Power of Attorney"). The Dachau Power of Attorney purported to permit Grünbaum's wife, Elisabeth, to liquidate Grünbaum's assets and hand them over to the Nazi regime.[2] [A-2199]. According to a July 1938 Nazi inventory located in the Austrian State Archives, Grünbaum's art collection contained at least 81 works by Schiele. [A-2204]. The Nazis appointed an "Aryan" trustee to liquidate his property for the Nazi Reich. [A-2205]. Grünbaum's Jewish Property Declarations bear the Nazi stamps "*Erledigt*" ["done" or "completed"] and "*Gesperrt*" ["closed" or "blocked"], indicating the Nazis' theft of Grünbaum's art collection. [A-2204]. In *Reif v. Nagy*, the Appellate Division held that Grünbaum never voluntarily relinquished his art collection before the Nazis sent him to a concentration camp and that any transfer he made while in a concentration camp, even if to his wife, was involuntary as a matter of law. 175 A.D.3d at 129.

There is no record of Grünbaum ever transferring title to *Russian Prisoner* or any other Schiele artwork prior to his imprisonment. The Nazis murdered Grünbaum

---

[2] Fritz and Elisabeth had separate property under Austrian law. Elisabeth and Fritz Grünbaum's separate June 1939 Jewish Property Declarations (signed by Elisabeth) each shows that their property had been taken by the Nazis before Elisabeth was murdered. [A-2199]. Pursuant to Austrian law, a husband and wife each retain their own property. Austrian Civil Code § 1237. Thus, absent a freely executed writing signed by Fritz Grünbaum, which does not exist, valid title for *Russian Prisoner* did not, and could not, pass to his wife or her heirs.

in Dachau on January 14, 1941. [A-2197]. On or about October 5, 1942, Elisabeth Grünbaum was taken to the Maly Trostinec extermination camp outside of Minsk in what is now Belarus, where she was murdered. [A-2199].

### 2. Allied and Post-War Warnings on Nazi-Looted Artworks and AIC's Bad Faith Acquisition of the Artwork

Following World War II, the U.S. government, led by the Department of State, issued specific and direct written warnings to cultural institutions, including AIC, urging vigilance against acquiring Nazi-looted artwork and asking for assistance in returning stolen art. [A-2205]. In 1947, AIC received a circular sent by the Department of State entitled "Return of Looted Objects of Art to Countries of Origin" warning against acquiring artworks from Europe that lacked provenance. [A-2206]. AIC appeared as number 18 on the list of institutions that received the 1947 warning. [A-2288].

Even prior to the U.S. government issuing a warning directly to AIC, in 1943, the Allies issued the Inter-Allied Declaration against Acts of Dispossession Committed in Territories under Enemy Occupation and Control ("London Declaration"). This warning, drafted by the Allied governments, reserved to these governments "all of their rights to declare invalid any transfer of, or dealings with property, rights and interests of any description whatsoever which are, or have been, situated in" territories coming under Nazi occupation. [A-2222]. The London Declaration applied "whether such transfers or dealings have taken the form of open

7

looting or plunder, or of transactions apparently legal in form, even when they purport to be voluntarily effected." The London Declaration's policy of undoing acts of Nazi spoliation has remained consistent U.S. policy until the present, as recently reaffirmed in the HEAR Act of 2016. Pub. L. 114-308 Dec. 16, 2016.

The Nazi looting of artworks from Jewish victims received widespread media attention in the United States. [A-2205]. This media attention and these governmental efforts put AIC and the entire art and museum community on heightened notice that acquiring artworks that were in Europe after 1933 and transferred prior to 1946 without complete provenances was a "red flag," indicating that such artworks were potentially stolen. [A-2206].

Post-War catalogues of Schiele exhibitions trace the Artwork to Grünbaum. In 1956, *Russian Prisoner* and other works from Grünbaum's art collection surfaced in the 1956 catalog of Schiele artworks at the Klipstein & Kornfeld gallery (formerly Gutekunst & Klipstein). [A-2207; A-2216] (the "1956 Kornfeld Catalogue"). The first artwork listed in the 1956 Kornfeld Catalogue is *Dead City III* (1911) with Grünbaum listed as the prior owner. All artworks in the 1956 Kornfeld Catalogue were stolen from Grünbaum by the Nazis (including *Russian Prisoner*). [A-2207]. According to a Gutekunst & Klipstein invoice, on September 18, 1956, Otto Kallir (who had previously borrowed *Russian Prisoner* from Grünbaum in 1928) purchased *Dead City III* together with 19 other artworks by Schiele, including

8

*Russian Prisoner*. [A-2207]. In 1998, Manhattan District Attorney Robert Morgenthau seized *Dead City III* from the Museum of Modern Art in New York City. [A-2207].

Purchases of Schieles without a provenance were particularly acute "red flag" transactions because Schiele's primary collectors were Viennese Jews who lost their lives and collections to the Nazi regime during the Holocaust. [A-2223]. AIC knew this Austrian history when it acquired the Artwork. [A-2206; A-2221-27]. In the Fall of 1964, for example, the London gallery Marlborough Fine Art, Limited hosted the first major post-War exhibition of Schiele's oeuvre. [A-2223]. The Marlborough's 1964 Schiele exhibition catalogue notes that Schiele's primary collectors were Viennese Jews who lost their collections to the Nazi regime while being persecuted and murdered. [A-2223].

AIC asserts that it received *Russian Prisoner* through the B.C. Holland Gallery by invoice dated July 28, 1966. [A-2226]. Importantly, this B.C. Holland invoice reveals no provenance for the Artwork. [A-2226]. There is no evidence that AIC inquired of Otto Kallir, who was known to have personal knowledge of *Russian Prisoner's* provenance, as to who *Russian Prisoner*'s prior owners were.

New York places the burden of investigating the provenance of a work of art on the potential purchaser in furtherance of discouraging the trade in stolen art. [A-2207]. AIC, a sophisticated party, failed in its duty to investigate the Artwork's

9

provenance. As such, under New York law, AIC was a bad faith possessor of *Russian Prisoner* from the time AIC obtained the Artwork in 1966. [A-2210]. This meant that the three-year statute of limitations for the Grünbaum Heirs to assert a claim for the Artwork accrued in mid-1966 when AIC acquired the work. [A-2225]. Under New York's three-year statute of limitations for conversion and replevin claims in New York, any action to recover the Artwork would have become untimely in mid-1969. [A-2225]. Due to this 1969 time bar, the HEAR Act of 2016 – which supplants state statutes of limitations for Nazi-looted artworks with a national six-year statute of limitations for claims time-barred as of 1999 – revived such time-barred claims.

### 3. Litigation Concerning Grünbaum's Stolen Artworks

Pursuant to a September 12, 2002 Certificate of Heirship issued by the District Court Innere Stadt Vienna, Leon Fischer ("Fischer") and Milos Vavra ("Vavra") were each declared an heir of Fritz Grünbaum's estate. [A-2200]. This was the first occasion since Grünbaum's murder in 1941 that an Austrian court declared a valid heirship. [A-2200]. Thus, any transactions in Grünbaum's property that took place before September 12, 2002 were void as a matter of law. [A-2214].

#### a. *Bakalar v. Vavra*

In 2005, David Bakalar, a Massachusetts resident, sued Grünbaum Heirs Fischer and Vavra in the Southern District of New York to extinguish the Grünbaum Heirs' rights in a Schiele drawing stolen from Grünbaum titled *Seated Woman with*

*Bent Left Leg* ("*Torso*") ("*Bakalar v. Vavra*"*)*. [A-2208]. In *Bakalar*, the Grünbaum Heirs were unable to point to any pre-1956 evidence listing *Torso* by title as belonging to Grünbaum. The *Bakalar Torso* "was not specifically catalogued in the inventory and may not have even been among the unnamed works of art in Grünbaum's apartment." *Bakalar*, 819 F. Supp. 2d 293, 299 (S.D.N.Y. 2011), *aff'd*, 500 F. App'x 6 (2d Cir. 2012). Unlike Grünbaum's *Russian Prisoner, Torso* was not listed in the 1925 Würthle Gallery Catalogue or the 1928 Correspondence between Grünbaum and Kallir. [A-2208]. Thus, the *Bakalar* Court, unlike here, did not have before it pre-War evidence by title that *Torso* was a part of Grünbaum's collection. This key factual difference between *Torso* and *Russian Prisoner* lent support to the *Bakalar* trial court's conclusion that *Torso* was "was not looted by the Nazis." *Id.*

Plaintiff Bakalar relied on a false story (that first surfaced in 1998) that a Grünbaum sister-in-law, Mathilde Lukacs, had obtained Grünbaum's art collection and sold it to Swiss art dealer Eberhard Kornfeld in 1956. [A-2208]. Since its 1998 invention, the false "Mathilde Lukacs story", has been derided by Holocaust scholars as implausible. Lukacs was herself imprisoned in Belgium during World War II after escaping Vienna; the Mathilde Lukacs story has since been thoroughly debunked. [A-2208].

Without the benefit of recent evidence debunking the Lukacs provenance or the benefit of expert testimony, *Bakalar* determined in 2010 that Fischer's and

Vavra's claims to *Torso* were barred by laches and held in favor of plaintiff Bakalar. *Bakalar*, 819 F. Supp. 2d at 307; [A-2208]. The Second Circuit affirmed by summary order. The Second Circuit's affirmance concluded that the District Court's finding that *Torso* was not looted by the Nazis was not clearly erroneous. However, the Second Circuit declined to rule on whether Lukacs had acquired proper title to the drawing. Instead, the Second Circuit affirmed the dismissal on laches grounds, as there was no clear error in finding Fischer's and Vavra's ancestors knew or should have known of a potential claim to *Torso* and that novice collector Bakalar was prejudiced by the delay because he had no duty to inquire where *Torso* came from when he purchased it. *Bakalar v. Vavra*, 500 F. App'x 6, 7-8 (2d Cir. 2012). In short, because it was premised entirely on laches, the Second Circuit's judgment did not necessarily rely on any finding that Grünbaum's collection was not stolen by the Nazis.

Leon Fischer died on August 16, 2013. Fischer's will appointed Timothy Reif and David Fraenkel executors of his estate and created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum (the "Fischer Trust") to pursue claims for artworks stolen from Grünbaum with proceeds going to charity. [A-2201]. Reif and Fraenkel are now co-trustees of the Fischer Trust and hold valid letters of trusteeship. [A-2201].

12

**b.** *Reif v. Nagy*

In November 2015, shortly after learning that two other Schiele artworks from the 1956 Kornfeld Catalogue (*Woman Hiding Her Face* and *Woman In Black Pinafore*) were displayed by London art dealer Richard Nagy at the Park Avenue Armory in New York, Reif, Fraenkel and Vavra commenced *Reif v. Nagy* in the New York State Supreme Court, New York County. [A-2211].

The trial court granted summary judgment on the Grünbaum Heirs' replevin and conversion claims, finding that (i) the Nazis confiscated Fritz Grünbaum's artworks by forcing him to sign the power of attorney to his wife, who was later murdered by the Nazis, and (ii) the act of signing the power of attorney was involuntary: "[a] signature at gunpoint cannot lead to a valid conveyance." *Reif v. Nagy*, 61 Misc.3d at 326, 330, *aff'd Reif v. Nagy*, 175 A.D.3d at 119-20 (internal quotation marks and citations omitted).

In affirming, the Appellate Division held:

> There is no evidence in the record that Elisabeth transferred title to the collection. Nor was Elisabeth able to convey good title as Grünbaum signed the purported power of attorney while imprisoned in Dachau. We reject the notion that a person who signs a power of attorney in a concentration camp can be said to have executed the document voluntarily. *Reif v. Nagy*, 175 A.D.3d at 129.

The Appellate Division concluded that Grünbaum's art collection "never legally left Austria." *Id.* at 111. The Appellate Division credited Dr. Petropoulos'

13

testimony that Eberhard Kornfeld was found to have trafficked in Nazi looted art; found that Kornfeld lied in his deposition in the Bakalar action regarding the Grünbaum provenance of many Schieles in the 1956 Kornfeld Catalogue; cast serious doubt on the Mathilde Lukacs story; and credited the testimony of Jane Kallir (Otto Kallir's granddaughter who published "Egon Schiele: The Complete Works") that many works in the 1956 Kornfeld Catalogue were owned by Grünbaum. *Id.* at 115, 122-24. The Appellate Division found a specifically-identifiable group of artworks – those appearing in the 1956 Kornfeld Catalogue – to have been stolen by the Nazis. [A-2214]. *Russian Prisoner* was among those artworks. The New York Court of Appeals denied Nagy's motion for leave to appeal. *Reif v. Nagy*, 38 N.Y.3d 908 (2022).

### c. Works from the 1956 Kornfeld Catalogue Returned to the Grünbaum Heirs

In 2023, the Grünbaum Heirs recovered the following artworks featured in the 1956 Kornfeld Catalogue:

- *Girl Putting on Shoe* (1910), via stipulation from the Museum of Modern Art [A-2220];

- *Girl with Black Hair* (1911), via stipulation from Carnegie Museums of Pittsburgh [A-2220];

- *I Love Antitheses* (1912), via agreement with Ronald S. Launder Trust [A-2218];

- *Portrait of the Artist's Wife* (1915), via stipulation from the Santa Barbara Museum of Art [A-2219];

14

- *Portrait of a Boy (Herbert Rainer)* (1910), via stipulation from the Vally Sabarsky Trust [A-2219];

- *Portrait of a Man* (1917), via stipulation from the Carnegie Museums of Pittsburgh [A-2220];

- *Prostitute* (1912), via stipulation Museum of Modern Art [A-2218-19];

- *Self-Portrait* (1910), via stipulation from the Morgan Library & Museum [A-2219]; and

- *Standing Nude with Drapery* (1910), via surrender agreement from Vally Sabarsky Trust and Sabarsky Holdings LLC [A-2220-21].

**B.   Procedural History**

AIC removed this action from New York State Supreme Court, based on diversity jurisdiction. [ECF 1]. The Grünbaum Heirs filed a First Amended Verified Complaint ("FAC"). [ECF 15; A-14]. Exhibit 1 to the FAC is the expert report of historian Dr. Jonathan G. Petropoulos dated March 2, 2023 (the "Petropoulos Carnegie Report"), where Dr. Petropoulos reported on the conditions governing the persecution of Jews during the Holocaust and theft of Fritz Grünbaum's art collection, and the bad-faith acquisition of Grünbaum's Egon Schiele artworks by museums after World War II ended. [A.52-107]. Dr. Petropoulos noted that "persons with even a passing knowledge of Schiele and World War II acquiring Schieles after 1938 without researching provenance did so knowing that the artworks were at substantial risk of being looted."  [A-58]. The Petropoulos Report also described how in 1945 the American Commission for the Protection and Salvage of Artistic and Historic Monuments in War Areas (the "Roberts Commission") distributed

circulars warning "museums, art and antique dealers, and auction houses" that "no clear title can  be passed on objects that have been looted from public or private collections abroad."  [A-73]. The Petropoulos Report concludes that the Roberts Commission officially put the art world and art market participants on formal notice about the dangers of trafficking in works lost under Nazi duress, particularly works of "red flag" artists like Schiele. [A-58, A-73]. This is in addition to the London Declaration and the 1947 warning.

AIC moved to dismiss. [ECF 30-32]. The Grünbaum Heirs requested that AIC's motion to dismiss be converted pursuant to Rule 56 to a motion for summary judgment because AIC requested that the District Court consider materials outside the pleadings. The Grünbaum Heirs cross-moved for summary judgment. [ECF 35-38; A-1841]. AIC replied. [ECF 41]. On July 27, 2023, the Grünbaum Heirs replied in further support of summary judgment. [ECF 45; A-2165].

On September 12, 2023, at the request of the Manhattan District Attorney, Supreme Court, New York County issued a search warrant and seizure order for *Russian Prisoner*. [ECF 69-1]. The Artwork was seized on September 16, 2023 and is still in the District Attorney's possession. [ECF 55 at 36]. On October 19, 2023, three months after the motion to dismiss was fully submitted, AIC filed an Answer and Counterclaim [ECF 55]. On October 27, 2023, the Grünbaum Heirs answered the Counterclaim. [ECF 60].

On November 24, 2023, the District Court granted AIC's motion to dismiss, determining the AIC was an "innocent purchaser." [ECF 74]. In doing so, the District Court observed that, unlike for innocent purchasers in which the statute of limitations starts when a demand is refused, New York's statute of limitations begins to run against "bad faith possessors at the time of acquisition." [SA-11, n.5]. Because the District Court determined the AIC was an innocent purchaser (a status the Grünbaum Heirs have consistently contested), the District Court found that the cause of action accrued in 2006 with the Grünbaum Heirs' demand and AIC's subsequent refusal, and consequently that the claim was time-barred by 2009.

The Complaint did not include any allegations regarding a 2006 demand and refusal. The District Court erroneously inferred from the correspondence submitted by AIC that a claim to *Russian Prisoner* filed from 2006 to 2009 would have been timely under New York law. [SA-13].

Based on these misguided inferences of timeliness, the District Court held that the Grünbaum Heirs' claim to *Russian Prisoner* was not revived by the HEAR Act under the HEAR Act's exception for claims that could have been brought between 1999 and 2016. The District Court also held that "it is plain that the plaintiffs' claims are barred by laches, as decided in *Bakalar*. Moreover, the plaintiffs are collaterally estopped from relitigating that issue." [SA-20]. The District Court held that the

laches issue "is identical to the issue in *Bakalar*, and that issue was raised, necessarily decided, and material to the decision." [SA-21].

The District Court held that the Grünbaum Heirs "lacked diligence not only with respect to the work in *Bakalar* but also with respect to the collection as a whole – namely Grünbaum's Schieles that went through Mathilde Lukacs and Galerie Gutekunst & Klipstein – which includes the Artwork at issue in this case." [SA-23]. The District Court found that *Bakalar,* not *Reif v. Nagy,* controlled the outcome of this case. [SA-24-25]. The District Court also found the facts in *Reif v. Nagy* to be "completely distinguishable," as David Bakalar and AIC bought the works at issue in the 1960s. Nagy bought artworks in 2013, fully aware of the title issues, and the Grünbaum Heirs made a demand on Nagy in 2015. *Id.*

The District Court denied the Grünbaum Heirs' motion for reconsideration and for leave to file an amended complaint because the "proposed amendments are futile because the amendments fail to cure the deficiencies of the prior complaint and fail to state a claim under Rule 12(b)(6)." [ECF 86; SA-45]. The District Court found that the Grünbaum Heirs "do not adequately allege that the defendant was a bad-faith possessor, such that the plaintiffs' claims would accrue immediately upon possession." [SA-46] The District Court concluded that "all of the allegations in the amended complaint support the idea that the defendant is a good-faith purchaser," noting that the Grünbaum Heirs did not accuse AIC of theft, but "only

18

accuse [AIC] of 'having ignored government warnings …, failing to investigate …, and overlooking … evidence ….'". [SA-37]. The District Court posited that the Grünbaum Heirs failed to cite any case "where courts have interpreted the New York rule to impute bad faith upon current possessors who failed to conduct sufficient due diligence." [SA-37]. The District Court also found that the Grünbaum Heirs "do not allege any new facts that would demonstrate that this action is not barred by collateral estoppel or laches." [SA-47].

The Grünbaum Heirs filed a timely notice of appeal. [ECF 93].

## SUMMARY OF THE ARGUMENT

The crux of this appeal is whether the Grünbaum Heirs sufficiently alleged AIC's "bad faith" acquisition of *Russian Prisoner* in 1966 so as to trigger accrual of New York's statute of limitations, which, in turn, would lead to the claim to *Russian Prisoner* being revived by the HEAR Act of 2016.

There are four bases for reversal of the District Court's opinion. *First*, the District Court's failure to take all well-pleaded allegations as true and to draw all inferences in the Grünbaum Heirs' favor led to several reversible errors: (a) the District Court overlooked and failed to draw inferences favorable to the Grünbaum Heirs' from documentation and eyewitness testimony (available to AIC at the time of its purchase of the Artwork) of Grünbaum's ownership of the Artwork before his murder in a concentration camp; (b) the District Court failed to draw inferences

19

favorable to the Grünbaum Heirs regarding information known or accessible to a sophisticated art institution such as AIC when in 1966 it acquired a work known to have been owned by a well-known murdered Viennese Jew; and (c) these mistakes led the District Court to hold incorrectly that the Grünbaum Heirs' claims were barred as a matter of New York law by the statute of limitations, collateral estoppel and laches.

*Second*, the District Court committed reversible error by failing to apply New York law to the Grünbaum Heirs' claims as the *Erie* Doctrine requires. In *Reif v. Nagy*, the Appellate Division found a group of artworks to be stolen as a matter of law. The District Court then inconsistently found the same artworks to not be stolen. Moreover, the District Court, acting as if it had appellate powers over New York courts, in sweeping language determined all claims (including those successfully pursued in *Reif v. Nagy*) to have been time-barred.

*Third*, the District Court failed to heed the HEAR Act by erroneously placing a new hurdle before Holocaust victims art claimants by requiring them to disprove a possessor's potential statute of limitations defense as a condition of proceeding, contrary to the HEAR Act's plain preemptive language and stated remedial purpose of reviving time-barred claims.

*Fourth,* the District Court mistakenly inferred from a 2006 demand letter that a 2006-2009 claim to *Russian Prisoner* would have been timely.

In opposing AIC's motion to dismiss this action, the Grünbaum Heirs argued that the *Erie* Doctrine required the District Court to respect and follow the Appellate Division's decision in *Reif v. Nagy* denying B*akalar* collateral estoppel effect and rejecting the relevance of any possible testimony from Mathilde Lukacs. Because the District Court's dismissal draws negative inferences against the Grünbaum Heirs with respect to allegations showing AIC's bad faith in 1966, fails to follow under the *Erie* Doctrine the Appellate Division's rulings and findings, and reaches outside the complaint to find a statute of limitations defense contrary to the directive of the HEAR Act, reversal is warranted.

## STANDARD OF REVIEW

Review of a grant of a pre-answer motion to dismiss pursuant to Rule 12(b)(6) is *de novo* "accepting as true all factual claims in the complaint and drawing all reasonable inferences in the plaintiff's favor." *Mhina v. Bank of Am., N.A., Corp.*, No. 23-96-CV, 2023 WL 6873045, at *2 (2d Cir. Oct. 18, 2023). A district court must assume all well-pleaded factual allegations to be true and must "determine whether they plausibly give rise to an entitlement to relief." *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The court's

function is "not to assay the weight of the evidence which might be offered in support" of the complaint, but "merely to assess [its] legal feasibility." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

"A district court's legal conclusions, including its interpretation and application of a statute of limitations, are likewise reviewed *de novo*." *City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011). "Although the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.,* 988 F.3d 127, 131–32 (2d Cir. 2021). *See also Frankel v. Cole*, 313 F. App'x 418, 420 (2d Cir. 2009) (vacating where unclear when cause of action accrued from the face of the complaint). Dismissal on statute of limitations grounds "is appropriate only if a complaint *clearly* shows the claim is out of time." *Harris v. City of New York*, 186 F.3d 243, 250 (2d Cir. 1999) (emphasis added).

"When denial of leave to file a revised pleading is based on a legal interpretation, such as futility, a reviewing court conducts a *de novo* review. A proposed amendment to a complaint is futile when it 'could not withstand a motion to dismiss.'" *Balintulo v. Ford Motor Co.*, 796 F.3d 160, 164–65 (2d Cir. 2015).

## ARGUMENT

I.   **Reversal is Warranted Because the District Court Failed to Draw Inferences Favorable to the Grünbaum Heirs on a Rule 12(b)(6) Pre-Answer Motion to Dismiss**

Reversal is warranted because the District Court failed to take the Grünbaum Heirs' allegations as true and draw all inferences from those allegations in the Grünbaum Heirs' favor, as required. Had it properly weighed the "red flags" in the Complaint consistently with applicable New York law to find AIC's 1966 acquisition to lack good faith, as it should have, the District Court would have found the Grünbaum Heirs' claim to *Russian Prisoner* to be timely. Reversal is warranted also because the District Court failed to properly distinguish the facts in *Bakalar* by drawing inferences favorable to the Grünbaum Heirs. Had it done so, the District Court would not have found the claim to *Russian Prisoner* to have been barred by collateral estoppel.

A court reviewing a motion to dismiss pursuant to Rule 12(b)(6) must accept all factual allegations in the complaint as true and grant all inferences in the non-movant's favor. "[A]t the motion to dismiss stage, Plaintiffs need not prove the allegations in their complaint 'definitively.'" *Sonterra Cap. Master Fund Ltd. v. UBS AG*, 954 F.3d 529, 534–35 (2d Cir. 2020). Moreover, a "fact-specific question cannot be resolved on the pleadings." *Todd v. Exxon Corp.*, 275 F.3d 191, 203 (2d Cir. 2001). The District Court overlooked several key allegations in the Grünbaum

Heirs' Complaint probative of AIC's bad faith in 1966 and drew several inferences in defendant AIC's favor, which erroneously led to the Complaint's dismissal.

### A. The District Court Failed to Weigh Pre-War Evidence of Fritz Grünbaum's Ownership of *Russian Prisoner* Favorably to the Grünbaum Heirs When Determining Whether the Grünbaum Heirs Alleged AIC's Bad Faith Acquisition in 1966

Reversal is warranted because the Grünbaum Heirs alleged facts sufficient to support a finding that AIC acted in bad faith in acquiring *Russian Prisoner* and the District Court failed to draw inferences favorable to the Grünbaum Heirs from these facts. The Grünbaum Heirs' Complaint is not a bare-bones pleading, but one supported by dozens of exhibits and the thorough expert report of Dr. Jonathan Petropoulos [A-51-144], a foremost expert historian on the issue of Nazi theft during World War II whose report was buttressed by numerous original documents. [A-55, A-109 (Petropoulos curriculum vitae)]. The District Court failed to weigh evidence provided in the expert historian's report of Dr. Petropoulos. The Petropoulos Report describes the circumstances regarding AIC's knowing acquisition of the Artwork by a red-flag artist such as Schiele. [A-58, A-72-73]. The District Court failed to address Dr. Petropoulos' evidence that AIC and other museums received government warnings about obtaining artworks coming from Nazi-controlled territories during World War I, and disregards Dr. Petropoulos's conclusion that "persons with even a passing knowledge of Schiele and World War II acquiring Schieles after 1938

without researching provenance did so knowing that the artworks were at substantial risk of being looted." [A-58, A-72-76].

The District Court ignores the plain, undisputed evidence that AIC acquired *Russian Prisoner* notwithstanding that the Artwork's ownership by Fritz Grünbaum – a well known entertainer murdered by the Nazis – was directly disclosed in the 1925 Würthle Gallery Catalogue. AIC does not dispute that Grünbaum owned *Russian Prisoner.* Grünbaum was a well-known collector of Schiele. In 1925, the Würthle Gallery in Vienna displayed 21 artworks from Grünbaum's art collection, including the Artwork, and recorded the participating works in the 1925 Würthle Gallery Catalogue. [A-2201]. In 1928, in the context of Otto Kallir organizing an exhibition commemorating the tenth anniversary of Schiele's death, Kallir visited Grünbaum's apartment to view his collection and corresponded about which works to include. [A-2202-03]. The 1928 correspondence indicates that Grünbaum lent Kallir 21 Schiele drawings and watercolors for the show, including *Russian Prisoner.* [A-2203]. Kallir was thus aware of *Russian Prisoner* being part of Grünbaum's collection. There is no evidence that Grünbaum transferred title to the Artwork before his imprisonment in Dachau.

To discourage traffic in stolen art, New York places the burden of investigating the provenance of a work of art on the potential purchaser. *Solomon R. Guggenheim Found. V. Lubell*, 77 N.Y.2d 311, 320-21 (1991). "A higher standard

25

of good faith applies to merchants and art dealers, and in that context the analysis of whether a party acted in good faith may entail consideration of whether a duty to investigate provenance attaches." *Republic of Turkey v. Christie's Inc.*, 527 F. Supp. 3d 518, 522 (S.D.N.Y. 2021); *see also Davis v. Carroll*, 937 F. Supp. 2d 390, 422–23 (S.D.N.Y. 2013) (citing *Brown v. Mitchell–Innes & Nash, Inc.,* No. 06-CV-7871, 2009 WL 1108526, at *5 (S.D.N.Y. Apr. 24, 2009)); *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 306 (S.D.N.Y. 2011), *aff'd*, 500 F. App'x 6 (2d Cir. 2012) (unlike merchants, ordinary buyers do not have a duty to investigate provenance prior to purchasing an antiquity). To paraphrase the District Court in *Republic of Turkey*, "If Plaintiff[s] [are] correct that [AIC] is subject to the heightened standard, that [it] had a duty to investigate the provenance of the [Artwork], and that [it] failed to do so, then [AIC] would not be a 'good faith purchaser' because the higher standard is part of the good faith inquiry." *Republic of Turkey*, 527 F. Supp. 3d at 522–23.

An "action to recover a chattel or damages for the taking or detaining of a chattel [replevin or conversion] . . . must be commenced within three years," CPLR § 214(3), computed from "the time the cause of action accrued to the time the claim is interposed," CPLR § 203(a).

Determining whether a purchase is made in "good faith" or "bad faith" determines when the statute of limitations accrues. Under New York Law, for a claim of replevin, "[t]he date of accrual depends on whether the current possessor is

26

a good faith purchaser or bad faith possessor." *Swain v. Brown*, 24 N.Y.S.3d 598, 600 (1st Dep't 2016). "An action against a good faith purchaser accrues once the true owner makes a demand and is refused." *Id.* "By contrast, an action against a bad faith possessor begins to run immediately from the time of wrongful possession." *Id.* at 601. For a thief, "the statute of limitations begins to run immediately upon the theft." *Kunstsammlungen Zu Weimar v. Elicofon*, 678 F.2d 1150, 1163 (2d Cir. 1982).

A "bad faith purchaser is treated as a thief for the purposes of the statute of limitations." *Id.*; *see also Grosz v. Museum of Mod. Art*, 772 F. Supp. 2d 473, 481–82 (S.D.N.Y.), *aff'd,* 403 F. App'x 575 (2d Cir. 2010) ("Under New York law, the statute of limitations for conversion and replevin automatically begins to run against a bad faith possessor on the date of the theft or bad faith acquisition—even if the true owner is unaware the chattel is missing"). There is no demand requirement for a bad faith purchaser, unlike for a good faith purchaser. *Id.*

The District Court's erroneous conclusion that AIC was a good faith purchaser under New York law led the District Court to apply the wrong accrual rule. When the District Court rejected the Grünbaum Heirs' motion for leave to amend, the court noted that "the plaintiffs do not allege that they made a demand that the defendant refused in 1966." [SA-46]. The District Court's comment overlooked that under

27

New York law a demand and refusal is not necessary to trigger accrual of a claim based on allegations of bad faith.

In contrast, the Grünbaum Heirs forcefully alleged that AIC was a bad faith purchaser. Indeed, in its opinion, the District Court, while mistakenly failing to apply New York law to the allegations before it, acknowledged the correct accrual rule for a bad faith possessor stating: "[t]hough not applicable to this case, in New York, the statute of limitations begins to run against bad faith possessors at the time of acquisition." [SA-11 n. 5]. Contrary to the District Court's observation, the statute of limitations for bad faith purchasers is clearly applicable here based on the Complaint.

Accepting the well-pleaded allegations in the Complaint as true and taking all inferences in the Grünbaum Heirs' favor, AIC was a bad faith purchaser in 1966. As a sophisticated purchaser under New York law, AIC was obligated to undertake a provenance investigation and failed to do so. Accordingly, the statute of limitations on the Grünbaum Heirs' claims began to run on July 28, 1966, when AIC obtained the Artwork, and ended three years later. As a result, the Grünbaum Heirs' claims were time-barred in 1969. Plaintiffs were not required to demonstrate more at the pleading stage.

In writing that the Grünbaum Heirs cited no case finding that an institution like AIC must conduct due diligence regarding provenance, the District Court erred.

The Grünbaum Heirs cited numerous "red flag" diligence cases. For example, *Bakalar* (cited throughout the Grünbaum Heirs' briefs) states, "under New York law, a *dealer* in art must take reasonable steps to inquire into the title to a painting." 819 F. Supp. 2d at 306 (emphasis in original). The Grünbaum Heirs specifically raised this point to the District Court. *See, e.g.*, ECF 82 (Plaintiffs' Reply Brief in support of Motion for Reconsideration) [A-2452].

New York law imposes a duty on a sophisticated purchaser of artworks, like an art dealer or museum, to investigate suspicious "red flags" to satisfy its obligation of establishing that it is a "good faith" purchaser for value. Because a large number of Schiele's important collectors were murdered Viennese Jews, acquiring a Schiele without a provenance was a "red flag" to a sophisticated museum like AIC. An artwork created decades earlier unaccompanied by a provenance (showing a chain of voluntary transactions) is a "red flag" in ordinary art transactions. *Republic of Turkey*, 527 F. Supp. 3d at 522–23. U.S. government warnings are also red flags. AIC's 1966 acquisition of *Russian Prisoner* was in "bad faith" because the Complaint alleges that AIC knew or should have known of the ample evidence documenting Jewish cabaret performer Fritz Grünbaum's ownership of *Russian Prisoner* prior to the Nazis seizing Grünbaum's art collection while he was in a concentration camp (before murdering him in 1941).

The Complaint's "bad faith" allegation is further supported by the fact that the art dealer Otto Kallir – a key player in the provenance of the Artwork due to his relationship with Grünbaum, who was known to AIC and an important figure in the art scene at the time of AIC's acquisition of the work – knew that *Russian Prisoner* belonged to Grünbaum. Any investigation into the Artwork's provenance in 1966, when AIC acquired the work, would have led AIC to Kallir and thus to Grünbaum's ownership.

In assessing AIC's good faith, the District Court opinion did not discuss or weigh the pre-World War II evidence of Fritz Grünbaum's ownership of *Russian Prisoner* evidenced in the 1925 Würthle Gallery Catalogue in light of New York law denying sophisticated institutions *bona fide* purchaser status where "red flags" exist. AIC's "good faith" is a disputed issue of fact that should not have been resolved on a pre-answer motion to dismiss. Nor did the District Court weigh or discuss the 1928 Grünbaum/Kallir correspondence. The District Court's failure to appropriately weigh this pre-World War II evidence and to draw inferences favorable to the Grünbaum Heirs led, in turn, to erroneous rulings on statutes of limitations, collateral estoppel, and laches.

The allegation that the 1925 Würthle Gallery Catalogue evidenced Grünbaum's ownership of the Artwork is pivotal for two reasons. *First*, it supports the Grünbaum Heirs' allegation that Grünbaum once owned the Artwork, which AIC

does not dispute. This point is key in terms of establishing provenance to *Russian Prisoner* in its own right; but it is important also to distinguish the artwork considered in *Bakalar – Torso* – for which there was no pre-War documentation of Grünbaum's ownership (the determination that Grünbaum once owned *Torso* was solely "based on evidence of his prior ownership of another Schiele work and the testimony of Jane Kallir"). *Bakalar*, 819 F. Supp. 2d at 295. *Second*, the 1925 Catalogue means that Grünbaum's ownership of the Artwork was memorialized in the historical record, such that a researcher investigating the provenance of the Artwork would have been able to trace its ownership to Grünbaum before the war.

Yet, the District Court did not even mention the 1925 Würthle Gallery Catalogue in its opinion. This omission led to erroneous legal conclusions in four ways. *First,* the fact that Grünbaum was the documented owner of *Russian Prisoner* before being sent to a concentration camp supports the Grünbaum Heirs' allegation that the Artwork was stolen by the Nazis (unlike the work in *Bakalar* that was found not to have been stolen by the Nazis). *Second*, the fact that Grünbaum's ownership of the Artwork was documented in print means that a sophisticated party looking into its provenance after the World War II would have learned that it belonged to Grünbaum. *Third,* as Otto Kallir was still alive and involved in the art market in 1966, a sophisticated party looking into a Schiele's provenance should have spoken to him regarding his knowledge of Grünbaum's collection. *Fourth,* AIC's bad faith

represents another key factual distinction from *Bakalar*'s facts, undermining the District Court's conclusion that the issues in the two cases were "identical." [SA-21].

Drawing all inferences in favor of the Grünbaum Heirs, the District Court should have found that the Grünbaum Heirs adequately alleged that: (i) the Artwork was looted by the Nazis; and (ii) AIC, as a sophisticated party, acted in bad faith because it knew or should have known that the Artwork was looted by the Nazis and should have been able to trace its provenance to Grünbaum. Had the District Court taken proper account of these allegations, it would have determined that these important differences distinguish this case from *Bakalar* so that the Grünbaum Heirs should not be collaterally estopped by *Bakalar*; and that because AIC knew or should have known of Grünbaum's ownership in 1966 at the time of acquisition, AIC could not have been prejudiced by any purported delay by the Grünbaum Heirs in bringing their claims.

The HEAR Act revived claims to *Russian Prisoner* because the claims had been time-barred since 1969 (three years after AIC's bad faith 1966 acquisition). The HEAR Act preempts statutes of limitations that created time bars to claims for artworks prior to 1999 and created a new six-year window for Holocaust victims to sue. The "bad faith" allegation is central to determining the accrual of the statute of limitations. Had the District Court credited the Grünbaum Heirs' "bad faith"

allegations, any statutes of limitations barring a claim to ownership of *Russian Prisoner* would have accrued in 1966, would have lapsed in 1969, and thus would be preempted by the HEAR Act. This action alleging AIC's bad faith 1966 acquisition was timely filed on December 15, 2022, within the HEAR Act's statutory window for previously time-barred claims.

### B. The District Court Failed to Weigh U.S. Government Warnings Favorably to Grünbaum's Heirs When Determining Whether Grünbaum's Heirs Alleged AIC's Bad Faith Acquisition in 1966

The District Court committed reversible error by failing to draw reasonable inferences in the Grünbaum Heirs' favor regarding AIC's "bad faith" in 1966 because it failed to appropriately weigh U.S. government warnings to AIC against acquiring potentially Nazi-looted art. In 1947, AIC received a numbered circular from the U.S. State Department warning about collectors acquiring Nazi-looted artworks without a valid provenance between 1933 and 1945. AIC would also have been aware of the London Declaration, which the U.S. State Department distributed to AIC. [A-2222]. It also would have been aware of the Roberts Commission's circulars. [A-58; A-73]. Finally, as one of the leading U.S. cultural institutions, AIC would have seen or read the extensive media reports about the spread of Nazi-looted artworks' and would have been aware that a considerable number of Schiele's collectors were Viennese Jews that were murdered in the Holocaust. [A-2205-06; A-2223].

33

The District Court erroneously found that these allegations were inadequate to allege bad faith on the part of AIC, as the Grünbaum Heirs did not accuse AIC of theft, but "only accuse [AIC] of 'having ignored government warnings . . . , failing to investigate . . . , and overlooking . . . evidence . . . .'" [SA-21]. The District Court found that the Grünbaum Heirs failed to cite any case "where courts have interpreted the New York rule to impute bad faith upon current possessors who failed to conduct sufficient due diligence." [SA-37]. As argued in Point I.A., the Grünbaum Heirs did cite such cases. There is no obligation ot label someone a "thief" or allege "theft." Here, the Grünbaum Heirs adequately alleged bad faith by alleging, as the District Court acknowledged, that AIC ignored government warnings, failed to investigate provenance issues, and overlooked evidence that the Artwork had been stolen by the Nazis.

Contrary to the District Court's understanding, under New York law the Grünbaum Heirs are not required allege that AIC itself stole the Artwork from Grünbaum for AIC to be a bad faith possessor. Under New York law, the Grünbaum Heirs need only allege that AIC failed in its duty to investigate the Artwork's provenance, which they did. *Republic of Turkey*, 527 F. Supp. 3d at 522–23; *Solomon R. Guggenheim Found. V. Lubell*, 77 N.Y.2d at 320-21. Further, it is likely that discovery will show that AIC had actual knowledge of Grünbaum's ownership and his murder at Dachau when it acquired the work in 1966.

Based on the New York cases cited in Part I.A., above, it is clear that, based on the Grünbaum Heirs' allegations and taking all favorable inferences from those allegations, the District Court should have determined AIC was subject to a sophisticated purchaser's higher standard of diligence necessary to prove good faith purchaser status under New York law. AIC is a world-renowned institution with the knowledge, means, and experience both to be aware of provenance issues related to works that passed through Europe during the Holocaust and World War II, particularly Schiele's, and to undertake an investigation that would have uncovered Grünbaum's ownership of the Artwork before his murder in a concentration camp.

### C. When Assessing Collateral Estoppel and Laches, the District Court Overlooked Allegations Distinguishing the *Bakalar* Case

The District Court's failure to grant the Grünbaum Heirs the benefit of reasonable inferences from well-pleaded facts showing marked factual and legal differences between David Bakalar and his *Torso* drawing, on the one hand, and AIC and *Russian Prisoner*, on the other, also led to the District Court's erroneous rulings on collateral estoppel and laches. The District Court mistakenly held that *Bakalar*'s collateral estoppel effect barred the Grünbaum Heirs' claims. The District Court further relied on *Bakalar*'s laches determination to bar the Grünbaum Heirs' claims without examining the circumstances relevant to AIC's acquisition of *Russian Prisoner* in 1966. [SA-20].

The District Court erred because it failed to appropriately defer to the Appellate Division's directly contrary legal conclusion. The Appellate Division found that *Bakalar* did not collaterally estop the Grünbaum Heirs from pursuing claims to Fritz Grünbaum's art collection:

> Collateral estoppel requires the issue to be identical to that determined in the prior proceeding, and requires that the litigant had a full and fair opportunity to litigate the issue. Neither of those requirements has been shown here where the purchaser, the pieces, and the time over which the pieces were held differ significantly. The three works are not part of a collection unified in legal interest such to impute the status of one to another. *Reif v. Nagy*, 175 A.D.3d at 118-19.

In this diversity case, the District Court should have applied New York's law of collateral estoppel as applied by the Appellate Division, rather than substituting its own judgment or a federal standard. The substantive res judicata law of the state in which the federal court sits determines the preclusive effect of the previous dismissal, so the District Court was bound to have applied New York law in determining the issue of res judicata. *Isaly v Boston Globe Media Partners, LLC*, 650 F.Supp 3d 106, 116-17 (S.D.N.Y. 2023), *aff'd*, 23-67-CV, 2023 WL 6439901 (2d Cir Oct. 3, 2023); *Algonquin Power Income Fund v. Christine Falls of N.Y., Inc.*, 362 F. App'x 151, 154 (2d Cir. 2010) ("Because the decision claimed to have preclusive effect was rendered by a district court sitting in diversity, we apply the

preclusion law 'that would be applied by state courts in [New York], the state in which the federal diversity court sits.'").

*Bakalar*'s holding on laches cannot collaterally estop the Grünbaum Heirs' claims as it fails the first hurdle of the collateral estoppel analysis – the issues are not identical. *See Cent. Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) (first element of collateral estoppel analysis is that issues must be identical).[3] First, "of greatest significance" to the *Bakalar* decision on laches was the fact that Mathilde Lukacs had passed away in 1979, as "perhaps the only person who could have elucidated the manner in which she came to possess [*Torso*], or indeed, whether she owned it at all." *Bakalar*, 819 F. Supp. 2d at 306. By contrast, *Reif v. Nagy* found as a matter of New York law that Grünbaum could not have legally transferred title from a concentration camp (to Mathilde Lukacs or anyone else), and that the Artwork was stolen by the Nazis as a matter of law. *See Reif v. Nagy*, 175 A.D.3d at 129.

Further, the *Bakalar* Court found that "Bakalar, as an ordinary non-merchant purchaser of art, had no obligation to investigate the provenance of the Drawing, and this Court will not saddle him with a greater duty than the law requires." *Bakalar*,

---

[3] That the core issues related to the various works the Nazis stole from Grünbaum are distinct is highlighted by the fact that the *Bakalar* Court denied class certification in that case, holding that a class of parties that participated in transactions regarding artworks originating in Grünbaum's collection was unascertainable and did not meet the commonality, typicality, and adequacy prerequisites. *Bakalar v. Vavra*, 237 F.R.D. 59 (S.D.N.Y. 2006)

819 F. Supp. 2d at 306. The Grünbaum Heirs allege that AIC, by contrast, was a sophisticated collector under New York law, subject to a heightened due diligence standard to attain "good faith purchaser" status.

The Complaint alleges "[a]nyone who looked into the provenance of Schieles from this period would know there were issues. As a sophisticated acquirer of art work with superior advance knowledge and warnings of Nazi art looting, Defendant Art Institute stands in a radically different factual position from David Bakalar vis-à-vis any potential laches defense." [A-2210].

With respect to laches, AIC's heightened legal duty as a sophisticated purchaser also supports the conclusion that AIC could not have been prejudiced by any purported delay of a Holocaust victim's family in asserting a claim. If, as alleged, AIC knew or should have known about the Artwork's provenance in 1966, AIC could not have been prejudiced by any delay (unlike Bakalar, who never shared AIC's duty to investigate). In any event, no finding of prejudice, a necessarily factual issue, is appropriate in this case at the motion to dismiss stage.

A complaint cannot be dismissed on laches grounds if the party evoking the defense cannot demonstrate prejudice. *Premier Cap., LLC v. Best Traders, Inc.*, 88 A.D.3d 677, 678 (2d Dept. 2011) ("mere delay alone, without actual prejudice, does not constitute laches"). A "determination that a claim is barred by laches requires a factual inquiry into the reasons for plaintiff's delay and the extent and nature of the

38

prejudice suffered by defendant as a result of that delay. . . . [T]his inquiry is inappropriate on a motion to dismiss." *Deere & Co. v. MTD Prod., Inc.*, No. 00 CIV 5936 LMM, 2001 WL 435613, at *2 (S.D.N.Y. Apr. 30, 2001).

The District Court did not identify any prejudice AIC may have suffered – not even a generic one. The District Court describes how Bakalar was prejudiced, and describes how Nagy was not prejudiced, but fails to analyze how AIC was prejudiced. [SA-5, 22-23 25]. As *Bakalar* explained, laches "is not susceptible to uniform application as the prejudice suffered may vary" across the different parties possessing works stolen from Grünbaum. *Bakalar v. Vavra*, 237 F.R.D. 59, 68 (S.D.N.Y. 2006). It is not the Grünbaum Heirs' burden to demonstrate lack of prejudice at the pleading stage. *Deere & Co.*, 2001 WL 435613, at *2. As a sophisticated art institution, AIC knew or should have known in 1966 that the Artwork was stolen by the Nazis, just as it knows it today. Thus, any delay of the Grünbaum Heirs in bringing a claim for *Russian Prisoner* did not prejudice AIC.

Finally, the *Bakalar* Court inferred from its finding that, in 1956, Mathilde Lukacs possessed *Torso* (the artwork at issue there), that Grünbaum's art collection was *not* looted by the Nazis. *Bakalar*, 819 F. Supp. 2d at 299. However, the District Court overlooked that this finding was not necessary to the Second Circuit's decision in *Bakalar*, which relied exclusively on laches. Because the issue of whether Grünbaum's art collection was stolen was not "necessary" to the decision, it is not

subject to collateral estoppel. Further, the District Court overlooked that, New York courts, consistent with the HEAR Act, had already weighed expert testimony on that point and engaged in extensive factfinding to conclude that artworks, including *Russian Prisoner,* had been stolen from Grünbaum. No principle of res judicata prevents reliance upon new significant evidence. *Lane Bryant, Inc. v. Tax Comm'n of City of New York*, 21 A.D.2d 669, 670 (1st Dept. 1964), *aff'd sub nom. Lane Bryant, Inc. v. Tax Comn. of City of New York*, 19 N.Y.2d 715 (1967). There is significant additional evidence available now that was not available to the *Bakalar* court.

As the Grünbaum Heirs should not be collaterally estopped from litigating laches, this case should move forward to discovery. "[B]ecause laches turns on factual issues, it is ordinarily not a proper defense at the pleading stage." *Connecticut Gen. Life Ins. Co*, 988 F.3d at 134. "The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case. The inquiry is a factual one." *Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994).

## II. Reversal Is Warranted by the *Erie* Doctrine Because the District Court Failed to Follow New York Law Applied By The Appellate Division To Fritz Grünbaum's Stolen Art Collection

On a pre-answer motion to dismiss, the District Court erroneously rejected the Grünbaum Heirs' arguments that the *Erie* Doctrine required deference to the

40

Appellate Division's legal conclusions in *Reif v. Nagy* as applicable to Fritz Grünbaum's stolen art collection. The District Court found that *Bakalar*'s collateral estoppel effect barred the Grünbaum Heirs' claims. In reaching this erroneous finding, the District Court improperly relied on *Bakalar* to conclude that the Nazis did not steal Grünbaum's collection. The District Court then relied on *Bakalar* to conclude that AIC had demonstrated a laches defense based on Mathilde Lukacs' missing testimony, which, in turn, barred the Grünbaum Heirs' claim to *Russian Prisoner*. The District Court concluded that, based on *Bakalar*'s reasoning, Mathilde Lukacs' missing testimony was probative of AIC's laches defense. Because the District Court's reasoning and application of New York law was directly contrary to the Appellate Division's determination of legal questions related to the same facts, it was reversible error.

The *Erie* Doctrine forbids a federal court from ignoring the applicable New York law to get different legal outcomes solely because a litigant removed the case to federal court. Consistent with *Erie*, Grünbaum's art collection cannot be determined in New York State court under New York Law to have been looted by the Nazis and later determined in federal court *not* to have been looted. Consistent with *Erie*, Grünbaum's sister-in-law Mathilde Lukacs' testimony cannot lack probative value as a matter of New York law for laches in New York State court, but be found to be probative on laches in a subsequent proceeding in federal court

involving the same collection. Accordingly, the District Court's findings relating to laches and collateral estoppel, which are directly contrary to *Reif v. Nagy*'s holdings, and thus New York law, should be reversed.

## A. The Appellate Division's Decision in *Reif v. Nagy* Binds the District Court

A federal court sitting in diversity jurisdiction is required to apply state substantive law: "it is well established that the laws of the several States, including to common law, as declared by the highest courts of such States, prevail upon and are enforced in the courts of the United States except where the Constitution, Treaties or Statutes of the United States otherwise require." *In re Washington Square Slum Clearance, Borough of Manhattan, City of New York*, 5 N.Y.2d 300, 314 (1959), *citing Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938). Where a state's high court has not opined on an issue, the federal court must apply the law as interpreted by the state's intermediate appellate court unless the federal court is convinced the high court would decide otherwise. *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940). Not following the Appellate Division "would defeat the purpose of the principle announced by the Supreme Court: to prevent the development of two conflicting systems of law, one to be applied in state court and the other to be applied to those who meet the prerequisites of federal jurisdiction." *Pentech Int'l, Inc. v. Wall St. Clearing Co.*, 983 F.2d 441, 446 (2d Cir. 1993); *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999) ("We are bound, as [is]

the district court, to apply the law as interpreted by New York's intermediate appellate courts . . . unless we find persuasive evidence that the New York Court of Appeals, which has not ruled on th[e] issue, would reach a different conclusion.").

Trial courts throughout the State of New York are bound to apply the law as promulgated by any of the Appellate Division's departments, unless its home department or the Court of Appeals pronounces a contrary rule. *Maple Med., LLP v. Scott*, 191 A.D.3d 81, 90 (2d Dept. 2020), *aff'd sub nom. Columbia Mem'l Hosp. v. Hinds*, 38 N.Y.3d 253 (2022) ("The Appellate Division is a single state-wide court divided into departments for administrative convenience.").

In *Reif v. Nagy*, the Appellate Division made several key conclusions that are now the law of the State of New York. *First,* the Appellate Division held that any person that signed a power of attorney in a concentration camp could not have executed the document voluntarily: regardless of who they granted power to (their spouse or anyone else), and any such power is of no effect when the grantor is in a concentration camp with a gun to his or her head. *Reif v. Nagy*, 175 A.D.3d at 129. This led the Appellate Division to conclude that the Nazis looted Grünbaum's art collection. *Id. Second*, the Appellate Division held that since the power of attorney signed by Grünbaum while in the Dachau Concentration Camp was a product of duress, no subsequent transfer of his art collection could convey legal title. *Id.* Artwork "stolen during World War II still belongs to the original owner, even if

43

there have been several subsequent buyers and even if each of those buyers was completely unaware that she was buying stolen goods." *Id.* at 21-22, citing *Bakalar*, 619 F.3d 136, 141 (2d Cir. 2010). *Third,* the Appellate Division decided that *Bakalar* did not cut off the Grünbaum Heirs' rights under New York law to pursue artworks in the 1956 Kornfeld Catalogue based on collateral estoppel. *Reif v. Nagy*, 175 A.D.3d at 129. *Fourth,* the Appellate Division found that the testimony of Mathilde Lukacs could not possibly have been probative, no matter what she testified, as there is no way she could have shown good title to the artworks. *Id.* at 131. *Fifth*, the Appellate Division found that the artworks in the 1956 Kornfeld Catalogue "were not part of a collection unified in legal interest such that collateral estoppel may be applied offensively against them." *Id.* at 119.

These legal conclusions must be applied not only in the trial courts of New York State; they must be applied by federal courts sitting in diversity jurisdiction when applying New York law. The Appellate Division credited the expert testimony of Dr. Jonathan Petropoulos, Jane Kallir and the testimony of art dealer Eberhard Kornfeld for the proposition that all of the artworks in the 1956 Kornfeld Catalogue belonged to Grünbaum and had been stolen from him. 175 A.D.3d at 120-125. *Russian Prisoner* appears in the 1956 Kornfeld Catalogue and thus was found to have been stolen. *Id.* There is no reason for the District Court to have disregarded the same testimony or reached a different conclusion.

The Grünbaum Heirs are unaware of any evidence casting doubt on any aspect of *Reif v. Nagy*.[4]  The Appellate Division's decision in *Reif v. Nagy* was a 47-page opinion reflecting a unanimous 5-0 decision. Compare *Mountain View Coach Lines, Inc. v. Storms*, 102 A.D.2d 663, 665 (2d Dept. 1984) (mere "conclusory assertion of result" given little precedential value). The New York Court of Appeals denied Nagy's motion for leave to appeal, strengthening the decision's precedential value. *Reif v. Nagy*, 38 N.Y.3d 908 (2022).

## B. The District Court's Failure to Follow the Appellate Division has Undermined the Dual Aims of the *Erie* Doctrine

The *Erie* doctrine has two main aims: "discouragement of forum-shopping and avoidance of inequitable administration of the laws."  *Hanna v. Plumer*, 380 U.S. 460, 468 (1965). "In essence, the intent of [*Erie*] was to insure that, in all cases where a federal court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the federal court should be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court."  *Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 109 (1945). The fact that a litigant files in a federal court rather than the state court down the block should not have an outcome-determinative effect on the litigation. *Id.* Since a case in which a federal court exercises diversity jurisdiction would be heard in state

---

[4] According to Westlaw, the only "negative treatment" *Reif v. Nagy* has received is from the District Court here.

court but for the diversity of the parties, a party should not be able to remove to federal court to gain the advantage of a substantively different application of the law. *See Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 509 (2001). Since the District Court's decisions, there are now two starkly contradictory opinions as to whether *Russian Prisoner* was stolen.

> **1. The District Court's Decision Violates the *Erie* Doctrine Because Grünbaum's Art Collection Cannot Be Stolen in State Court and Not Stolen in Federal Court**

The Appellate Division found conclusively that the Nazis looted Grünbaum's art collection as depicted in the 1956 Kornfeld Catalogue. *Reif v. Nagy*, 175 A.D.3d at 129. The Appellate Division found that the Nazis inventoried Grünbaum's collection, appointed an Aryan Trustee to administer this collection, and executed Grünbaum during the Holocaust. *Id.* at 128. Even if Grünbaum had transferred his property to his wife or Mathilde Lukacs was somehow able to possess the collection, any such transfers would have been invalid as a matter of law as based on a power of attorney signed in a concentration camp. *Id.* at 129.

The District Court reached the opposite legal conclusion to *Reif v. Nagy,* holding that the Grünbaum Heirs were "collaterally estopped from relitigating the finding in *Bakalar* that Grünbaum's Schieles were 'not looted by the Nazis.'" [SA-

17 n. 7].[5]  By relying on *Bakalar* while overlooking *Reif v. Nagy,* the District Court's decision not only creates two different legal regimes; it creates two distinct historical realities. In the courts of New York State, Grünbaum's Schieles were expropriated from Grünbaum by the Nazi regime while he was imprisoned in a concentration camp. Meanwhile, in the Southern District of New York, Grünbaum was somehow able to pass good title to his art collection while imprisoned in Dachau.

In New York State courts, the artworks in the 1956 Kornfeld Catalogue "were not part of a collection unified in legal interest such that collateral estoppel may be applied offensively against them."  *Reif v. Nagy*, 175 A.D.3d at 119. Meanwhile, in the Southern District of New York: "the Artwork in this case and the work in *Bakalar* were both part of a common collection" such that the principles of estoppel can apply. [SA-5].

The inconsistencies continue. In New York State courts, the testimony of Mathilde Lukacs could not possibly have been probative, as there is no way she could have shown good title to the artworks. *Reif v. Nagy*, 175 A.D.3d at 131, *citing Matter of Flamenbaum*, 22 N.Y.3d 962, 966 (2013). Meanwhile, in the Southern District of New York, AIC was prejudiced by the Grünbaum Heirs' delay in bringing their claim because, if she were still alive, "Mathilde Lukacs (Grünbaum's sister-in-

---

[5] In *Bakalar,* the Second Circuit affirmed on laches. The determination of whether or not the Nazis stole the artwork at issue was not necessary to the result. *Bakalar v. Vavra*, 500 F. App'x 6 (2d Cir. 2012).

law) could have spoken to title and the circumstances pursuant to which she obtained the Artwork." [SA-43]. These inconsistencies – different answers depending on what venue is invoked, state versus federal – violate the *Erie* Doctrine.

There is no question that, had AIC not removed this action to federal court, any motion to dismiss would have been decided by a New York court applying *Reif v. Nagy* as controlling precedent. Pursuant to the *Erie* Doctrine, this appeal from the District Court's granting of AIC's motion to dismiss must be decided in light of *Reif v. Nagy*, which is controlling New York precedent. The District Court committed reversible error in failing to follow *Reif v. Nagy*, and the District Court's opinions create a clear rift between its holdings and the established law in New York. This inconsistent application of the law is unacceptable under *Erie* and will encourage further chaos and forum shopping if this Court does not reverse the decision below.

## III. Reversal is Warranted Because Congress Revived Time-Barred Claims When It Passed the HEAR Act

As the Grünbaum Heirs' claim to *Russian Prisoner* was time-barred as of mid-1969, it was revived by the HEAR Act. Despite Congress' explicit intent under the HEAR Act to permit heirs of Holocaust victims to litigate claims regarding stolen property on the merits, the District Court did the opposite, and drew inferences in AIC's favor from a demand letter outside of the pleadings to find a basis to deny the Grünbaum Heirs' claims as untimely. The District Court concluded, "[t]his is plainly

not the type of action that the HEAR Act was drafted to resurrect." [SA-18]. The opposite is true.

## A. The HEAR Act is a Broad Remedial Statute Reviving Otherwise Time-Barred Actions

The explicit purpose of the HEAR Act is to revive untimely claims related to Nazi-looted artworks: "To ensure that claims to artwork and other property stolen or misappropriated by the Nazis are not unfairly barred by statutes of limitations but are resolved in a just and fair manner." HEAR Act §3(2). Congress passed the HEAR Act to allow claimants their day in court to have claims heard on the merits:

> Victims of Nazi persecution and their heirs have taken legal action in the United States to recover Nazi-confiscated art. These lawsuits face significant procedural obstacles partly due to State statutes of limitations, which typically bar claims within some limited number of years from either the date of the loss or the date that the claim should have been discovered. In some cases, this means that the claims expired before World War II even ended. . . . The unique and horrific circumstances of World War II and the Holocaust make statutes of limitations especially burdensome to the victims and their heirs. Those seeking recovery of Nazi-confiscated art must painstakingly piece together their cases from a fragmentary historical record ravaged by persecution, war, and genocide. This costly process often cannot be done within the time constraints imposed by existing law. *Id.* §2(6).

The HEAR Act creates a six-year statute of limitations that starts after the "actual discovery" by the "claimant" of both "the identity and location of the artwork" and "a possessory interest of the claimant in the artwork:"

49

> Notwithstanding any other provision of Federal or State law or any defense at law relating to the passage of time, and except as otherwise provided in this section, a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during the covered period because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant or the agent of the claimant of (1) the identity and location of the artwork or other property; and (2) a possessory interest of the claimant in the artwork or other property."
> *Id.* §5(1).

"Actual discovery" is defined as "knowledge." *Id.* §4(1). That is, the claimant must know of the object and where it is located *and* that he or she has claim to title of the object. Claims to recover an artwork or other property lost due to Nazi persecution are deemed to have been actually discovered on the date of the enactment of the HEAR Act – December 16, 2016 – if the action was already barred by a federal or state statute of limitations, or, if the action was not yet barred by a statute of limitations, at the date of enactment the action. Thus, if a claim was time-barred as of 1999, a party gets six-years from the enactment of the HEAR Act on December 16, 2016 to bring their claim, or until December 15, 2022.

There is an exception built into the HEAR Act. The HEAR Act will not resuscitate a claim barred by a federal or state statute of limitations on the date of enactment, if (1) the claimant or a predecessor-in-interest had the requisite knowledge on or after January 1, 1999, and (2) for six-years after January 1, 1999,

the claim was *not* procedurally time-barred. *Id.* §5(e).[6]  However, as the Senate Judiciary Committed explained, for this exception to apply, "[t]he claimant must have had [] an opportunity to bring a claim that was not time-barred during that six year period."  S. Rep. No. 114-394, at 11 (2016).

The HEAR Act is a broad remedial statute. "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." *Nelson v. HSBC Bank USA*, 87 A.D.3d 995, 998 (2d Dept. 2011). "[T]he term remedial is especially applicable to statutes giving a mode of remedy for a wrong not available or ineffective under the prior system of law."  N.Y. Stat. Law § 35.

Courts applying a broad remedial statute like the HEAR Act must follow a "standard of liberal construction in order to accomplish Congress' objects." *Atchison, Topeka & Santa Fe Ry. Co. v. Buell*, 480 U.S. 557, 562 (1987). That remedial statutes should be "liberally construed to carry out the reforms intended and to promote justice" is statutorily required in New York. N.Y. Stat. Law § 321. Where a law is "procedural and remedial in nature … it should be liberally construed to spread its beneficial effects as widely as possible." *Post v. 120 E. End Ave. Corp.*, 62 N.Y.2d 19, 24 (1984); *see also Matter of New York Cnty. DES Litig.*, 89 N.Y.2d

---

[6] The Act's legislative history suggests that this period started in 1999 because the Washington Conference held in 1998 on Nazi-confiscated art led to increased public knowledge about artworks stolen by the Nazis during the Holocaust. S. Rep. No. 114-394, at 10 (2016).

506, 514 (1997) (noting toxic tort statute of limitations should be construed liberally to effectuate its purpose); *U.S. Bank Nat'l Ass'n v. DLJ Mortg. Cap., Inc.*, 33 N.Y.3d 72, 78 (2019) (remedial statute extending statute of limitations "allows plaintiffs to avoid the harsh consequences of the statute of limitations and have their claims determined on the merits" and explaining "the provision's broad and liberal purpose is not to be frittered away by a narrow construction."). The guidance is clear: courts should look for ways to find that actions commenced pursuant to legislative actions expanding statutes of limitations are timely, not scour pleadings for justifications to find them untimely, as the District Court did.

The Appellate Division, heeding the HEAR Act's directive in *Reif v. Nagy*, concluded its opinion by reflecting on the importance of the HEAR Act and its mission: "We are informed by the intent and provisions of the HEAR Act which highlights the context in which plaintiffs, who lost their rightful property during World War II, bear the burden of proving superior title to specific property in an action under the traditional principles of New York law. We also note that New York has a strong public policy to ensure that the state does not become a haven for trafficking in stolen cultural property, or permitting thieves to obtain and pass along legal title." 175 A.D.3d at 132. As argued below, had the District Court applied the HEAR Act, as the Appellate Division did in *Reif v. Nagy*, it would have found that the Grünbaum Heirs' claims were timely.

## B. The Grünbaum Heirs' Claims Were Time-Barred By Mid-1969 and Thus Saved By The HEAR Act

The Grünbaum Heirs' claims are timely under the HEAR Act because, as set forth in Point I, the Grünbaum Heirs' claim to *Russian Prisoner* was time-barred prior to 1999. Since AIC was a bad faith purchaser, the Grünbaum Heirs' claims were time barred three years after acquisition, or in 1969. Thus, as before the enactment of the HEAR Act, the Grünbaum Heirs had knowledge of their claim and that claim was barred by a federal or state statute of limitations (*i.e.*, New York's statute of limitations for claims against bad faith purchasers), the Grünbaum Heirs had six years from December 16, 2016, or to December 15, 2022, to bring their claims. The HEAR Act's exception does not apply because the Grünbaum Heirs' claim would not have been timely for a six year period between January 1, 1999 and the passage of the HEAR Act. This is so, because the claim to *Russian Prisoner* would have been deemed untimely if filed following the demand and refusal in 2006. The Grünbaum Heirs filed their complaint in this action in New York Supreme Court, New York County on December 14, 2022, so the action is timely under the HEAR Act.

## C. The District Court Mistakenly Inferred From A 2006 Demand That A 2006 Claim To *Russian Prisoner* Would Have Been Timely

The District Court's finding that the Grünbaum Heirs' claims would have been timely in 2006 (and are therefore time-barred) is contrary to the record and the

allegations of the Complaint, and it was reached only by drawing inferences in AIC's favor. It should be reversed.

The District Court erred by requiring the Grünbaum Heirs to disprove AIC's unpleaded statute of limitations defense, which was not based on facts pleaded in the Complaint, but based on legally irrelevant materials appended to AIC's motion to dismiss. In doing so, the District Court set up a new procedural hurdle for Holocaust victims claiming artwork that is inconsistent with the HEAR Act's plain language and public policy. Drawing inferences in favor of a defendant to make a plaintiff overcome a statute of limitations defense at the pleading stage is counter to the directive of the HEAR Act, a federal statute explicitly crafted to preempt statutory time bars and to revive and permit factfinding of claims previously time-barred under state law. Because AIC's 1966 acquisition of *Russian Prisoner* was alleged to be in bad faith, the Grünbaum Heirs' claims were time-barred by mid-1969 under New York law. Congress revived such time-barred claims and preempted shorter state statutes of limitations when it passed the HEAR Act, which created a new six-year statute of limitations, starting from December 15, 2016, for previously time-barred claims. Accordingly, the Grünbaum Heirs' claims were timely commenced.

Overlooking all of the allegations of bad faith discussed above, the District Court inferred that the Grünbaum Heirs' claim to *Russian Prisoner* would have been timely in 2006 from an exhibit to AIC's motion to dismiss. The exhibit showed that

in 2006, counsel for Fischer and Vavra demanded the return of multiple works from Grünbaum's collection, with one, *Russian Prisoner,* held by AIC. [ECF 32-3; 32-4]. The Complaint made no allegation whatever regarding this 2006 demand and refusal.

Whether or not the Grünbaum Heirs' made a demand in 2006 speaks nothing as to whether the demand was timely or whether or not the Grünbaum Heirs could have brought a timely claim to *Russian Prisoner* in 2006. *See, e.g.*, *Swain*, 135 A.D.3d at 630-31 (1st Dept. 2016) (applying bad faith statute of limitations despite demand and refusal). Indeed, according to *Swain,* had the Grünbaum Heirs filed this lawsuit between 2006 and 2009 in New York, a court applying New York law would have found that AIC acquired the work in 1966 as a bad faith purchaser and thus that the claim to *Russian Prisoner* was time-barred. The District Court undertook no analysis to demonstrate that this action would have been timely if filed between 2006 and 2009 and failed to draw inferences favorable to the Grünbaum Heirs. The District Court could not have determined an action filed in these years to have been timely based entirely on the pleadings. Instead, the District Court erroneously drew an inference against the Grünbaum Heirs, and in favor of AIC, that the demand letter was timely and that the statute of limitations had not already run under New York law. This constitutes reversible error.

The District Court's erroneous inference from the legally irrelevant 2006 demand caused the District Court to commit the further error of concluding that the Grünbaum Heirs' claims fell under the "narrow exception in the HEAR Act." [SA-14]. AIC's argument (adopted by the District Court), was that AIC was a good faith purchaser and thus the statute of limitations started to run when AIC refused the Grünbaum Heirs' 2006 demand to return the Artwork. [SA-30]. The Grünbaum Heirs made no allegation whatsoever regarding this 2006 demand and refusal, but a copy of the demand letter and refusal was appended as an exhibit to AIC's motion to dismiss. [ECF 32-3]. That the 2006 demand was made by the Grünbaum Heirs is irrelevant to the question of when the statute of limitations for replevin and conversion commenced under New York law, because the existence of a 2006 demand and refusal reveals nothing about AIC's bad faith in 1966. Whatever the Grünbaum Heirs might have thought was the case when they made a demand in 2006 is not probative of whether the claim was actually timely in 2006.

Only by improperly finding inferences in favor of AIC was the District Court able to find (i) that AIC was a good faith purchaser and (ii) that the Grünbaum Heirs' claims against AIC were time-barred by the statute of limitations. At the very least, there is a question of fact as to whether the Grünbaum Heirs' claims are timely under the HEAR Act and that should have led to AIC's motion to dismiss being denied.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court should be reversed.

Dated: New York, New York
     May 28, 2024

                    Respectfully submitted,

                    **DUNNINGTON BARTHOLOW & MILLER LLP**

                    *Attorneys for Plaintiffs*

                  By: _/s/Raymond J. Dowd_____
                        Raymond J. Dowd
                        Claudia G. Jaffe
                        Jeffrey F. Kinkle
                        230 Park Avenue, 21st Floor
                        New York, New York 10169
                        Telephone: 212-682-8811
                        Facsimile: 212-661-7769
                        rdowd@dunnington.com
                        cjaffe@dunnington.com
                        jkinkle@dunnington.com

                        Dennis E. Glazer
                        15 Kensington Road
                        Bronxville, NY 10708
                        Tel: (914) 450-4960
                        dennis.e.glazer@gmail.com

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(i), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,765 words and uses a proportionally spaced typeface.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word with Times New Roman 14 pt font.

Dated: New York, New York
        May 28, 2024

Respectfully submitted,

**DUNNINGTON BARTHOLOW & MILLER LLP**

*Attorneys for Plaintiffs*

By: /s/Raymond J. Dowd_____
        Raymond J. Dowd
        Claudia G. Jaffe
        Jeffrey F. Kinkle
        230 Park Avenue, 21st Floor
        New York, New York 10169
        Telephone: 212-682-8811
        Facsimile: 212-661-7769
        rdowd@dunnington.com
        cjaffe@dunnington.com

jkinkle@dunnington.com

Dennis E. Glazer
15 Kensington Road
Bronxville, NY 10708
Tel: (914) 450-4960
dennis.e.glazer@gmail.com

SPECIAL APPENDIX

i

## TABLE OF CONTENTS
## SPECIAL APPENDIX

**Page**

Opinion and Order, filed November 24, 2023 ...........   SA-1

Memorandum Opinion and Order, filed
   February 28, 2024 .................................................   SA-29

Clerk's Judgment, filed March 19, 2024....................   SA-49

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TIMOTHY REIF, ET AL.,

                **Plaintiffs,**

    - against -

THE ART INSTITUTE OF CHICAGO,

                **Defendant,**

AN ARTWORK, RUSSIAN PRISONER OF WAR
(1916) BY THE ARTIST EGON SCHIELE,

                **Defendant-in-Rem.**

---

23-cv-2443 (JGK)

OPINION AND ORDER

**JOHN G. KOELTL, District Judge:**

    The plaintiffs Timothy Reif, David Fraenkel, and Milos Vavra -- the heirs of Franz Freidrich ("Fritz") Grünbaum -- brought this diversity action against the Art Institute of Chicago ("the defendant"). The plaintiffs assert claims for declaratory judgment, conversion, and replevin, arising out of the alleged theft of Russian Prisoner of War (1916) created by Egon Schiele ("the Artwork").[1] The Artwork was allegedly stolen from Grünbaum by the Nazi regime while Grünbaum was imprisoned in the Dachau Concentration Camp.

    The plaintiffs originally filed this action in New York State Supreme Court, New York County, on December 14, 2022. Am. Compl. ¶ 29, ECF No. 15. The action was removed to this Court based on diversity of citizenship jurisdiction on March 22,

---

[1] Russian Prisoner of War (1916) is a drawing with watercolor, with another black-and-white drawing on its recto (back). Am. Compl. ¶¶ 1-2, ECF No. 15.

SA-2

2023. ECF No. 1.[2] The plaintiffs filed an amended complaint on March 31, 2023. ECF No. 15. The defendant filed a motion to dismiss the amended complaint on June 8, 2023, arguing that the plaintiffs' claims were barred by the statute of limitations and laches. Def.'s Mot. to Dismiss, ECF No. 31. The plaintiffs filed a cross-motion for summary judgment on June 29, 2023. ECF No. 35.

For the reasons set forth below, the defendant's motion to dismiss the amended complaint is **granted**, and the plaintiffs' cross-motion for summary judgment is **denied** without prejudice.

## I.

Unless otherwise indicated, the following facts are taken from the amended complaint and are accepted as true for purposes of deciding the defendant's motion to dismiss.

Fritz Grünbaum was a Jewish Viennese cabaret performer, Am. Compl. ¶ 11, who had a collection of works by Austrian expressionist artist Egon Schiele, id. ¶ 71. The plaintiffs, Grünbaum's heirs, allege that Grünbaum involuntarily lost his collection prior to his death. Id. ¶ 41. Grünbaum was arrested by the Gestapo on March 22, 1938, and imprisoned in the Dachau

---

[2] Reif is a citizen of the State of New York. Fraenkel is a citizen of the State of Florida. Vavra is a citizen of the Czech Republic. The Art Institute of Chicago is a not-for-profit corporation organized under the laws of the State of Illinois with its principal place of business in Chicago, Illinois, and is a citizen of the State of Illinois. Notice of Removal at 2, ECF No. 1; Am. Compl. ¶¶ 13-16.

SA-3

Concentration Camp. Id. ¶ 11. On April 27, 1938, the Nazi regime passed a law requiring Jews with property valued over 5,000 Reichsmarks to declare and forfeit their property to the regime. Id. ¶ 32. On July 16, 1938, in the Dachau Concentration Camp, Nazis allegedly forced Grünbaum under duress to sign a power of attorney permitting his wife Elisabeth to liquidate his assets and hand the proceeds over to the regime. Id. ¶ 34. As a result, from 1938 to 1939, Elisabeth was forced to liquidate Grünbaum's assets. Id. ¶ 36. Among these assets were eighty-one works by Schiele, which were inventoried by a Nazi-controlled auction house that sold art seized from Jews. Id. ¶¶ 68-69, 71. Grünbaum was murdered in Dachau on January 14, 1941. Id. ¶ 11. On Grünbaum's death, both Elisabeth and a Vienna notary certified that Grünbaum had no property. Id. ¶ 37. On October 5, 1942, Elisabeth was deported to the Maly Trostinec death camp in Minsk, where she was murdered. Id. ¶ 38. Fritz and Elisabeth Grünbaum had separate property under Austrian law, and Elisabeth's June 1939 Jewish Property Declaration shows that all her property had been taken by the Nazi regime before she was murdered. Id. ¶¶ 39-40.

The plaintiffs allege that, in 1999, Leon Fischer and Milos Vavra first learned that Grünbaum's art collection survived World War II, when District Attorney Robert Morgenthau seized Grünbaum's Dead City III by Schiele at the Museum of Modern Art

in New York City. Id. ¶ 47. Upon learning of the existence of
Grünbaum's art collection, Fischer and Vavra began to pursue it.
Id. ¶ 50. In 2002, Fischer and Vavra were each declared an heir
of Fritz Grünbaum's estate entitled to an undivided, fifty-
percent (50%) share, pursuant to a Certificate of Heirship
issued by the District Court Innere Stadt Vienna. Id. ¶ 46.

In 2005, Fischer and Vavra were sued by David Bakalar, who
sought to extinguish their rights in Seated Woman with Bent Left
Leg (Torso), a Schiele drawing that Bakalar purchased in 1964.
Id. ¶¶ 92-93, 106. After a bench trial, a court in this District
applying Swiss law initially awarded judgment to Bakalar.
Bakalar v. Vavra, No. 05-cv-3037, 2008 WL 4067335 (S.D.N.Y.
Sept. 2, 2008). The Court of Appeals for the Second Circuit
vacated the judgment and remanded, holding that New York law,
rather than Swiss law, should be applied. Bakalar v. Vavra, 619
F.3d 136 (2d Cir. 2010). On remand, the district court found
that "Bakalar c[ould] not establish by a preponderance of the
evidence that Grunbaum voluntarily relinquished possession of
the [d]rawing, or that he did so intending to pass title."[3]
Bakalar v. Vavra, 819 F. Supp. 2d 293, 300 (S.D.N.Y. 2011). The
court also found that Bakalar did not satisfy his burden of
proving that Mathilde Lukacs -- Grünbaum's sister-in-law who

---

[3] Unless otherwise noted, this Opinion and Order omits all internal
alterations, citations, footnotes, and quotation marks in quoted text.

sold the drawing to Gallery Gutekunst & Klipstein in 1956 --
acquired valid title in the drawing. See id. at 295, 299-302.
However, the court held that Fischer and Vavra's "claims against
Bakalar [we]re barred by laches" because they or their ancestors
knew or should have known about a potential claim, and Bakalar
was prejudiced by their delay. Id. at 304-07. The Court of
Appeals for the Second Circuit affirmed the judgment in favor of
Bakalar, holding that "there [wa]s no clear error in the
findings that Vavra and Fischer's ancestors knew or should have
known of a potential claim to the [d]rawing, that they took no
action in pursuing it, and that Bakalar was prejudiced in this
litigation as a result of that delay." Bakalar v. Vavra, 500 F.
App'x 6, 9 (2d Cir. 2012).

On January 24, 2006, as part of the Bakalar litigation,
Fischer and Vavra made a demand on the Art Institute of Chicago,
the defendant in this case, to return Russian Prisoner of War,
the Artwork at issue in this case. Lonergan Decl., Ex. C, ECF
No. 32-3; Oral Arg. Tr. at 29:18-21, ECF No. 72 ("Tr."). This
was because the Artwork in this case and the work in Bakalar
were both part of a common collection -- Grünbaum's Schieles
sold by Mathilde Lukacs to Gallery Gutekunst & Klipstein in 1956
-- before they were eventually sold to Bakalar and the defendant
in this case in the 1960s. Bakalar, 819 F. Supp. 2d at 295; Am.
Compl. ¶¶ 23, 87, 102, 155, 162. On February 3, 2006, the

defendant declined to return the Artwork. Lonergan Decl., Ex. D, ECF No. 32-4.

In February 2012, Fischer appointed Reif and Fraenkel as executors of his estate in a last will and testament. Am. Compl. ¶ 48. Fischer created the Leon Fischer Trust for the Life and Work of Fritz Grünbaum, id. ¶ 52, of which Reif and Fraenkel are co-trustees, id. ¶ 53. Fischer died in August 2013. Id. ¶ 49.

In November 2015, Reif, Fraenkel, and Vavra filed an action in New York State Supreme Court, New York County, against London art dealer Richard Nagy and Richard Nagy Ltd. for two other Schiele works, titled Woman Hiding Her Face and Woman in Black Pinafore. Id. ¶ 124. Although the two works in Nagy were part of the same collection of Grünbaum's Schieles that included the work at issue in Bakalar and the Artwork at issue in this case, Reif v. Nagy, 80 N.Y.S.3d 629, 631 (Sup. Ct. 2018); Am. Compl. ¶¶ 23, 87, 102, the Nagy defendants purchased the two Schiele works in December 2013, Nagy, 80 N.Y.S.3d at 631. The New York State Supreme Court granted summary judgment to the plaintiffs on the plaintiffs' replevin and conversion claims, holding that the defendants' "statute of limitations and laches defenses fail[ed]." Id. at 635. The Appellate Division affirmed, holding that the Nagy defendants, having acquired the works at issue in 2013, "suffered no change in position[,] [n]or was any evidence lost between defendants' acquisition and plaintiffs' demand for

SA-7

the return of the [a]rtworks." <u>Reif v. Nagy</u>, 106 N.Y.S.3d 5, 22
(App. Div. 2019). In fact, "Nagy was on notice of plaintiffs'
claims to the Grunbaum collection prior to the purchase, as he
filed a brief in the Bakalar action[,] . . . purchased the
[a]rtworks at a substantial discount from the price sought by
Sotheby's prior to the claim being publicized, and . . .
obtained insurance for the very purpose of insuring title
against plaintiffs' claims." <u>Id.</u> at 22-23.

**II.**

The defendant moves to dismiss the plaintiffs' claims
pursuant to Federal Rule of Civil Procedure 12(b)(6).

In deciding a Rule 12(b)(6) motion to dismiss for failure to
state a claim, the Court must accept the allegations in the
complaint as true and draw all reasonable inferences in the
plaintiff's favor. <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d
184, 191 (2d Cir. 2007). The Court's function on a motion to
dismiss is "not to weigh the evidence that might be presented at
a trial but merely to determine whether the complaint itself is
legally sufficient." <u>Goldman v. Belden</u>, 754 F.2d 1059, 1067 (2d
Cir. 1985). To survive a motion to dismiss, the plaintiff's
complaint "must contain sufficient factual matter, accepted as
true, to state a claim for relief that is plausible on its face."
<u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). "A claim has facial
plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss, the Court may consider documents attached to or referenced in the complaint, documents that the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. See Taylor v. Vt. Dep't of Educ., 313 F.3d 768, 776 (2d Cir. 2002); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). In particular, courts may take judicial notice of court documents and other public records. See Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras, No. 98-cv-3099, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001) (taking judicial notice of "relevant pleadings, motion papers, orders, and judgments in [a] [separate] [c]ourt [a]ction" in resolving a Rule 12(b)(6) motion to dismiss). The purpose of taking judicial notice of such documents is to determine what statements the documents contained, not to establish the truth of the matters asserted therein. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); Kramer, 937 F.2d at 774 ("[C]ourts routinely take

judicial notice of documents filed in other courts . . . to establish the fact of such litigation and related filings.").

### III.

In this case, the defendant argues that the plaintiffs' amended complaint must be dismissed pursuant to Rule 12(b)(6) because the claims are barred by the statute of limitations and laches. "[B]ecause the defendant[] bear[s] the burden of establishing the expiration of the statute of limitations as an affirmative defense, a pre-answer motion to dismiss on this ground may be granted only if it is clear on the face of the complaint that the statute of limitations has run." Fargas v. Cincinnati Mach., LLC, 986 F. Supp. 2d 420, 427 (S.D.N.Y. 2013). A court may grant a motion to dismiss based on an affirmative defense such as laches where "the complaint itself establish[es] the circumstances required as a predicate to a finding that the affirmative defense applies." In re Sept. 11 Prop. Damage & Bus. Loss Litig., 481 F. Supp. 2d 253, 258 (S.D.N.Y. 2007). The Court addresses the statute of limitations and laches in turn.

### A. Statute of Limitations

#### 1. Applicable Law

A preliminary question is what law governs the statute of limitations in this case. The parties raise various arguments, citing both New York and Illinois laws. "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in

9

SA-10

New York must apply the New York . . . statutes of limitations." Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015). As a result, this Court, which sits in New York and hears this action brought in diversity, must apply the New York laws on statutes of limitations.

### 2. New York Statute of Limitations

Applying the New York laws on the statute of limitations, the plaintiffs' claims against the defendant are time-barred.

The defendant argues that the New York statute of limitations for conversion and replevin should apply, namely the three-year statute of limitations in N.Y. C.P.L.R. § 214(3). See Def.'s Mot. to Dismiss at 11. The plaintiffs argue that a longer Illinois statute of limitations should apply. See Pls.' Opp'n at 4, ECF No. 38. New York has a specific statutory provision that applies to a claim that accrues outside New York, namely N.Y. C.P.L.R. § 202, and that provision must be applied in this diversity action. See Thea, 807 F.3d at 497. N.Y. C.P.L.R. § 202 provides: "An action based upon a cause of action accruing without [New York] cannot be commenced after the expiration of the time limited by the laws of either [New York] or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of [New York] the time limited by the laws of [New York] shall apply." In other words, "when a nonresident plaintiff sues upon a cause

SA-11

of action that arose outside of New York, the court must apply the _shorter_ limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued."[4] _Thea_, 807 F.3d at 497 (emphasis added).

This cause of action accrued in Illinois, where the defendant refused the plaintiffs' demand to return the Artwork. In diversity cases, state law governs not only the limitations period but also the commencement of the statute of limitations. _See_ _Cantor Fitzgerald Inc. v. Lutnick_, 313 F.3d 704, 709 (2d Cir. 2002). In New York, the statute of limitations on conversion and replevin claims accrues -- against innocent purchasers[5] -- when there is a demand and refusal. _See_ _Grosz v. Museum of Mod. Art_, 772 F. Supp. 2d 473, 482 (S.D.N.Y. 2010), _aff'd_, 403 F. App'x 575 (2d Cir. 2010). It follows that conversion and replevin claims also accrue _where_ the demand is refused. _See_, _e.g._, _Kunstsammlungen Zu Weimar v. Elicofon_, 678 F.2d 1150, 1152-53, 1160-61 (2d Cir. 1982) (applying N.Y. C.P.L.R. § 214(3) -- indicating that the conversion and replevin

---

[4] As applicable to this case, where the New York statute of limitations is shorter than the statute of limitations of the state where the cause of action accrued, the result is the same whether the plaintiffs are New York residents or not: the New York statute of limitations applies.

[5] Though not applicable to this case, in New York, the statute of limitations begins to run against bad faith possessors at the time of acquisition. _See_ _Grosz v. Museum of Mod. Art_, 772 F. Supp. 2d 473, 481-82 (S.D.N.Y. 2010) (citing _Close-Barzin v. Christie's, Inc._, 857 N.Y.S.2d 545 (App. Div. 2008)), _aff'd_, 403 F. App'x 575 (2d Cir. 2010).

claim accrued in New York -- where the defendant refused the demand in New York). Conversion and replevin claims are distinguishable from claims for damages, in which claims arise where the plaintiff sustains the economic impact of the loss, often where the plaintiff resides. See Thea, 807 F.3d at 498. Indeed, the plaintiffs in this case seek the return of the Artwork, rather than damages. See Am. Compl. ¶ 1. Therefore, the shorter statute of limitations of either New York or Illinois -- where the plaintiffs' claims accrued -- must apply.

The New York statute of limitations for the plaintiffs' claims is three years from the date of accrual. See Wallace Wood Properties v. Wood, 117 F. Supp. 3d 493, 497 (S.D.N.Y. 2015), aff'd, 669 F. App'x 33 (2d Cir. 2016) (for conversion and replevin); Grosz, 772 F. Supp. 2d at 481 (for declaratory judgment based on conversion and replevin). The Illinois statute of limitations is five years from the date of accrual, see 735 Ill. Comp. Stat. Ann. 5/13-205, also upon refusal of a demand, see First Illini Bank v. Wittek Indus., Inc., 634 N.E.2d 762, 763 (Ill. App. Ct. 1994) (citing Solomon R. Guggenheim Found. v. Lubell, 569 N.E.2d 426 (N.Y. 1991)). Thus, the statute of limitations applicable to this case is the shorter, New York statute of limitations: three years after the accrual of the plaintiffs' claims.

The plaintiffs brought this action more than three years after their claims accrued. In New York, the three-year statute of limitations begins to run after the plaintiff has demanded return of the chattel and such demand has been refused. See Grosz, 772 F. Supp. 2d at 481-82; Lubell, 569 N.E.2d at 429-30; Howard Univ. v. Borders, 588 F. Supp. 3d 457, 468 (S.D.N.Y. 2022). In this case, the plaintiffs' claims accrued and the statute of limitations began to run on February 3, 2006, when the defendant refused by email to return the Artwork during the Bakalar litigation. See Lonergan Decl., Ex. D. The statute of limitations expired three years later, on February 3, 2009, long before the plaintiffs brought this action in New York state court in December 2022. Accordingly, the plaintiffs' claims are time-barred under New York's statute of limitations.

### 3. HEAR Act: Statute of Limitations

The Holocaust Expropriated Art Recovery Act Of 2016 ("HEAR Act") does not save the plaintiffs' time-barred claims.

By way of background, Congress enacted the HEAR Act in 2016 to "remedy th[e] injustice" that is "the unique and horrific circumstances of World War II and the Holocaust[.]" S. Rep. No. 114-394, at 5 (2016). More specifically, Congress sought to address "[s]tate statutes of limitations[,] [which] can be an unfair impediment to the victims and their heirs[.]" Id. Accordingly, the HEAR Act facilitates the return of Nazi-stolen

13

artwork to Holocaust victims, heirs, and their survivors by preempting state statutes of limitations and imposing a uniform nationwide six-year statute of limitations. See HEAR Act, Pub. L. No. 114-308, § 5(a), 130 Stat. 1524, 1526 (2016) ("a civil claim or cause of action against a defendant to recover any artwork or other property that was lost during [the period between 1933 and 1945] because of Nazi persecution may be commenced not later than 6 years after the actual discovery by the claimant . . . ."). Generally, the HEAR Act revives causes of action, which may otherwise have been time-barred, for six years after the Holocaust victim, heir, or survivor first learns of the existence of the Nazi-stolen artwork.

However, Congress did not intend to revive claims where the parties had a reasonable opportunity to bring their claims but failed to do so. One of the stated purposes of the HEAR Act is to ensure that claims to recover art lost in the Holocaust are "resolved in a just and fair manner." HEAR Act § 3(2). To allow potential claimants to wait indefinitely to bring a claim would be neither just nor fair. Thus, Congress carved out a narrow exception in the HEAR Act. The Act provides, in relevant part:

> (e) EXCEPTION.—Subsection (a) shall not apply to any civil claim or cause of action barred on the day before the date of enactment of this Act [i.e. December 16, 2016] by a Federal or State statute of limitations if—
> (1) the claimant or a predecessor-in-interest of the claimant had knowledge of the elements set forth in subsection (a) on or after January 1, 1999; and

14

(2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

HEAR Act § 5(e). The Senate Judiciary Committee Report for the HEAR Act explains:

Subsection (e) states that claims do not benefit from the HEAR Act limitations period if the claimant had the relevant actual knowledge on or after January 1, 1999, not less than six years have passed from the date the claimant . . . had such knowledge, <u>during any portion of that time the claim was timely</u> and, nonetheless, the claimant failed to bring it.

S. Rep. No. 114-394, at 10 (emphasis added). <u>See also Zuckerman v. Metro. Museum of Art</u>, 928 F.3d 186, 196-97 (2d Cir. 2019) (relying on this Senate Report to interpret the HEAR Act). In other words, the HEAR Act does not revive causes of action where the potential claimant or a predecessor-in-interest knew about a possible cause of action after 1999,[6] could have brought a timely claim, but waited more than six years to bring a claim. This exception is clearly aligned with Congress's intent to "quiet[] title in property generally" and ensure "that claimants assert their rights in a timely fashion." S. Rep. No. 114-394, at 10.

---

[6] The effect of having the operative year be 1999 is that Holocaust victims, heirs, and survivors are not penalized for having a predecessor-in-interest who knew about a possible claim but could not act on their knowledge due to the political climate in Europe through the 1990s. Put differently, the HEAR Act specifically addresses the plaintiffs' appeal that "[u]ntil at least the fall of the Iron Curtain in 1991, a line of Grünbaum's heirs were in Czechoslovakia, a totalitarian Communist State that did not recognize private property and where Jewish persons with private wealth would be in danger of expropriation and persecution." Am. Compl. ¶ 45.

The plaintiffs' claims fall squarely within the exception of the HEAR Act. The plaintiffs' claims were time-barred on February 3, 2009 -- years before December 15, 2016, the day before the date of enactment of the HEAR Act -- by the New York statute of limitations. See HEAR Act § 5(e). Also, the plaintiffs had knowledge of the elements set forth in subsection 5(a) of the Act -- the identity and location of the Artwork (Russian Prisoner of War at the Art Institute of Chicago) as well as a possessory interest of the plaintiffs in the Artwork (prompting their demand email) -- on February 3, 2006, which was "on or after January 1, 1999." Lonergan Decl., Exs. C-D; see also HEAR Act § 5(e)(1). Finally, over nine years -- that is, "not less than 6 years" -- had passed between the date the plaintiffs acquired such knowledge (a date no later than February 3, 2006) and December 15, 2016. See HEAR Act § 5(e)(2).

Reading the HEAR Act as the Senate Report instructs, the plaintiffs' claims did not have to be timely for the entire six-year period, see S. Rep. No. 114-394, at 10 ("during any portion of that time the claim was timely"), as long as "[t]he claimant . . . had . . . an opportunity to bring a claim that was not time-barred during that six year period[,]" id. at 11. In fact, the Senate Report explicitly addresses the situation that the plaintiffs find themselves in: "[I]f the relevant conditions are met and the claim arose after 1999; the applicable limitations

16

period was three years; and three years elapsed before the HEAR Act was enacted, the claim would fall under the 5(e) exception." Id. As the Senate Report demonstrates, the plaintiffs' claims fall under the 5(e) exception because: the claims arose after 1999 (namely, on February 3, 2006); the applicable limitations period was three years (the New York statute of limitations); and three years elapsed on February 3, 2009, before the HEAR Act was enacted on December 16, 2016. Indeed, this is consistent with the Senate Report's explanation that "[t]he six year period in subsection 5(e) reflects [the six-year period] in subsection 5(a), but it is not intended to extend shorter limitations periods that came and went prior to the enactment of the HEAR Act." S. Rep. No. 114-394, at 11.[7]

The plaintiffs argue that "[b]ecause the Grünbaum Heirs' claims were time-barred prior to January 1, 1999 and because the Grünbaum Heirs did not acquire a possessory interest under Austrian law until 2002, the Grünbaum Heirs' claims do not fall under the HEAR Act's exception[.]" Pls.' Opp'n at 47. However, the plaintiffs have simply confused the undisputed facts. The plaintiffs were indeed given rights in 2002 under Austrian law as heirs of the Grünbaum estate. Thereafter, they made a demand

---

[7] It is unnecessary to reach the defendant's additional argument that the plaintiffs' claims fall outside the scope of the HEAR Act, see HEAR Act § 5(a), because the plaintiffs are collaterally estopped from relitigating the finding in Bakalar that Grünbaum's Schieles were "not looted by the Nazis[,]" 819 F. Supp. 2d 293, 299 (S.D.N.Y. 2011).

for the return of the Artwork in February 2006, which was refused, and the statue of limitations then began to run under New York law. For the following three years -- until February 2009 -- they could have brought a timely claim in New York for the return of the Artwork. But they failed to do so. Indeed, they failed to bring a claim for more than six years. This period of time was after 1999 and was prior to the enactment of the HEAR Act. This is plainly not the type of action that the HEAR Act was drafted to resurrect. As a result, the plaintiffs cannot and should not benefit from the HEAR Act, see HEAR Act § 5(e), which was not enacted to revive a claim that the plaintiffs had a reasonable opportunity to bring but failed to bring, see S. Rep. No. 114-394, at 11.[8]

### B. Laches

In addition to being time-barred, the plaintiffs' claims are barred by laches.

---

[8] The plaintiffs asserted -- for the first time at oral argument -- that the plaintiffs could not have timely filed their claims between 2006 and 2009 because "[t]here was no remedy." Tr. 36:10. The plaintiffs claimed that denial of class certification in Bakalar meant that the claims had to be litigated in the states where the individual artworks were located, and this cause of action was already time-barred in Illinois, where the Artwork was located. Id. This argument was forfeited because it was not raised in the plaintiffs' papers. It is also contrary to the plaintiffs' complaint in this action, which was originally brought in New York state court and alleged that the tort occurred in New York County because one or more of the Grünbaum heirs resided in New York County and the Artwork was tortuously removed from New York County. See Notice of Removal, Exh. A at 6-7, ECF No. 1-1.

SA-19

**1. HEAR Act: Defenses**

As an initial matter, the HEAR Act does not affect the defendant's ability to assert the defense of laches. Although, generally, "laches cannot be invoked to bar legal relief" against "a statute of limitations enacted by Congress," the Court of Appeals for the Second Circuit has held that "[t]his general rule does not apply to the HEAR Act." Zuckerman, 928 F.3d at 196 (distinguishing SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 580 U.S. 328, 334-35 (2017); Petrella v. Metro-Goldwyn-Mayer, Inc., 572 U.S. 663, 679 (2014)). "While the HEAR Act revives claims that would otherwise be untimely under state-based statutes of limitations, it allows defendants to assert equitable defenses like laches." Id. "The statute explicitly sets aside defenses at law relating to the passage of time." Id. (citing HEAR Act § 5(a)). "It makes no mention of defenses at equity. A major departure from the long tradition of equity practice should not be lightly implied." Id. (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)). Moreover, the Senate Committee Report accompanying the statute unequivocally indicates that the Act does not preclude equitable defenses. See id. (citing S. Rep. No. 114-394, at 7). The Court of Appeals for the Second Circuit recently cited Zuckerman in its laches analysis in Republic of Turkey v. Christie's Inc., 62 F.4th 64, 72 (2d Cir. 2023).

19

The plaintiffs argue that "[i]n the face of a statute of limitations enacted by Congress, laches cannot be invoked to bar legal relief within the time period prescribed by Congress." Pls.' Opp'n at 63 (citing SCA Hygiene Prods., 580 U.S. at 346; Petrella, 572 U.S. at 664). However, the Court of Appeals for the Second Circuit explicitly rejected that argument and acknowledged the same Supreme Court cases in Zuckerman because the express terms and legislative history of the HEAR Act exempt equitable defenses. The plaintiffs also claim that Zuckerman "did not apply the HEAR Act." Id. at 64. But that assertion is plainly wrong. Zuckerman did, in fact, interpret the HEAR Act and found that "it allows defendants to assert equitable defenses like laches." 928 F.3d at 196. Accordingly, the HEAR Act does not preclude the defendant from asserting the equitable defense of laches.

### 2. Collateral Estoppel

Having found that the defendant may assert the defense of laches, it is plain that the plaintiffs' claims are barred by laches as decided in Bakalar. Moreover, the plaintiffs are collaterally estopped from relitigating that issue.

"Collateral estoppel prevents a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party . . . whether or not the causes of action are the same." Simmons v.

20

<u>Trans Express Inc.</u>, 170 N.E.3d 733, 737 (N.Y. 2021). Because
"the consequences of a determination that a party is
collaterally estopped from litigating a particular issue are
great, strict requirements for application of the doctrine must
be satisfied." <u>Gramatan Home Invs. Corp. v. Lopez</u>, 386 N.E.2d
1328, 1331 (N.Y. 1979). First, "[t]he doctrine applies only
where the issue in the second action is identical to an issue
which was raised, necessarily decided[,] and material in the
first action." <u>Simmons</u>, 170 N.E.3d at 737. "What is controlling
is the identity of the issue which has necessarily been decided
in the prior action or proceeding. Of course, the issue must
have been material to the first action or proceeding and
essential to the decision rendered therein." <u>Ryan v. N.Y. Tel.
Co.</u>, 467 N.E.2d 487, 490 (N.Y. 1984).

The issue here -- whether plaintiffs' claims are barred by
laches -- is identical to the issue in <u>Bakalar</u>, and that issue
was raised, necessarily decided, and material to the decision in
<u>Bakalar</u>. The defendants in <u>Bakalar</u> were the Grünbaum heirs, the
same plaintiffs here against whom the defense of laches is
asserted.[9] In <u>Bakalar</u>, the district court clearly considered
whether: "(1) [the Grünbaum heirs] were aware of their claim,

_____

[9] In <u>Bakalar v. Vavra</u>, David Bakalar (the plaintiff) sued the Grünbaum heirs
Milos Vavra and Leon Fischer (the defendants). The same Grünbaum heirs -- now
Milos Vavra and the co-executors of Leon Fischer's estate and co-trustees of
the Leon Fischer Trust (Timothy Reif and David Fraenkel) -- are the
plaintiffs in this case against the defendant the Art Institute of Chicago.

(2) they inexcusably delayed in taking action; and (3) Bakalar
was prejudiced as a result." 819 F. Supp. 2d at 303 (citing the
elements of laches as set out in Ikelionwu v. United States, 150
F.3d 233, 237 (2d Cir. 1998)). The district court found: "Given
[both Vavra's and Fischer's ancestors' awareness of their
relationship to the Grunbaums and their eventual deaths in
concentration camps], . . . [the plaintiffs'] ancestors were
aware of—or should have been aware of—their potential intestate
rights to Grunbaum property, and Vavra and Fischer [we]re bound
by the knowledge of their respective families." Id. at 305. It
also found that "Vavra's and Fischer's ancestors were not
diligent in pursuing their claims to the [d]rawing." Id. at 306.
Finally, it found that "[t]he resulting prejudice to Bakalar
[wa]s clear[:]" The plaintiffs' delay in pursuing their claims
"resulted in deceased witnesses, faded memories, lost documents,
and hearsay testimony of questionable value." Id. The court
pointed particularly to the death of Mathilde Lukacs in 1979,
perhaps the only person who could have explained the manner in
which she obtained the work at issue, or indeed, whether she
owned it at all. Id.[10]

_____

[10] The plaintiffs argue that, since Bakalar, In re Flamenbaum, 1 N.E.3d 782
(N.Y. 2013), changed the law and requires that a missing witness in an
alleged chain of legal title, for laches purposes, needs to be shown to have
been able to demonstrate legal title. Pls.' Opp'n at 45, ECF No. 38. But, as
the defendant argues, Flamenbaum did not purport to change the New York law
of laches. See Def.'s Reply at 13-14, ECF No. 41. In Flamenbaum, the New York
Court of Appeals found that the defendant in that case was not prejudiced by

Indeed, the Bakalar court seemed to anticipate this very
case. The court held that "where several items are treated
collectively for the purposes of knowledge, the current
possessor may show a lack of diligence with respect to the
collection as a whole, rather than the individual items." Id. at
304-05. This is because to hold otherwise "would defeat laches
in virtually every case." Id. at 304. The Court of Appeals for
the Second Circuit upheld these findings. See Bakalar, 500 F.
App'x at 9. The Court of Appeals concluded: "In sum, there is no
clear error in the findings that Vavra and Fischer's ancestors
knew or should have known of a potential claim to the Drawing,
that they took no action in pursuing it, and that Bakalar was
prejudiced in this litigation as a result of that delay. It was
therefore sound to recognize Bakalar's title on the basis of his
laches defense." Id.

Accordingly, the plaintiffs lacked diligence not only with
respect to the work in Bakalar but also with respect to the
collection as a whole -- namely Grünbaum's Schieles that went
through Mathilde Lukacs and Galerie Gutekunst & Klipstein --

---

the death of the relevant witness because there was "no scenario whereby the
decedent could have shown that he held title to this antiquity[,]" the
proposition for which the decedent would have testified. In re Flamenbaum, 1
N.E.3d at 784; see also Def.'s Reply at 14. In this case, however, Mathilde
Lukacs (Grünbaum's sister-in-law) could have spoken to title and the
circumstances pursuant to which she obtained the Artwork. Moreover, the
absence of Lukacs was only one of a number of indicia of prejudice that
Bakalar suffered.

which includes the Artwork at issue in this case. 819 F. Supp.
2d at 295; Am. Compl. ¶¶ 23, 87, 102, 155, 162. The plaintiffs
conceded at argument that the Artwork in this case was part of
the collection of Grünbaum's Schieles that went through Mathilde
Lukacs and Galerie Gutekunst & Klipstein (sometimes called
Galerie Kornfeld) and therefore appeared in the gallery's 1956
catalog. Tr. at 25-26.

Furthermore, the laches issue was fully litigated. The
plaintiffs allege that the Bakalar court "denied additional
class discovery, frustrating the Grünbaum Heirs' efforts to
trace Grünbaum's art collection" and that "[b]ecause of this
lack of judicial relief, the Grünbaum Heirs have not been able
to trace the 450-work art collection." Pls.' Opp'n at 56-57. But
the Court of Appeals for the Second Circuit specifically held
that "[t]he district court did not abuse its discretion in
abiding by its discovery calendar, especially in light of its
generous extension [that the plaintiffs failed to meet]." 500 F.
App'x at 9. The Court of Appeals found no error in the record
before the district court and affirmed the judgment.

In response, the plaintiffs argue that Nagy, rather than
Bakalar, should control the outcome of this case. However, the
plaintiffs in this case -- the Grünbaum heirs -- are bound by
the issues decided against them in the Bakalar case in which
they were defendants, while the defendant in this case -- the

Art Institute of Chicago -- is not bound by the adverse findings in the Nagy case, in which it was not a party. In any event, the facts in Nagy are completely distinguishable from the facts in this case. Unlike Bakalar and the defendant in this case, who bought the Schiele works in the 1960s, see 819 F. Supp. 2d at 295; Am. Compl. ¶ 155, the Nagy defendants bought the relevant Schiele works in 2013, see 80 N.Y.S.3d at 631, when Nagy was fully aware of the title issues relating to the artworks. The plaintiffs made a demand on Nagy in 2015, see id., as opposed to 2006, as in this case, see Lonergan Decl., Exs. C-D. Unlike Bakalar and the defendant in this case, the Nagy defendants were not prejudiced by the plaintiffs' delay because the Nagy defendants purchased the Schiele works long after the relevant witnesses, documents, and testimony were gone. See Bakalar, 819 F. Supp. 2d at 306. The Appellate Division explained why the defense of laches that applied in Bakalar did not apply to Nagy:

> Nagy acquired both pieces in 2013. He suffered no change in position. Nor was any evidence lost between defendants' acquisition and plaintiffs' demand for the return of the Artworks. Significantly, Nagy was on notice of plaintiffs' claims to the Grunbaum collection prior to the purchase, as he filed a brief in the Bakalar action. Further, it is undisputed that Nagy purchased the Artworks at a substantial discount from the price sought by Sotheby's prior to the claim being publicized, and he obtained insurance for the very purpose of insuring title against plaintiffs' claims.

Nagy, 106 N.Y.S.3d at 22-23.

In fact, the plaintiffs implicitly concede this point. In their reply brief, the plaintiffs argue that the Grünbaum heirs were not aware that they had a claim to the Artwork until May 24, 2022, when the New York Court of Appeals rejected Nagy's challenge based on Bakalar. Pls.' Reply Br. at 11-13, ECF No. 45. In so doing, they appear to concede that they are bound by Bakalar.

In summary, the plaintiffs' claims are barred by laches as decided in Bakalar, and the plaintiffs are collaterally estopped from relitigating the issue.

**IV.**

Finally, the plaintiffs have cross-moved for summary judgment.

However, a motion for summary judgment is procedurally barred for two reasons. First, the plaintiffs did not comply with Local Rule 56.1 and failed to file a required Rule 56.1 statement. See Local Civil Rule 56.1(a) ("Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion."). Additionally, a motion for summary judgment is procedurally

26

SA-27

premature because the defendants have not consented to such a motion, and there has been no discovery in this case. See, e.g., Berger v. United States, 87 F.3d 60, 65 (2d Cir. 1996) ("[W]e cannot conclude that the parties had already had a fully adequate opportunity for discovery when the district court granted summary judgment. . . . [T]he grant of summary judgment here was premature.")

In any event, to the extent that the plaintiffs' motions for summary judgment can be limited to the issues of the statute of limitations and laches, they are denied for the same reasons that the motion to dismiss is granted.

SA-28

CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss the plaintiffs' amended complaint is **granted**. The plaintiffs' cross-motion for summary judgment is **denied** without prejudice. The Clerk is directed to close all pending motions.[11]

SO ORDERED.

Dated:    New York, New York
          November 24, 2023

                                    _____
                                        John G. Koeltl
                                    United States District Judge

---

[11] After the motion to dismiss and cross-motion for summary judgment were fully briefed, the defendant filed an answer and counterclaim which included a defense of failure to join an indispensable party -- namely the District Attorney's Office of New York County -- because the District Attorney purported to seize the Artwork in place. ECF No. 55. That provoked correspondence in which both sides made arguments, see ECF Nos. 56, 57, 61, and 62, resulting in the defendant's offering to withdraw the defense of failure to join an indispensable party, see ECF No. 64, to which the plaintiffs objected, and the plaintiffs submitting a proposed order pursuant to which the Court would remand the case to the New York State Supreme Court, see ECF No. 68. Because none of these proposed issues were briefed before the argument on the motion to dismiss and cross-motion for summary judgment, the Court instructed the parties that they could make any necessary motions after the Court's decisions on the current motions. Tr. 5:2-4. Therefore, the plaintiffs can make any motions that are appropriate and in good faith at this point by **December 15, 2023**. The defendant can respond by **January 5, 2024**. The plaintiffs may reply by **January 16, 2024**.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————

TIMOTHY REIF, ET AL.,

                     Plaintiffs,         23-cv-2443 (JGK)

          - against -             MEMORANDUM OPINION
                                        AND ORDER
THE ART INSTITUTE OF CHICAGO,

                    Defendant,

AN ARTWORK, RUSSIAN PRISONER OF WAR
(1916) BY THE ARTIST EGON SCHIELE,

              Defendant-in-Rem.
————————————————————————————

JOHN G. KOELTL, District Judge:

The plaintiffs Timothy Reif, David Fraenkel, and Milos
Vavra -- the heirs of Franz Freidrich ("Fritz") Grünbaum --
brought this diversity action against the defendant the Art
Institute of Chicago. The plaintiffs assert claims for
declaratory judgment, conversion, and replevin, arising out of
the alleged theft of Russian Prisoner of War (1916) ("the
Artwork") from Grünbaum by the Nazi regime while Grünbaum was
imprisoned in the Dachau Concentration Camp.

In an Opinion and Order dated November 24, 2023 (the
"Opinion"), this Court granted the defendant's motion to dismiss
the plaintiffs' claims. The plaintiffs now move for
reconsideration of that Opinion, ECF No. 75, and move to file a
second amended complaint, ECF No. 78. For the following reasons,

the plaintiffs' motion for reconsideration and motion for leave
to file an amended complaint are **denied.**

### I.

The Court assumes familiarity with the facts of this case,
which are set out in detail in the Opinion. See Reif v. Art
Inst. of Chicago, No. 23-cv-2443, 2023 WL 8167182, at *1-2
(S.D.N.Y. Nov. 24, 2023). The facts most relevant to the
plaintiffs' motions are as follows.

The defendant acquired the Artwork in 1966. See Am. Compl.
¶ 155, ECF No. 15. In 2006, the plaintiffs made a demand on the
defendant to return the Artwork. See Reif, 2023 WL 8167182, at
*2. On February 3, 2006, the defendant declined to return the
Artwork. See id.

The plaintiffs originally filed this action in New York
State Supreme Court, New York County, on December 14, 2022. See
id. at *1. The action was removed to this Court based on
diversity of citizenship jurisdiction on March 22, 2023. See id.
Applying New York law, the Court held that -- pursuant to New
York's three-year statute of limitations on replevin claims,
which accrue upon demand and refusal -- the plaintiffs' claims
expired in 2009 and were therefore barred by the statute of
limitations. See id. at *4-5. The Holocaust Expropriated Art
Recovery Act Of 2016 ("HEAR Act") did not revive the plaintiffs'
claims because the plaintiffs' claims fall within the exception

of the Act. See id. at *5-7. The Court also held that laches
barred the plaintiffs' claims. See id. at *7-10.

## II. Motion for Reconsideration

### A. Standard of Review

Reconsideration of a previous Opinion of the Court is an
"extraordinary remedy to be employed sparingly in the interests
of finality and conservation of scarce judicial resources."[1] In
re Beacon Assocs. Litig., 818 F. Supp. 2d 697, 701 (S.D.N.Y.
2011). To succeed on a motion for reconsideration, the movant
carries a heavy burden. The movant must show "an intervening
change of controlling law, the availability of new evidence, or
the need to correct a clear error or prevent manifest
injustice." Torres v. Carry, 672 F. Supp. 2d 346, 348 (S.D.N.Y.
2009). "A motion for reconsideration is not an opportunity for
making new arguments that could have been previously advanced."
Liberty Media Corp. v. Vivendi Universal S.A., 861 F. Supp. 2d
262, 265 (S.D.N.Y. 2012). Moreover, the "decision to grant or
deny a motion for reconsideration rests within the sound
discretion of the district court." Vincent v. The Money Store,
No. 03-cv-2876, 2014 WL 1673375, at *1 (S.D.N.Y. Apr. 28, 2014).

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal
alterations, citations, footnotes, and quotation marks in quoted text.

### B. Discussion

#### i. Statute of Limitations

The plaintiffs' claims are barred by the statute of limitations. Because this action was brought in diversity, this Court, a federal court sitting in New York, is required to apply the New York laws on statutes of limitations. See Reif, 2023 WL 8167182, at *4 (citing Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015)). The relevant New York law is N.Y. C.P.L.R. § 202, which provides that, where a cause of action accrued outside New York, the shorter of the statute of limitations of either New York or the state where the cause of action accrued must apply. See id. at *4-5. In this case, the cause of action accrued in Illinois, which has a five-year statute of limitations. Thus, New York's shorter, three-year statute of limitations applies.[2] See id. The defendant refused the plaintiffs' demand that the defendant return the Artwork in 2006, and therefore the plaintiffs' claims expired three years later, in 2009. See id. at *5. The HEAR Act did not revive the plaintiffs' claims because the plaintiffs knew of their claims after 1999 and failed to bring their claims during the three years that their claims were timely. See id. at *5-7 (citing

---

[2] Both the New York and Illinois statutes of limitations apply a demand-and-refusal rule. See Reif v. Art Inst. of Chicago, No. 23-cv-2443, 2023 WL 8167182, at *5 (S.D.N.Y. Nov. 24, 2023).

4

HEAR Act, Pub. L. No. 114-308, § 5(e), 130 Stat. 1524, 1527 (2016)).

The plaintiffs now attempt to contest the fact that their claims are plainly barred by striking and amending allegations in their complaint. However, their prior allegations are a matter of public record. Moreover, as explained below, the only way that the plaintiffs' claims could be timely is if the defendant acquired the Artwork by theft, but that is clearly not the case, and the plaintiffs do not argue that the defendant stole the Artwork. The Court addresses each of the plaintiffs' arguments in turn.

### a. Defendant's Counterclaim

Relying on N.Y. C.P.L.R. § 203(d), the plaintiffs initially argue that the defendant, by making an adverse possession counterclaim, (1) rendered the plaintiffs' untimely claims timely and (2) waived the defense of the statute of limitations. See Pls.' Mot. for Recons. 20-21.

Section 203(d) provides:

> A defense or counterclaim is not barred if it was not barred at the time the claims asserted in the complaint were interposed, except that if the defense or counterclaim arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed.

N.Y. C.P.L.R. § 203(d). In other words, "a defense [or counterclaim] that would be time-barred as a claim for affirmative relief may be used to reduce an adverse recovery where the defense establishes an equitable defect inhering in the adverse party's claim." 118 E. 60th Owners, Inc. v. Bonner Properties, Inc., 677 F.2d 200, 203 (2d Cir. 1982). The reasoning behind section 203(d) is that "it would be highly inequitable to permit a party to place a question before a court and then prevent the opposing party from disputing issues lying at the foundation of the claim." Id.

The plaintiffs' reliance on N.Y. C.P.L.R. § 203(d) is plainly misplaced. The plaintiffs' affirmative claims are neither the "defenses" nor "counterclaims" contemplated in section 203(d), as the plaintiffs attempt to argue. See Pls.' Mot. for Recons. 21. The plaintiffs' affirmative claims of ownership, see Am. Compl., are plainly not defenses or counterclaims to the defendant's adverse possession counterclaim, see Def.'s Countercl. ¶ 11, ECF No. 55. Indeed, as the defendant points out, the plaintiffs asserted no affirmative defenses in their answer to the defendant's counterclaim. See Pls.' Answer to Def.'s Countercl., ECF No. 60.

In any event, this is a new argument and therefore cannot be a basis for reconsideration. See Liberty Media Corp., 861 F. Supp. 2d at 265. Accordingly, the defendant did not revive the

6

plaintiffs' time-barred claims nor waive the defense of the
statute of limitations by asserting its counterclaim.

### b. Accrual in 1966

As to the Court's finding that the statute of limitations
barred the plaintiffs' claims, the plaintiffs argue that they
alleged the defendant "committed a New York tort in acquiring
the Artwork in 1966[,] triggering a three-year statute of
limitations that expired in 1969, and thus the claims were time-
barred in 1969 and resuscitated and timely under the Hear
Act[.]" Pls.' Mot. for Recons. 6.

However, "[a] motion for reconsideration is not an
opportunity for making new arguments that could have been
previously advanced." Liberty Media Corp., 861 F. Supp. 2d at
265. The plaintiffs failed to make this argument previously; in
fact, the plaintiffs took several contrary positions. The
plaintiffs first alleged that their claims accrued on March 22,
2023, the date the defendant allegedly refused the plaintiffs'
demand by seeking removal to this Court. See Am. Compl. ¶¶ 186-
88. Then, the plaintiffs argued that the Court should not
consider New York law and instead should rely on the fact that
"California, Illinois, Ohio and Pennsylvania . . . barred the
[plaintiffs'] claims . . . by the 1960's or early 1970's." Pls.'
Opp'n to Def.'s Mot. to Dismiss 50, ECF No. 38. Finally, at oral
argument, the plaintiffs appeared to concede that they made a

demand -- and that therefore their claims accrued under New York law -- in 2006. See Oral Arg. Tr. 29:18-21, ECF No. 72. Because the plaintiffs never raised the argument that their claims accrued in 1966 in New York until now, they cannot seek reconsideration on that ground.

Furthermore, this argument is without merit. The essence of the argument is that the defendant was a "bad-faith possessor[,]" that the "statute of limitations runs against bad faith possessors at the time of acquisition," and that, as a result, the plaintiffs' claims accrued in 1966, were barred in 1969, and were revived by the HEAR Act. Pls.' Mot. for Recons. 6.

However, the plaintiffs made no factual allegations to support that contention; in fact, the contention is contrary to the allegations in the amended complaint. Nowhere in the amended complaint or the plaintiffs' opposition to the defendant's motion to dismiss did the plaintiffs explicitly accuse the defendant of theft or of acting in bad faith. Rather, all of the allegations in the amended complaint support the idea that the defendant is a good-faith possessor. The defendant gained possession of the Artwork in 1966. See Am. Compl. ¶ 155. The plaintiffs only made a demand on the defendant forty years later, in 2006. See Reif, 2023 WL 8167182, at *2. Had it been so clear that the Artwork was stolen, the plaintiffs would have

made a demand sooner than forty years after the defendant
acquired the Artwork. Indeed, the plaintiffs' own allegations
detail the difficulty of uncovering the provenance of the
Artwork and other works that belonged to Grünbaum. See Am.
Compl. ¶¶ 45, 47.

Even now, the plaintiffs do not accuse the defendant of
theft. The plaintiffs only accuse the defendant of "having
ignored government warnings . . . , failing to investigate . . .
, and overlooking . . . evidence . . . ." Pls.' Mot. for Recons.
7. As the defendant correctly argues, these allegations are
clearly distinguishable from allegations of theft. See Def.'s
Opp'n 10-11, ECF No. 81 (citing Wallace Wood Properties v. Wood,
117 F. Supp. 3d 493, 498 (S.D.N.Y. 2015) ("Plaintiff [alleging
theft] specifically alleges that Defendant was aware that she
did not have rightful title to the Original Artwork."), aff'd
sub nom. Wallace Wood Properties, LLC v. Wood, 669 F. App'x 33
(2d Cir. 2016)). There is no case that the plaintiffs cite where
courts have interpreted the New York rule to impute bad faith
upon current possessors who failed to conduct sufficient due
diligence.

Furthermore, accepting the plaintiffs' proposition would
lead to anomalous consequences. For example, the plaintiffs are
essentially asking the Court to invalidate the law that benefits
original owners of property by delaying the start of the statute

of limitations clock until after a demand is made and refused. See Solomon R. Guggenheim Found. v. Lubell, 569 N.E.2d 426, 430 (N.Y. 1991). This would bar the claims of many property owners who are not yet aware of the identity of a person who acquired stolen property and failed to exercise sufficient diligence to return the stolen property.

In summary, the plaintiffs cannot seek reconsideration on the basis that the defendant was a bad-faith possessor and that therefore the statute of limitations should have begun to run at the time of acquisition.

### c. Illinois Statute of Limitations

The plaintiffs also argue that the Court erred in "finding that the [plaintiffs] forfeited the argument that their claims would have been untimely in 2006 in Illinois by raising it for the first time at oral argument . . . ." Pls.' Mot. for Recons. 9. This argument is inconsistent with the requirement that the Court should apply the shorter of the New York statute of limitations and any other state's statute of limitations. See N.Y. C.P.L.R. § 202. It is also inconsistent with the plaintiffs' mistaken argument discussed above that this action is barred by the New York statute of limitations.

In any event, the plaintiffs cannot satisfy their burden of demonstrating a "need to correct a clear error or prevent manifest injustice." Torres, 672 F. Supp. 2d at 348. As an

initial matter, the plaintiffs misconstrue the Court's finding. As the defendant correctly argues, the Court found that the plaintiffs waived the argument that their claims were barred in New York between 2006 and 2009. See Reif, 2023 WL 8167182, at *7 n.8. Nowhere does the Opinion state what the plaintiffs now argue that it does.

In any event, the Court considered the Illinois statute of limitations and found that it did not affect the plaintiffs' claims. More specifically, the Court considered Illinois's five-year statute of limitations but found that -- pursuant to N.Y. C.P.L.R. § 202 -- New York's shorter, three-year statute of limitations controlled. See id. at *4-5.

Accordingly, with respect to the Illinois statute of limitations, the plaintiffs cannot demonstrate that there is clear error or the need to prevent manifest injustice, see Torres, 672 F. Supp. 2d at 348, or that the Court overlooked controlling facts or law that might reasonably be expected to alter the conclusion reached by the Court, see Albritton v. Fredella, No. 22-cv-4512, 2023 WL 2057997, at *2 (S.D.N.Y. Feb. 16, 2023).

### d. HEAR Act Exception

Finally, the plaintiffs argue that the Opinion should be vacated because "the HEAR Act's exception requires the

[plaintiffs] to have had six years post-1999 during which their claims were not time-barred." Pls.' Mot. for Recons. 8.

However, the plaintiffs provide no reasoning as to why the Court's analysis of the HEAR Act's exception -- and subsequent finding that the exception did not apply to the plaintiffs' claims -- were wrong. Accordingly, the plaintiffs make no showing of a "need to correct a clear error or prevent manifest injustice[,]" Torres, 672 F. Supp. 2d at 348, required to prevail on a motion for reconsideration.

### ii. Laches

The plaintiffs' claims are also barred by laches. The issue of whether the plaintiffs' claims were barred by laches was decided in Bakalar, and the plaintiffs are collaterally estopped from relitigating the issue. See Reif, 2023 WL 8167182, at *10.

### a. Nagy

As to the Court's finding that laches bars the plaintiffs' claims, the plaintiffs initially argue that the Court impermissibly overlooked the New York state courts' findings in Reif v. Nagy, 80 N.Y.S.3d 629 (Sup. Ct. 2018), aff'd as modified, 106 N.Y.S.3d 5 (App. Div. 2019). See Pls.' Mot. for Recons. 9-16. The Court plainly did not "overlook" Nagy but discussed it extensively. See Reif, 2023 WL 8167182, at *9-10.

While the Court is bound by the law of New York as interpreted by the New York state courts, it is not bound to a

state court's application of a previously established rule to any particular set of facts. See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 739 F.3d 45, 48 (2d Cir. 2013). In this case, the plaintiffs confuse the facts for the substantive law. The plaintiffs claim that the Court is bound by the state courts' findings of fact in Nagy, namely that "the Nazis stole the artworks in the 1956 Gutekunst & Klipstein catalogue[,] . . . Mathilde Lukacs' testimony could not have been probative[,] . . . [and] the artworks [in the 1956 Gutekunst & Klipstein catalogue] are not part of a collection 'legally united in interest[.]'" Pls.' Mot. for Recons. 9-16. However, the Court is not bound by these findings of fact in the same way that the Court is bound by state courts' interpretations of New York state law. See Licci, 739 F.3d at 48. Moreover, the Court held that the finding in Nagy did not affect the result in this case because the facts in Nagy are completely distinguishable from the facts in this case. See Reif, 2023 WL 8167182, at *9.

Accordingly, the plaintiffs present no controlling facts or law that the Court overlooked that would warrant reconsideration of the Court's Opinion, see Albritton, 2023 WL 2057997, at *2, that "the defendant in this case . . . is not bound by the adverse findings in the Nagy case, in which it was not a party." Reif, 2023 WL 8167182, at *9.

13

### b. **Bakalar**

Finally, the plaintiffs argue that Bakalar v. Vavra, 819 F. Supp. 2d 293, 296 (S.D.N.Y. 2011), aff'd, 500 F. App'x 6 (2d Cir. 2012), should not be given preclusive effect because, in their view, this case is distinguishable from Bakalar. See Pls.' Mot. for Recons. 16-20. However, in so arguing, the plaintiffs simply restate arguments that were previously raised. As such, the plaintiffs fail to point out controlling facts or law that the Court overlooked that would warrant reconsideration of the Court's Opinion. See Albritton, 2023 WL 2057997, at *2.

The plaintiffs contend that the defendant should be held to a "higher standard of due diligence" to investigate the Artwork's provenance because there were warnings about Nazi-looted art, the defendant is a "sophisticated collector," and there is evidence that Grünbaum owned the Artwork before World War II. Pls.' Mot. for Recons. 15-18. All of these contentions were raised in the plaintiffs' brief in opposition to the motion to dismiss. See Pls.' Opp'n to Def.'s Mot. to Dismiss 19-20, 61-62. However, the plaintiffs' arguments had no bearing on the end result. The plaintiffs were collaterally estopped from relitigating the fact that their claims were barred, which was raised, necessarily decided, and material to the decision in Bakalar. See Reif, 2023 WL 8167182, at *8-9. The plaintiffs fail to raise any controlling facts or law that the Court overlooked.

The plaintiffs also allege that, unlike in Bakalar, the defendant in this case was not prejudiced by Lukacs's death. See Pls.' Mot. for Recons. 18. This argument, too, was raised in the plaintiffs' papers and considered on the motion to dismiss. See Pls.' Opp'n to Def.'s Mot. to Dismiss 45, 57-58, 61-62. The plaintiffs provide no new facts or law that would alter the Court's finding that, "[i]n this case, . . . Lukacs . . . could have spoken to title and the circumstances pursuant to which she obtained the Artwork." Reif, 2023 WL 8167182, at *8 n.10. And in any event, the inability to access Lukacs's testimony was not the only form of prejudice to the defendant in this case. Id.

Lastly, the plaintiffs argue that the Opinion "should be vacated due to its failure to engage in individualized determination required by New York law of whether [the defendant] suffered a prejudice as a result of the [plaintiffs'] purported inaction[.]" Pls.' Mot. for Recons. 18-20. However, the plaintiffs again fail to identify any facts or controlling law that would alter the Court's finding. As an initial matter, contrary to the plaintiffs' argument that "the defense of laches cannot be raised in a motion to dismiss[,]" id. at 18, the Court of Appeals for the Second Circuit has found that "a determination [as to whether the plaintiff's claims are barred by the doctrine of laches] can be made on the pleadings." Zuckerman v. Metro. Museum of Art, 928 F.3d 186, 190 (2d Cir.

2019). Moreover, the plaintiffs read a "requirement of an
individualized laches determination" into Judge Pauley's
decision "den[ying] class certification in Bakalar . . ." that
does not exist. Pls.' Mot. for Recons. 19. Rather, Judge Pauley
found that "where several items are treated collectively for the
purposes of knowledge, the current possessor may show a lack of
diligence with respect to the collection as a whole, rather than
the individual items." Reif, 2023 WL 8167182, at *9 (citing
Bakalar, 819 F. Supp. 2d at 304-05).

     In summary, the Court of Appeals for the Second Circuit
upheld the district court's finding in Bakalar that the
plaintiffs' claims were barred by laches because the plaintiffs'
ancestors knew or should have known of a potential claim, took
no action in pursuing it, and prejudiced Bakalar as a result of
the delay. See 500 F. App'x at 9. The plaintiffs are
collaterally estopped from relitigating that finding in this
case. Accordingly, the plaintiffs' motion for reconsideration is
**denied**.

### III. Motion for Leave to File an Amended Complaint

#### A. Standard of Review

     Rule 15(a) provides that courts should "freely give leave
[to amend a complaint] when justice so requires." Fed. R. Civ.
P. 15(a)(2). However, such leave need not be granted "[w]here a
proposed amendment would be futile." Hill v. Curcione, 657 F.3d

116, 123-24 (2d Cir. 2011). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6)." In re Tribune Co. Fraudulent Conv. Litig., 10 F.4th 147, 175 (2d Cir. 2021).

The futility inquiry on a motion for leave to amend is "comparable to that required upon a [Rule 12(b)(6)] motion to dismiss." Aetna Cas. & Sur. Co. v. Aniero Concrete Co., 404 F.3d 566, 604 (2d Cir. 2005). In evaluating whether granting leave to amend would be futile, a court must consider both the proposed amendments and the original complaint, "accepting as true all non-conclusory factual allegations therein, and drawing all reasonable inferences in the plaintiff's favor." Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 225 (2d Cir. 2017); see also Tribune Co., 10 F.4th at 175.

**B. Discussion**

The plaintiffs' proposed amendments are futile because the amendments fail to cure the deficiencies of the prior complaint and fail to state a claim under Rule 12(b)(6).

With respect to the statute of limitations, the proposed amended complaint strikes previous allegations that the plaintiffs' claims arose on March 22, 2023 -- when the defendant allegedly refused the plaintiffs' demand by removing the action to this Court -- and instead alleges that the plaintiffs' claims

17

accrued in 1966, expired in 1969, and were revived by the HEAR Act. See Redlined Proposed Am. Compl. 41-43, ECF No. 80-41 ("Proposed Am. Compl."). As previously stated, the plaintiffs' claims did not accrue in 1966 upon the defendant's acquiring the Artwork. First, the plaintiffs do not adequately allege that the defendant was a bad-faith possessor, such that the plaintiffs' claims would accrue immediately upon possession. See Proposed Am. Compl. 32-39 (alleging lack of diligence, ignoring public warnings, and constructive notice based on pre-World War II evidence). Furthermore, the plaintiffs do not allege that they made a demand that the defendant refused in 1966. Finally, the plaintiffs' new proposed claim for a constructive trust does not affect this analysis. Constructive trust claims are subject to a six-year statute of limitations. See Bice v. Robb, 324 F. App'x 79, 81 (2d Cir. 2009) (citing N.Y. C.P.L.R. §§ 213(1)-(2)). The plaintiffs' constructive trust claim would have accrued in 2006 when the defendant refused its demand, the statute of limitations would have run in 2012, and the HEAR Act would not have revived the claim because the plaintiffs had the opportunity to bring the claim after 1999. Cf. Reif, 2023 WL 8167182, at *4-7. In other words, the plaintiffs' new constructive trust claim would, like the plaintiffs' other claims, be barred by the statute of limitations. Accordingly, the proposed amendments are futile because they fail to overcome

18

the Court's finding that the statute of limitations barred the plaintiffs' claims.

As to laches, the plaintiffs argue that the proposed amended complaint "contains particularized allegations demonstrating that this action is not barred by . . . collateral estoppel or laches." See Pls.' Mot. for Leave to Amend 2, ECF No. 79. However, the plaintiffs do not allege any new facts that would demonstrate that this action is not barred by collateral estoppel or laches. Moreover, "[r]epleading matters precluded under the doctrines of res judicata or collateral estoppel would be futile." Doe v. Columbia Univ., 551 F. Supp. 3d 433, 477 (S.D.N.Y. 2021). Accordingly, the proposed amendments also fail to overcome the Court's finding that laches barred the plaintiffs' claims and are therefore futile.

As the plaintiffs concede, their argument that the proposed amendments are not futile depends on the Court granting their motion for reconsideration. See Pls.' Mot. for Leave to Amend 6. Therefore, because the Court denies the plaintiffs' motion for reconsideration, the plaintiffs' motion for leave to amend the complaint is also **denied**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments are either moot or without merit. For the foregoing reasons, the

SA-48

plaintiffs' motion for reconsideration and motion for leave to file a second amended complaint are **denied**. The Clerk is directed to close ECF Nos. 75, 78, and 85.[3] The only remaining claim in this case is the defendant's counterclaim. ECF No. 55. The defendant's counterclaim prompted considerable contentious correspondence between the parties.[4] Should the defendant wish to withdraw its counterclaim and dispose of the case, it should advise the Court by **March 13, 2024**. The plaintiffs may respond to any such application five days thereafter.

**SO ORDERED.**

Dated:    New York, New York
          February 28, 2024

                                    _____
                                         John G. Koeltl
                                 **United States District Judge**

---

[3] The request for oral argument is denied.

[4] After the motion to dismiss and cross-motion for summary judgment were fully briefed, the defendant filed an answer and counterclaim which included a defense of failure to join an indispensable party -- namely the District Attorney's Office of New York County -- because the District Attorney purported to seize the Artwork in place. ECF No. 55. That provoked correspondence in which both sides made arguments, see ECF Nos. 56, 57, 61, and 62, resulting in the defendant's offering to withdraw the defense of failure to join an indispensable party, see ECF No. 64, to which the plaintiffs objected, and the plaintiffs submitted a proposed order pursuant to which the Court would remand the case to the New York State Supreme Court, see ECF No. 68.

SA-49

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
TIMOTHY REIF, ET AL.,

       Plaintiffs,

  -against-            23 **CIVIL** 2443 (JGK)

                **JUDGMENT**

THE ART INSTITUTE OF CHICAGO, ET AL.,

       Defendants.

------------------------------------------------------------X

   It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Order dated March 18, 2024, all claims in this case having been dismissed.

Judgment is entered dismissing the complaint; accordingly, the case is closed.

**Dated:**  New York, New York

   March 19, 2024

            **RUBY J. KRAJICK**
            _____
            **Clerk of Court**
    **BY:**   K. Mango
            _____
            **Deputy Clerk**