# 24-809

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

❖

TIMOTHY REIF, DAVID FRAENKEL, as Co-Trustees of the Leon Fischer
Trust for the Life and Work of Fritz Grunbaum, MILOS VAVRA,

*Plaintiff-ctr-Defendants-Appellants,*

—against—

THE ART INSTITUTE OF CHICAGO,

*Defendant-ctr-Claimant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-COUNTER-CLAIMANT-APPELLEE
## THE ART INSTITUTE OF CHICAGO

JESSICA R. LONERGAN
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
1301 Avenue of the Americas,
  40th Floor
New York, New York 10019
(212) 999-5800

ERIC P. TUTTLE
WILSON SONSINI GOODRICH
  & ROSATI, P.C.
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104
(206) 883-2500

MARK R. YOHALEM
LUIS LI
MATTHEW K. DONOHUE
JULIA HU
WILSON SONSINI GOODRICH
  & ROSATI P.C.
953 East Third Street, Suite 100
Los Angeles, California 90013
(323) 210-2900
mark.yohalem@wsgr.com

*Attorneys for Defendant-Counter-Claimant-Appellee The Art Institute of Chicago*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, counsel for

Defendant-Appellee the Art Institute of Chicago ("AIC") certifies that AIC has no

parent corporation and that no publicly held corporation owns 10% or more of its

stock.

Dated: July 2, 2024          Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Mark R. Yohalem*
Mark R. Yohalem
953 East Third Street, Suite 100
Los Angeles, California 90013

*Counsel for Defendant-Appellee*
*The Art Institute of Chicago*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................. 1

STATEMENT OF JURISDICTION ................................................. 4

STATEMENT OF THE ISSUES .................................................... 4

STATEMENT OF THE CASE ..................................................... 5

I.    FACTUAL BACKGROUND .................................................. 5

    A.    The Parties ....................................................... 5

    B.    The History of the Artwork ........................................ 5

II.    PROCEDURAL HISTORY ................................................... 6

    A.    Plaintiffs Demand the Artwork, and AIC Refuses .................... 7

    B.    Plaintiffs Unsuccessfully Litigate Their Claims to the Grunbaum-Kornfeld Collection in *Bakalar v. Vavra* ................ 8

    C.    Plaintiffs Plead Around *Bakalar* in *Reif v. Nagy* ............... 13

    D.    Six Years After the Enactment of the HEAR Act, Plaintiffs Again Pursue Litigation Over the Grunbaum-Kornfeld Collection .................................................... 17

        1.    In 2016, Congress Passed the HEAR Act but Specifically Excluded Cases Like Plaintiffs' ......... 17

        2.    In 2022, Plaintiffs Finally Initiate Suit Over the Artwork ....... 19

        3.    The District Court Grants the Motion to Dismiss the FAC ..... 19

        4.    The District Court Denies Plaintiffs' Motion for Reconsideration and to Amend ................ 21

SUMMARY OF ARGUMENT ...................................................... 22

STANDARD OF REVIEW ....................................................... 24

ARGUMENT ............................................................................................ 24

I.  PLAINTIFFS' CLAIMS ARE UNTIMELY UNDER NEW YORK
    LAW AND NOT EXTENDED BY THE HEAR ACT ............................... 24

    A.  Plaintiffs Forfeited Any Argument that the New York Statute of
        Limitations Expired in the 1960s ..................................................... 26

    B.  Because the Demand-and-Refusal Rule Applies, the HEAR Act
        Does Not Extend the Relevant Statute of Limitations ...................... 29

        1.  The Demand-and-Refusal Rule Applies Unless There Is
            Bad Faith, Which Requires More than Merely
            Insufficient Diligence ................................................................. 31

        2.  Plaintiffs' Allegations Did Not Reach the Required Level
            of Bad Faith ................................................................................ 37

        3.  The District Court Properly Resolved Timeliness on the
            Pleadings ..................................................................................... 38

    C.  The HEAR Act Does Not Apply Because the Artwork Was Not
        Looted by the Nazis ......................................................................... 41

II.  PLAINTIFFS' CLAIMS ARE BARRED BY LACHES ............................ 45

    A.  As *Bakalar* Makes Clear, Laches Bars Plaintiffs' Claims ................ 45

        1.  Plaintiffs Unreasonably Delayed in Bringing Suit .................. 47

        2.  Plaintiffs' Delay Caused Prejudice .......................................... 49

        3.  The District Court Properly Resolved Laches on the
            Pleadings ..................................................................................... 52

    B.  *Nagy* Was Not Binding on the District Court ................................... 53

        1.  Rulings Against Nagy Cannot Be Imposed on AIC, a
            Non-Party, Under Principles of Collateral Estoppel ............... 53

        2.  *Erie* Did Not Compel the District Court to Follow *Nagy*'s
            Case-Specific Rulings ................................................................ 54

3. The District Court Rightly Deemed *Nagy*'s Reasoning Inapposite Here ........................................................................ 56

CONCLUSION ..................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*,
  21 F.4th 216 (2d Cir. 2021) ........................................................54, 55

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*,
  483 U.S. 143 (1987).........................................................................2

*Bakalar v. Vavra*,
  237 F.R.D. 59 (S.D.N.Y. 2006) ...........................................8, 9, 46

*Bakalar v. Vavra*,
  2008 WL 4067335 (S.D.N.Y. Sept. 2, 2008) .......................passim

*Bakalar v. Vavra*,
  819 F. Supp. 2d 293 (S.D.N.Y. 2011) ..................................passim

*Bakalar v. Vavra*,
  500 F. App'x 6 (2d Cir. 2012) ..............................................passim

*Close-Barzin ex rel. de Bekessy v. Christie's, Inc.*,
  51 A.D.3d 444 (2008) ....................................................................33

*Cohen v. M. Keizer, Inc.*,
  246 A.D. 277 (1st Dep't 1936) .......................................................32

*Cortec Indus., Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ............................................40, 41, 53

*Davidson v. Scully*,
  172 F. Supp. 2d 458 (S.D.N.Y. 2001) ...........................................27

*Davis v. Carroll*,
  937 F. Supp. 2d 390 (S.D.N.Y. 2013) ....................................34, 35

*DeWeerth v. Baldinger*,
  836 F.2d 103 (2d Cir. 1987) ....................................................29, 32

*DiFolco v. MSNBC Cable L.L.C.*,
  622 F.3d 104 (2d Cir. 2010) ....................................................39, 40

*Erie R. Co. v. Tompkins*,
  304 U.S. 64 (1938)...................................................................passim

*Freeman v. HSBC Holdings PLC*,
  57 F.4th 66 (2d Cir. 2023) ......................................................27, 54

*Galin v. United States*,
  2008 WL 5378387 (E.D.N.Y. Dec. 23, 2008)...........................42, 57

*Gasperini v. Ctr. for Humans., Inc.*,
   518 U.S. 415 (1996)...............................................................54, 55

*Gillet v. Roberts*,
   57 N.Y. 28 (1874)...................................................................30, 32

*Glob. Network Commc'ns, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006) ........................................................52

*Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*,
   1999 WL 673347 (S.D.N.Y. Aug. 30, 1999) ................................48

*Green v. Dep't of Educ. of New York*,
   16 F.4th 1070 (2d Cir. 2021) ........................................................24

*Grosz v. Museum of Mod. Art*,
   772 F. Supp. 2d 473 (S.D.N.Y. 2010) ..........................................33

*Herrera v. Wyoming*,
   587 U.S. 329 (2019)................................................................43, 44

*In re Howard v. Stature Elec., Inc.*,
   20 N.Y.3d 522 (2013)............................................................42, 46

*In re Keating v. Rogers*,
   77 A.D.2d 694 (3d Dep't 1980)....................................................52

*In re Peters v. Sotheby's Inc.*,
   34 A.D.3d 29 (1st Dep't 2006) ...............................................passim

*In re Stockdale v. Hughes*,
   189 A.D.2d 1065 (3d Dep't 1993)................................................45

*Kamienska v. Westchester Cnty.*,
   39 Misc. 2d 750 (N.Y. Civ. Ct. 1963) ..........................................31

*Knipe v. Skinner*,
   999 F.2d 708 (2d Cir. 1993) ........................................................29

*Liberty Synergistics Inc. v. Microflo Ltd.*,
   718 F.3d 138 (2d Cir. 2013) ........................................................55

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
   739 F.3d 45 (2d Cir. 2013) ....................................................55, 57

*Martin v. Hunter's Lessee*,
   14 U.S. 304 (1816)........................................................................54

*Menzel v. List*,
   49 Misc. 2d 300 (N.Y. Sup. Ct. 1966) ....................................30, 32

*Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*,
   321 U.S. 342 (1944)........................................................................2

*Parklane Hosiery Co. v. Shore,*
　439 U.S. 322 (1979)..................................................................53, 56

*Platt ex. rel. Platt Family Artwork Tr. v. Michaan,*
　2023 WL 6292770 (S.D.N.Y. Sept. 27, 2023) .............................50

*Poindexter v. Cash Money Recs.,*
　2014 WL 818955 (S.D.N.Y. Mar. 3, 2014)...........................42, 57

*Puebla Palomo v. DeMaio,*
　403 F. Supp. 3d 42 (N.D.N.Y. 2019) ............................................33

*Reif v. Nagy,*
　149 A.D.3d 532 (2017)......................................................15, 56, 57

*Reif v. Nagy,*
　175 A.D.3d 107 (2019) ......................................................... passim

*Reif v. Nagy,*
　61 Misc. 3d 319 (N.Y. Sup. Ct. 2018)....................................14, 15

*Republic of Turkey v. Christie's, Inc.,*
　2021 WL 4060357 (S.D.N.Y. Sept. 7, 2021) ..............................51

*Republic of Turkey v. Christie's Inc.,*
　527 F. Supp. 3d 518 (S.D.N.Y. 2021) ....................................34, 35

*Republic of Turkey v. Christie's Inc.,*
　62 F.4th 64 (2d Cir. 2023) ..................................................48, 51

*RJE Corp. v. Northville Indus. Corp.,*
　329 F.3d 310 (2d Cir. 2003) ........................................................24

*Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.,*
　959 F.2d 409 (2d Cir. 1992) ........................................................49

*Ryan v. New York Tel. Co.,*
　62 N.Y.2d 494 (1984).....................................................................46

*Shrader v. CSX Transp., Inc.,*
　70 F.3d 255 (2d Cir. 1995) ..........................................................27

*Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.,*
　82 F.4th 144 (2d Cir. 2023) ........................................................39

*Simmons v. Trans Express Inc.,*
　37 N.Y.3d 107 (2021).........................................................42, 54, 58

*Solomon R. Guggenheim Found. v. Lubell,*
　77 N.Y.2d 311 (1991).............................................30, 32, 33, 35, 51

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.,*
　762 F.3d 165 (2d Cir. 2014) ........................................................29

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
  547 F.3d 406 (2d Cir. 2008) ...................................................... 39

*Swain v. Brown*,
  135 A.D.3d 629 (1st Dep't 2016) .............................................. 34

*TechnoMarine SA v. Giftports, Inc.*,
  758 F.3d 493 (2d Cir. 2014) ...................................................... 52

*Thomas v. Stone*,
  284 A.D.2d 627 (3d Dep't 2001) .............................................. 52

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) ...................................................... 53

*Wallace Wood Props. v. Wood*,
  117 F. Supp. 3d 493 (S.D.N.Y. 2015) ...................................... 33

*Wertheimer v. Cirker's Hayes Storage Warehouse*,
  300 A.D.2d 117 (2002) ....................................................... 48, 50

*Whiteside v. Hover-Davis, Inc.*,
  995 F.3d 315 (2d Cir. 2021) ...................................................... 39

*Williams v. Nat'l Gallery of Art, London*,
  2017 WL 4221084 (S.D.N.Y. Sept. 21, 2017) ............................ 40

*Wood v. Carpenter*,
  101 U.S. 135 (1879) .................................................................... 2

*Zuckerman v. Metro. Museum of Art*,
  928 F.3d 186 (2d Cir. 2019) .............................................. passim

## STATUTES

C.P.L.R. § 214(3) ...................................................... 4, 24, 35

HEAR Act, PL 114-308, 130 Stat. 1524 ............................ passim

N.Y.U.C.C. § 1-201(9) ................................................................ 35

## RULES

Fed. R. Civ. P. 12(b)(6) .............................................................. 24

## INTRODUCTION

The evil of the Holocaust cannot be overstated and should not go unsaid. The Nazis perpetrated a crime against humanity made up of millions of individual crimes against millions of Jews. Franz Fredrich "Fritz" Grunbaum and his wife Elisabeth, murdered in Nazi death camps, were among those victims.

The district court's careful and correct application of the law—like the findings of the Hon. William H. Pauley III in *Bakalar v. Vavra*, 819 F. Supp. 2d 293 (S.D.N.Y. 2011) ("*Bakalar IV*"), and this Court's affirmance of Judge Pauley in *Bakalar v. Vavra*, 500 F. App'x 6 (2d Cir. 2012) ("*Bakalar V*")—does not minimize the horror of the Holocaust. Nor does the defense of this case by the Art Institute of Chicago ("AIC"). Plaintiffs' claims are barred by important legal principles, and this Court should affirm.

AIC rejected Plaintiffs' demand for Egon Schiele's *Russian Prisoner of War* (the "Artwork") because AIC reached the same conclusion that Judge Pauley did after a full trial: it "was not looted by the Nazis." *Bakalar IV*, 819 F. Supp. 2d at 299. This Court likewise ruled that the Grunbaum-Kornfeld Collection—which included the Artwork—had been purchased from "Grunbaum's sister-in-law," not from Nazi looters, and that Plaintiffs had "not come close to showing that [Judge Pauley's] finding was clearly erroneous." *Bakalar V*, 500 F. App'x at 7-8. "[T]wo independent art researchers and a genealogist working for a potential Grunbaum

heir" also found no "evidence that the Nazis stole" the collection. *Bakalar v. Vavra*, 2008 WL 4067335, at *8 (S.D.N.Y. Sept. 2, 2008) ("*Bakalar II*"), *vacated and remanded on other grounds*, 619 F.3d 136 (2d Cir. 2010) ("*Bakalar III*").

The careful determinations made in *Bakalar* confirm that the legal doctrines applied by the district court here did not thwart justice or deny Plaintiffs their day in court. And regardless of *Bakalar*'s preclusive ruling that there was no Nazi looting, the court's considered decision below advances the rule of law. Statutes of limitation—like the doctrines of laches—are "vital to the welfare of society" and "found and approved in all systems of enlightened jurisprudence." *Wood v. Carpenter*, 101 U.S. 135, 139 (1879). Far from impeding justice, they "promote justice," *Order of R.R. Telegraphers v. Ry. Express Agency, Inc.*, 321 U.S. 342, 348-49 (1944), because "[j]ust determinations of fact cannot be made when, because of the passage of time, the memories of witnesses have faded or evidence is lost," *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987) (cleaned up).

Even by 2012, this Court ruled "there c[ould] be no serious dispute" over the prejudice caused by Plaintiffs' failure to timely advance their claims of Nazi looting. *Bakalar V*, 500 F. App'x at 8-9. The Court ruled that these decades of delay caused the loss of critical evidence and "key witnesses," such as Grunbaum's sister-in-law. *Id*. Such a ruling should have either convinced Plaintiffs not to press these claims

against AIC or, at a minimum, spurred them into prompt action. Instead, Plaintiffs delayed *11 more years* after that ruling to sue AIC. By then, *16 years* had passed since Plaintiffs had unsuccessfully demanded that AIC hand over the Artwork, and over *80 years* had passed since the events in question. Now, even more evidence, memories, and witnesses have been lost.

Plaintiffs are collaterally estopped from re-litigating *Bakalar*'s dispositive rulings against them, but with or without estoppel, Plaintiffs' claims are untimely as a matter of law and, independently, as a matter of equity.

*First*, Plaintiffs' claims are untimely under New York law, which sets a three-year statute of limitations that accrued at the time AIC refused Plaintiffs' demand. Because Plaintiffs could have brought their claim after January 1, 1999—at a minimum, in the three years after the February 2006 refusal of their demand—the HEAR Act did not provide a new statute of limitations. And even if the Court were to accept Plaintiffs' incorrect contention that their claims actually expired decades ago and could not have been brought after January 1, 1999, the HEAR Act still would not apply because Plaintiffs are estopped from disputing the prior finding against them that the Artwork "was not looted by the Nazis."

*Second*, the doctrine of laches bars Plaintiffs' claims. Indeed, Plaintiffs are estopped from arguing otherwise by the rulings against them in *Bakalar*; if anything, Plaintiffs' further delay in advancing their known claims against AIC makes the case

-3-

for laches even stronger here than it was in *Bakalar*. The contrary laches ruling in *Reif v. Nagy*—to which AIC was not a party—does not estop AIC, did not bind the district court under *Erie*, and rested on unique facts (such as Nagy's purchasing the artworks in 2013 at a discount because of a known title dispute and lost evidence). The district court rightly deemed it inapposite here.

What the Nazis did to Fritz and Elisabeth Grunbaum was a horrific crime, the impact of which is amplified, not diminished, by the fact that it was surrounded by millions of other such crimes. But the Artwork "was not looted by the Nazis." And Plaintiffs' long delay in bringing their claims against AIC required the dismissal of this Complaint. This Court should affirm, as it did in *Bakalar*.

## STATEMENT OF JURISDICTION

Defendant agrees with Plaintiffs' jurisdictional statements.

## STATEMENT OF THE ISSUES

1.     Whether the district court correctly ruled that Plaintiffs' claims were time-barred under C.P.L.R. § 214(3).

2.     Whether the district court correctly ruled that Plaintiffs' claims were barred by the doctrine of laches.

## STATEMENT OF THE CASE

### I.    Factual Background

#### A.    The Parties

AIC is one of the oldest museums in the United States, and its collection includes the drawing *Russian Prisoner of War* by artist Egon Schiele.  (A-14.)  It acquired the Artwork in 1966 from B.C. Holland Gallery in Chicago.  (A-37.)

Plaintiffs are Grunbaum's heirs.  (A-16.)  Plaintiff Milos Vavra holds a 50% share of Grunbaum's estate, while Plaintiffs Timothy Reif and David Frankel serve as co-trustees for the "Leon Fischer Trust for the Life and Work of Fritz Grunbaum," which holds the other 50% interest, previously held by the now-deceased Leon Fischer.  (*Id.*)

#### B.    The History of the Artwork

Before World War II, Grunbaum resided in Vienna, Austria, with his wife Elisabeth.  (A-16, 19.)  During that time, he amassed a substantial art collection, including many works by Egon Schiele.  (A-22-24.)  On March 22, 1938, several days after the German annexation of Austria, Grunbaum was arrested by the Gestapo.  (A-16.)  Over the course of that year, the Nazi government passed a series of antisemitic laws aimed at, among other things, stripping Jews of their property.  (A-19, 24-25.)

Plaintiffs allege that, through these laws, Nazis forced the imprisoned Grunbaum to sign a power of attorney transferring his property to Elisabeth.  (A-

19.)  Plaintiffs acknowledge through an expert that Elisabeth "appears to have taken steps to export [Grunbaum's] art collection."  (A-83.)  In 1941, Grunbaum perished at Dachau.  (A-16.)  The following year, Elisabeth too was deported to a Nazi death camp, where she was killed.  (A-20.)

Plaintiffs' chronology of the Artwork skips to a 1956 Schiele exhibition at Galerie Gutekunst & Klipstein ("Galerie Gutekunst") in Bern, Switzerland.  Twenty of the Schiele works at that exhibition were purchased by Otto Kallir, a Viennese-Jewish art dealer who himself had fled the Nazis in 1938.  (A-22, 27, 96-97.)  Kallir and Grunbaum had been acquainted before the war, and at one point Grunbaum had lent part of his collection for a Schiele exhibition that Kallir arranged.  (A-22.)  After purchasing the Schiele works, Kallir exhibited them at his New York gallery, Galerie St. Etienne.  (A-18.)

The Artwork then passed to David Kimball and Leo Askew, then to B.C. Holland Gallery, from which AIC acquired the Artwork in 1966.  (A-37.)

## II.    Procedural History

Plaintiffs have known about AIC's possession of the Artwork since at least 2005, but they failed to bring suit until 2022.  In the interim, this Court affirmed the judgment that Plaintiffs could not assert title to the Grunbaum-Kornfeld Collection, including the Artwork, because it was "not looted by the Nazis" and because Plaintiffs' delay in bringing suit prejudiced any defense of title.

### A. Plaintiffs Demand the Artwork, and AIC Refuses

On October 24, 2005, nearly 40 years after the Artwork had been acquired by AIC, current counsel for Plaintiffs wrote to AIC seeking information about any works at the institution by Schiele or "with suspected Grunbaum provenance." (Supp.A-45-46.)  The letter attached a list of Schiele works, which included the Artwork.  (Supp.A-45, 81.)  As made clear in an exhibit Plaintiffs filed a month later in *Bakalar*, Plaintiffs knew the Artwork was located at "The Art Institute of Chicago" and took the position that it was among the "'stolen' Grunbaum work[s]." (Supp.A-154, 158.)

On January 24, 2006, Plaintiffs wrote to AIC "to formally demand the return of art works owned by Grunbaum," specifically including the Artwork.  (Supp.A-160; *see also* Supp.A-188, 232 (identifying "K1839/1449" as the Artwork)).  On February 3, 2006, AIC refused the demand, explaining that it "decline[d] to turn over" the Artwork because it did "not believe [Plaintiffs'] claim ha[d] any merit" based on its "current understanding of the law and facts."  (Supp.A-324.)  In a follow-up letter dated February 17, 2006, AIC provided a detailed provenance of the Artwork.  (Supp.A-328-29.)

Plaintiffs then waited *sixteen years* to bring this suit against AIC, while litigating the provenance of artworks from the same Grunbaum-Kornfeld Collection against other parties in the interim.

## B. Plaintiffs Unsuccessfully Litigate Their Claims to the Grunbaum-Kornfeld Collection in *Bakalar v. Vavra*

In 2005, David Bakalar brought a declaratory judgment action against Plaintiffs in the Southern District of New York seeking to establish his ownership of another Schiele drawing in the Grunbaum-Kornfeld Collection—*Seated Woman with Bent Left Leg* ("*Torso*"). (A-27.) At the time, Bakalar had owned *Torso* for over 40 years, which he had purchased in 1963 from the same New York gallery, Galerie St. Etienne, in AIC's provenance chain for the Artwork. *Bakalar II*, 2008 WL 4067335, at *1; (A-18, 27).

In November 2006, almost a year *after* sending the demand letter to AIC in this case concerning the Artwork, Plaintiffs—with the same counsel as in this case—asserted counterclaims for conversion and replevin against Bakalar and a putative class of defendants based on Plaintiffs' assertion that Grunbaum's entire Schiele collection had been looted by the Nazis. *Bakalar v. Vavra*, 237 F.R.D. 59, 62 (S.D.N.Y. 2006) ("*Bakalar I*"). In seeking to bind an entire defendant class (which would have included AIC), Plaintiffs maintained that the common question of "whether there was a thief in the chain of title" and the "common defenses of statutes of limitations and laches" could be resolved simultaneously for all the artworks once

-8-

belonging to Grunbaum, including the Artwork at issue here.[1]  *Bakalar v. Vavra*, No. 05-cv-3037-WHP, Dkt. 48 at 5, 8; *see also Bakalar I*, 237 F.R.D. at 65.

Plaintiffs' litigation of *Bakalar* fills in the period absent from the chronology in their Complaint: how the Artwork reached the Galerie Gutekunst so that it could be sold in 1956.

As Judge Pauley found, the Artwork passed from Elisabeth Grunbaum to her sister, Mathilde Lukacs.  In 1938, while Grunbaum was imprisoned, Lukacs and her husband—themselves Austrian Jews—fled to Belgium.  *Bakalar II*, 2008 WL 4067335, at *4.  Surviving records demonstrate that they took with them many works of art, as did another sister of Elisabeth and Lukacs.  *Id.*

In 1951, after the war, Lukacs began correspondence with a Swiss art dealer, Eberhard Kornfeld, a partner at Galerie Gutekunst.  *Bakalar II*, 2008 WL 4067335 at *1-2.  Lukacs, then in Belgium, asked Galerie Gutekunst to "auction[] original French and Dutch pieces that she owned," and in 1953, Galerie Gutekunst did so, as evidenced by invoices entered into evidence in *Bakalar*.  *Id.* at *2.  Lukacs continued to correspond with Kornfeld, and they wrote and visited each other at various points between 1952 and 1957.  *Id.*

---

[1] On July 28, 2006, Judge Pauley rejected the class, *Bakalar I*, 237 F.R.D. at 68, but did adjudicate the Grunbaum-Kornfeld Collection as a group.

In 1955 and 1956, Lukacs sold Kornfeld 54 Schiele works, which later comprised the entirety of the 1956 Schiele exhibition at Galerie Gutekunst. *Bakalar II*, 2008 WL 4067335, at *2. According to Kornfeld, Lukacs told him only that the Schiele works had been "an old Viennese family possession." *Id.* at *3.

These 54 pieces of this "Grunbaum-Kornfeld Collection" indisputably included the Artwork (A-26), and they were the subject of the five-day bench trial in 2008 before Judge Pauley.

At the end of that trial, Judge Pauley entered judgment against Plaintiffs. *Bakalar II*, 2008 WL 4067335, at *9. He did so based on the evidence developed "[a]fter more than two years of discovery in connection with this litigation and the benefit of archival research unavailable in 1956," including testimony and documentary records. *Id.* at *2, 8-9. At issue was the common provenance of "the entirety of Galerie Gutekunst's 1956 Schiele exhibition," which had all come from Lukacs, and which included *Torso* (called "the Drawing" in Judge Pauley's findings) and the Artwork at issue here. *Id.* at *2; (A-26).

Judge Pauley's findings that the Grunbaum-Kornfeld Collection had not been looted by the Nazis—and that Galerie St. Etienne had good title to the collection when it sold artworks from it to others—were based on Kornfeld's sworn deposition testimony and supporting documentation that Kornfeld had purchased "the entirety of Galerie Gutekunst's 1956 Schiele exhibition" from Lukacs in 1955 and 1956.

*Bakalar II*, 2008 WL 4067335, at *2, 9. The findings were also based on the fact that—despite years of discovery and investigation—Plaintiffs had "not produced any concrete evidence that the Nazis looted the Drawing or that it was otherwise taken from Grunbaum." *Id.* at *8. Further, Sotheby's, as well as "two independent art researchers and a genealogist working for a potential Grunbaum heir," had likewise all found no "evidence that the Nazis stole it." *Id.* These factual findings supported Judge Pauley's ruling that Kornfeld, and thus Galerie St. Etienne, had acquired good title "under Swiss law" and thus could pass good title to Bakalar. *Id.* at *7. Judge Pauley added: "Because this Court finds that Bakalar holds valid title to the Drawing, it need not reach his affirmative defense of laches." *Id.* at *9.

Plaintiffs appealed, and this Court vacated the judgment on the sole ground that New York law, not Swiss, applied to the determination of title. *Bakalar III*, 619 F.3d at 146-47. The Court confirmed that Judge Pauley did not need to conduct a new trial, but instead had discretion to simply apply New York law to the existing trial record. *Id.* at 147. The Court also confirmed that the defense of laches was "available" to Bakalar, and directed Judge Pauley to reach the issue if the title question were resolved against Bakalar. *Id.*

On remand, Judge Pauley again entered judgment against Plaintiffs. Now applying New York law, he addressed in sequence Plaintiffs' two alternative theories of theft: *first*, that "the Drawing may have been stolen by the Nazis," and *second*,

-11-

that "Bakalar cannot establish that Lukacs acquired possession in a manner that permitted her to convey title to Galerie Gutekunst," *i.e.*, that even if "the Drawing remained in the family," Bakalar could not prove that Lukacs had good title. *Bakalar IV*, 819 F. Supp. 2d at 298. Each of these rulings was essential to the judgment.

Even with the passage of decades, the record was sufficient for the Court to reject the first theory and find that the Grunbaum-Kornfeld Collection "remained in the Grunbaum family's possession and was never appropriated by the Nazis." *Bakalar IV*, 819 F. Supp. 2d at 298-99, 307 (citing *Bakalar II*, 2008 WL 4067335, at *2-5). As the court explained, Lukacs's possession of the artwork "strongly indicates that such a seizure never occurred." *Id.* at 299.

As to the second theory, however, the record was inadequate to determine whether Lukacs held valid title to the Grunbaum-Kornfeld Collection when she sold it to Galerie Gutekunst. *Bakalar IV*, 819 F. Supp. 2d at 299-302. Although Judge Pauley noted several ways that Lukacs might have acquired good title to the Grunbaum-Kornfeld Collection, there was simply no longer sufficient evidence to determine what actually occurred so many decades ago. *Id.*

The shortcomings of the record due to the passage of time meant that Plaintiffs' second theory was rejected through findings and a ruling regarding laches, rather than findings as to the title in the 1940s and 1950s. *Bakalar IV*, 819 F. Supp. 2d at 303-07. Judge Pauley found that Plaintiffs and their predecessors had sufficient

constructive knowledge of their claims and had not exercised due diligence. *Id.* As a result of Plaintiffs' "delay" in bringing their claims, it was impossible to procure testimony from Lukacs—"perhaps the only person who could have elucidated the manner in which she came to possess the Drawing" and the other works in the collection—as she had passed away in 1979. *Id.* at 306. Plaintiffs' delay caused "clear" prejudice, which warranted application of laches. *Id.* Judge Pauley made clear that his laches findings and ruling applied to the Grunbaum-Kornfeld "collection as a whole" because, on Plaintiffs' own account, these works were "purportedly stolen under common circumstances." *Id.* at 304-05.

This Court affirmed Judge Pauley's judgment. On Plaintiffs' first theory, it affirmed his specific findings "that the Drawing was not looted by the Nazis" and was instead purchased from "Mathilde Lukacs, Grunbaum's sister-in-law." *Bakalar V*, 500 F. App'x at 7. Plaintiffs had "not come close to showing the district court's finding was clearly erroneous." *Id.* at 7-8. On Plaintiffs' second theory, the Court affirmed Judge Pauley's laches ruling against Plaintiffs because their "delay in pursuing the Drawing" made it impossible to examine "key witnesses" such as "Lukacs and others of her generation," who had died in the interim. *Id.*

## C. Plaintiffs Plead Around *Bakalar* in *Reif v. Nagy*

Three years after the affirmance in *Bakalar*—and almost a decade after AIC refused Plaintiffs' demand for the Artwork—Plaintiffs tried their claims again. But

this suit was *still* not against AIC for the Artwork. Instead, Plaintiffs filed an action in the Supreme Court of New York against Richard Nagy seeking the return of two other Schiele artworks, *Woman in a Black Pinafore* and *Woman Hiding Her Face* (collectively, the "*Woman* Artworks"). *Reif v. Nagy*, No. 161799-2015 (N.Y. Sup. Ct. filed Nov. 16, 2015).

Unlike Bakalar and AIC—which had purchased their artworks many decades before any litigation—Nagy bought both Schiele pieces at a substantial discount after the *Bakalar* litigation resolved, fully understanding title was disputed. *Reif v. Nagy*, 175 A.D.3d 107, 118 (2019) ("*Nagy III*"). Nagy agreed that he would have no claim against the seller if Grunbaum's heirs invalidated title and obtained title insurance. *Id.* In stark contrast to their delay in suing AIC, Plaintiffs learned of Nagy's possession of the *Woman* Artworks on November 13, 2015, sent Nagy a demand letter that same day, and filed suit a few days later. *Reif v. Nagy*, 61 Misc. 3d 319, 322 (N.Y. Sup. Ct. 2018) ("*Nagy II*"); (Supp.A-334-46).

Plaintiffs again claimed that the *Woman* Artworks had been stolen from Grunbaum by the Nazis. (A-33; Dkt. 73 at ¶ 2, *Reif v. Nagy*, No. 161799-2015 (N.Y. Sup. Ct. Mar. 18, 2016) ("*Nagy FAC*").) Even though Plaintiffs had argued in *Bakalar* that the entire collection should be adjudicated together, their *Nagy* complaint made no mention of the fact that the *Woman* Artworks were part of the

1956 Grunbaum-Kornfeld Collection (alongside *Torso*) ruled upon in *Bakalar*. (*Nagy* FAC ¶¶ 42-51.)

Thus, in orally denying Nagy's motion to dismiss based on collateral estoppel, the trial court reasoned that it could not "know" based on the allegations in the complaint whether the *Woman* Artworks had "exactly the same provenance as the *Bakalar* particular work of art." (Tr. at 22:10-18, *Reif v. Nagy*, No. 161799-2015 (N.Y. Sup. Ct. Aug. 4, 2016), Dkt. 134.) The Appellate Division affirmed in a short opinion. *Reif v. Nagy*, 149 A.D.3d 532 (2017) ("*Nagy I*"). The Appellate Division concluded that *Bakalar* was not preclusive on laches at the pleading stage because the complaint suggested that the "works [were] not part of a collection unified in legal interest such to impute the status of one to another" and that "the purchaser, the pieces, and the time over which the pieces were held differ significantly." *Id.* at 533.

The parties later cross-moved for summary judgment. The trial court granted summary judgment to Plaintiffs, *Nagy II*, 61 Misc. 3d at 330, which the Appellate Division affirmed, *Nagy III*, 175 A.D.3d at 132.[2] As to laches, the Appellate Division homed in on the fact that Nagy had purchased the *Woman* Artworks in 2013—only two years before Plaintiffs initiated the *Nagy* suit and well after being

---

[2] Nagy did not ask the Appellate Division to revisit its prior collateral estoppel ruling. *Id.* at 119-20.

on notice of Plaintiffs' potential claims and the death of Lukacs and other potential witnesses—and "at a substantial discount" as a result of Plaintiffs' claims. *Id.* at 129-31. These considerations, which bore such weight in *Nagy*, were not true of Bakalar and are not true of AIC.

In dicta, the Appellate Division added, without elaboration, that "[i]n any event" Lukacs "could not have shown she had good title to the Artworks and her testimony would not have been probative." *Nagy III*, 175 A.D.3d at 131. This passing statement cannot be squared with *Bakalar* or even the remainder of *Nagy* itself, which acknowledged several ways that Lukacs's testimony might have been probative, but then rejected the defenses as speculative and lacking evidentiary support—indicating exactly the kind of topics on which Lukacs's testimony may have been probative:

- Asserting there was no evidence that "Elisabeth had withdrawn the collection … prior to Grunbaum's death to transfer it to [Lukacs] or anyone else." *Id.* at 125.

- Asserting there was "no evidentiary basis for defendants' experts' speculations that [Grunbaum's] Aryan Trustee was used by Grunbaum or Elisabeth as a ploy to transfer the art collection to [Lukacs]." *Id.* at 126-27.

- Asserting there was "no evidence to support defendants' experts' speculations that [a non-Jewish woman who helped Viennese Jews during the war] helped Elisabeth transfer the art collection to [Lukacs]." *Id.* at 127.

- Asserting there was "no evidence in the record that Elisabeth transferred title to the collection" to Lukacs. *Id.* at 129.

- Asserting that "the record is bereft of evidence that Grunbaum or even Elisabeth intended to gift the Artworks to [Lukacs], let alone any evidence of delivery or acceptance." *Id.* at 130.

**D.** **Six Years After the Enactment of the HEAR Act, Plaintiffs Again Pursue Litigation Over the Grunbaum-Kornfeld Collection**

**1.** **In 2016, Congress Passed the HEAR Act but Specifically Excluded Cases Like Plaintiffs'**

On December 16, 2016, Congress passed the Holocaust Expropriated Art Recovery Act. PL 114-308, 130 Stat. 1524 (the "HEAR Act"). The HEAR Act set a six-year statute of limitations for certain claims for recovery of property "lost … because of Nazi persecution." *Id.* § 5(a). The six-year statute of limitations for qualifying claims ran from the date of the claimant's "actual discovery" of the identity and location of the property and the claimant's possessory interest. *Id.*

For certain claims already barred before the enactment of the HEAR Act, however, the HEAR Act would treat the claim as having been discovered on the date

-17-

of its enactment. HEAR Act § 5(c). This provision was subject to a critical limitation on time-barred claims that could have been brought in recent years, but had not been. Thus, under Section 5(e), a claim *would not be extended* if it was already barred on the day before the enactment of the HEAR Act, and:

> (1) the claimant or a predecessor-in-interest of the claimant had knowledge [as defined by the statute] on or after January 1, 1999; and

> (2) not less than 6 years have passed from the date such claimant or predecessor-in-interest acquired such knowledge and during which time the civil claim or cause of action was not barred by a Federal or State statute of limitations.

*Id.* § 5(e).

This framework balanced competing considerations. Congress sought to "ensure that claims to artwork and other property stolen or misappropriated by the Nazis … are resolved in a just and fair manner." *Id.* § 3(2). This involved not merely reopening closed windows for litigation, but doing so in a way that "recognize[d] the importance of quieting title in property generally and the importance that claimants assert their rights in a timely fashion." *Zuckerman v. Metro. Museum of Art*, 928 F.3d 186, 196 n.11 (2d Cir. 2019) (quoting S. Rep. 114-394, at 10 (2016)).

### 2. In 2022, Plaintiffs Finally Initiate Suit Over the Artwork

On December 14, 2022, more than *sixteen years* after making their initial demand for the Artwork, Plaintiffs filed suit in New York state court against AIC. (Supp.A-1.) AIC removed the case based on diversity of citizenship. (Supp.A-1-4.)

### 3. The District Court Grants the Motion to Dismiss the FAC

Plaintiffs filed a First Amended Complaint ("FAC" or the "Complaint"), claiming that the Artwork—along with the rest of the Grunbaum-Kornfeld Collection—had been looted by the Nazis, the same argument that been decided against them in *Bakalar*. (A-26.) The FAC acknowledged that the Artwork had been part of the Grunbaum-Kornfeld Collection—it alleged that the Artwork had been displayed in same 1956 Gutekunst Catalogue as *Torso* and purchased that same year from Gutekunst by Galerie St. Etienne. (A-26-27.)

AIC moved to dismiss the FAC as barred by the statute of limitations and laches. AIC explained that New York's statute of limitations on Plaintiffs' claims ran in 2009, three years after AIC refused their demand for the Artwork. (Supp.A-23-24.) Relevant to this appeal, AIC explained that the 2016 HEAR Act did not revive Plaintiffs' claims for two independent reasons:

(1) the claims fell within the HEAR Act's express exclusion of claims that claimants could have—but failed to—bring after January 1, 1999, but prior to enactment, HEAR Act § 5(e); and

(2)     the Artwork did not meet the statutory requirement of having been looted

by the Nazis, as conclusively determined in *Bakalar*.

(Supp.A-24-29.)  AIC also raised a further argument, not reached below or presented

by this appeal, that due process would bar application of the HEAR Act if Plaintiffs'

statute-of-limitations theory prevailed.  (Supp.A-30-32.)

Separately, AIC explained that laches provided an independent basis to

dismiss the FAC, as the determination that this Court affirmed in *Bakalar* as to

Plaintiffs' unreasonable delay in suing over the Grunbaum-Kornfeld Collection was

preclusive.  (Supp.A-32-38.)

Plaintiffs opposed and cross-moved for summary judgment.  As to the statute

of limitations, Plaintiffs did not dispute that New York's demand-and-refusal rule

for good-faith purchasers would bar their claims if it applied, and did not assert that

AIC was a bad-faith possessor under New York law.  (A-1902-03.)  But Plaintiffs

argued the district court should apply Illinois's statute of limitations and accrual rule

and that Illinois's statute expired in the 1940s or 1970s.  Thus, they argued, their

claims did not fall within Section 5(e) of the HEAR Act, which applies to claims

that could have been brought after January 1, 1999.  (A-1901-04.)

Plaintiffs tried to evade *Bakalar* by attempting to relitigate various aspects of

the ruling already rejected by this Court.  (A-1904-06.)  Plaintiffs also challenged

the preclusive effect of Judge Pauley's laches ruling based on the factually

-20-

distinguishable *Nagy* decision, purported preemption by the HEAR Act, and other grounds. (A-1907-15.) Plaintiffs did not invoke the *Erie* doctrine.

After a hearing, the district court granted the motion to dismiss. The court held that New York's statute of limitations applied and that, under New York's demand-and-refusal rule, Plaintiffs' claims were not time-barred until 2009. (SA-9-13.) The HEAR Act did not revive Plaintiffs' claims because their claims fell within the Section 5(e) exception; Plaintiffs "had a reasonable opportunity to bring their claims" after 1999 "but failed to do so." (SA-13-18.) Laches provided an independent basis for dismissing the FAC. *Bakalar*, which resolved the laches issue as to the Grunbaum-Kornfeld Collection as whole, including the Artwork, precluded Plaintiffs from re-litigating laches. (SA-20-24.) The district court declined to follow *Nagy*'s contrary conclusion, which (1) was not binding on AIC under collateral estoppel rules and (2) was based on Nagy's distinct circumstances. (SA-25-26.)

### 4. The District Court Denies Plaintiffs' Motion for Reconsideration and to Amend

Plaintiffs moved for reconsideration and to amend the complaint. They argued for the first time that the New York statute of limitations began running not in 2006 (with AIC's refusal) but in 1966, when AIC acquired the Artwork, because AIC was purportedly a "bad-faith possessor"; thus, per Plaintiffs, the statute had run in 1969 and Section 5(e) of the HEAR Act did not apply. (Supp.A-444-46.) On laches, Plaintiffs rehashed arguments that AIC should be held to a different standard

for determining prejudice than had applied in *Bakalar* and suggested for the first time that the *Erie* doctrine mandated that *Nagy*'s case-specific rulings bound a federal court sitting in diversity jurisdiction. (Supp.A-451-58.)

The district court denied Plaintiffs' motions. It rejected Plaintiffs' argument concerning the new proposed 1966 accrual date for the New York statute of limitations as both (1) procedurally improper, having been raised for the first time in a reconsideration motion, and (2) substantively incorrect under New York law, which required allegations of theft to apply the bad-faith possessor rule. (SA-35-38.) The court likewise rejected Plaintiffs' new argument that *Erie* required it to follow *Nagy*'s application of law to a different defendant. (SA-40-41.)

Plaintiffs appealed.

## SUMMARY OF ARGUMENT

The district court rightly dismissed Plaintiffs' suit for two independent reasons: *first*, it is time-barred because the HEAR Act did not reset the statute of limitations; *second*, even if the statute of limitations were reset, the equitable doctrine of laches would bar the suit. This Court should affirm.

Plaintiffs' claims are indisputably untimely under New York's statute of limitations, and the HEAR Act does not render the claims timely. (Section I.) Because the statute did not run until 2009 under New York's demand-and-refusal rule, the HEAR Act did not give Plaintiffs six additional years to bring their claim.

-22-

Plaintiffs argue that the demand-and-refusal rule does not apply, but they forfeited that theory, as the district court rightly found. (Section I.A.) In addition to being forfeited, the theory fails on the merits because Plaintiffs seek to constrict the demand-and-refusal rule in a way that New York law does not permit, indeed in a way that would harm rather than help most art claimants. (Section I.B.) Regardless of these timing considerations, the HEAR Act would not apply because Plaintiffs are estopped by the careful, affirmed findings in *Bakalar* that the Artwork "was not looted by the Nazis." (Section I.C.)

Plaintiffs' claims are also barred as a matter of equity by the doctrine of laches. (Section II.) As Judge Pauley's findings and this Court's decision in *Bakalar* make clear, there can be "no serious dispute" about the significant prejudice caused by the decades-long delay in litigating the provenance of the Artwork. Plaintiffs are estopped by that ruling, which is all the more true here, where Plaintiffs waited yet more years, resulting in further loss of evidence. (Section II.A.) The *Nagy* decision distinguished *Bakalar* because Nagy had bought the works there at a discount precisely because title was being disputed by Plaintiffs and evidence of title had been lost. *Nagy* is uninstructive here, and does not estop AIC (which was not a party) or bind the district court under Plaintiffs' mistaken understanding of the *Erie* doctrine. Federal courts sitting in diversity defer to state courts' substantive legal *rules*, not their case-specific legal *rulings*. (Section II.B.)

-23-

## STANDARD OF REVIEW

This Court reviews the district court's Rule 12(b)(6) dismissal de novo, *Green v. Dep't of Educ. of New York*, 16 F.4th 1070, 1076 (2d Cir. 2021), and its denial of a motion for reconsideration for abuse of discretion, *RJE Corp. v. Northville Indus. Corp.*, 329 F.3d 310, 316 (2d Cir. 2003).

## ARGUMENT

### I. Plaintiffs' Claims Are Untimely Under New York Law and Not Extended by the HEAR Act

Under New York's demand-and-refusal rule, Plaintiffs' claims accrued in February 2006, when AIC refused Plaintiffs' demand for the Artwork. That meant the claims expired three years later, in February 2009: many years before Plaintiffs' brought suit, but recently enough that the HEAR Act did not renew the claims.

The district court's statute-of-limitations ruling took three steps. First, the court rightly ruled that New York's three-year statute of limitations for replevin claims, C.P.L.R. § 214(3), applied to all claims. Second, under § 214(3) and New York's well-established "demand-and-refusal rule," the three-year statute began to run when AIC refused Plaintiffs' 2006 demand for the Artwork and thus expired in 2009. Third, the statute of limitations was not extended by the HEAR Act because it fell within Section 5(e)'s exception to the renewed six-year statute of limitations. (*See* SA-9-18.)

On appeal, Plaintiffs do not challenge most aspects of that holding. They concede that § 214(3) applies and that, under that law, their claims are untimely unless saved by the HEAR Act. (*See* AOB-23-32.) Plaintiffs also do not dispute that, if the statute of limitations were triggered by Plaintiffs' 2006 demand for the Artwork, the HEAR Act would not revive their claims. (*See* SA-13; HEAR Act § 5(e); *cf.* AOB-55-56.) Rather, Plaintiffs attack a single link in the district court's reasoning: its application of the demand-and-refusal rule. Plaintiffs now argue that New York's statute of limitations accrued in 1966 and expired in 1969. (*See* AOB-10, 32-33.)

Plaintiffs argue their claims expired in 1969 rather than 2009 because January 1, 1999 is a watershed date under Section 5(e). Under the HEAR Act, claims for Nazi-looted art generally received a new, six-year statute of limitations. But under Section 5(e), that is not true where a plaintiff: (1) knew of his claim after January 1, 1999; (2) let six years pass without bringing the claim; and (3) would not have been time barred in bringing the claim at some point during those six years.

With a 2006 accrual and 2009 expiration of the statute of limitations, Plaintiffs' claims would not be revived by the HEAR Act. First, Plaintiffs knew of their claims after January 1, 1999—at a minimum, they had knowledge as of the January 24, 2006 demand. Second, far more than six years passed from when they

had such knowledge to when they filed suit (in 2022). Third, there was a time in which their claims were not barred: namely, the entire period until February 3, 2009.

The demand-and-refusal accrual rule is a pro-art-claimant rule first applied to permit a Holocaust-looting claim and praised by Plaintiffs' own counsel (*see infra* p. 30), but to advance their own claims in this case, Plaintiffs seek to constrict its scope significantly.

Plaintiffs' effort to circumvent the rule—and thus Section 5(e)'s operation—fails for at least three independent reasons. *First*, as the district court recognized, the argument is waived, because Plaintiffs did not present it until their motion for reconsideration. (SA-35-36.) *Second*, in any event, the argument fails on the merits: the district court was correct that the demand-and-refusal rule applies, and it properly decided timeliness on the complaint. *Third*, even if Plaintiffs were correct about the operation of Section 5(e) here, the HEAR Act would not apply given *Bakalar*'s binding determination that the Grunbaum-Kornfeld Collection was not looted by the Nazis.

### A. Plaintiffs Forfeited Any Argument that the New York Statute of Limitations Expired in the 1960s

While Plaintiffs now insist that "the crux of this appeal" is whether the statute of limitations accrued in 1966 (AOB-19), they fail to address the primary reason the district court rejected that argument: it was forfeited because Plaintiffs failed to present the issue until their motion for reconsideration (SA-35-36). Prior to that

stage, "plaintiffs took several contrary positions" as to the statute of limitations (SA-35), none of which involved accrual in 1966 under New York law, and thus they "cannot seek reconsideration on that ground" (SA-36). The district court acted well within its discretion, and that determination, standing alone, is sufficient reason to affirm.

"A motion for reconsideration may not be used to advance new facts, issues or arguments not previously presented to the Court, nor may it be used as a vehicle for relitigating issues already decided by the Court." *Davidson v. Scully*, 172 F. Supp. 2d 458, 461 (S.D.N.Y. 2001) (citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). Thus, "[a]s a general rule, [this Court] will not consider an argument on appeal that was raised for the first time below in a motion for reconsideration." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 83 (2d Cir. 2023) (citation omitted). Although this Court may nonetheless sometimes exercise its own "discretion to consider untimely arguments, [it] frequently declines[s] to do so when the party asserting the argument presents no persuasive excuse" for not presenting the argument earlier. *Id.*

Plaintiffs offer no excuse at all for their failure to advance the 1966 accrual argument prior to reconsideration, nor do they even address the district court's waiver finding. Instead, Plaintiffs imply that the argument was presented to, and

rejected by, the district court in the motion to dismiss proceedings. (*See* AOB-28-29.) The record is to the contrary. (*See* SA-35-36.)

Beginning with the complaint, Plaintiffs explicitly alleged that this matter was governed by New York's demand-and-refusal rule. (*E.g.*, A-39 (alleging "[a] claim for conversion arises when a true owner makes a demand for the return of stolen property from a possessor and the possessor refuses to return the property" and "the true owner has three years from the date of refusal to sue for conversion"); A-40 (alleging AIC's "conduct in refusing to return the artwork to Plaintiffs … constitute[s] conversion under New York law"); *see also* A-44, 46 (alleging demand and refusal).)[3]

In opposing the motion to dismiss, Plaintiffs changed tact, abandoning any reliance on New York law and arguing that Illinois law should govern and that "the Illinois statute would have run in 1943" or 1971.[4] (A-1875; *accord* A-1855.) Still, Plaintiffs did not dispute—and even tacitly acknowledged—that if New York law *did* apply, its demand-and-refusal rule would govern, such that their claims had

---

[3] In *Bakalar*, Plaintiffs likewise affirmatively relied on the demand-and-refusal rule to argue that their claims were timely, despite also arguing that Bakalar had not performed sufficient pre-purchase diligence. *See Bakalar v. Vavra*, No. 1:05-CV-3037, Dkt. 201, at 17, 22-23, 41-42.

[4] The district court held that even under Illinois law, the statute of limitations would not have accrued until demand and refusal (SA-12, 32), leading to the same outcome. Plaintiffs do not challenge this holding on appeal.

remained timely in New York long after they would have been barred elsewhere. (*See* A-2182-83.)  Through the hearing on the motion, Plaintiffs' position was that New York's statute of limitations did not apply at all (Supp.A-409), *not* that it applied but had begun to run in 1966 and expired in 1969.  As the district court found (SA-35-36), it was not until Plaintiffs' motion for reconsideration that this new and indeed contradictory theory was advanced.

Plaintiffs' failure to explain—or even acknowledge—their failure to timely raise the 1966 accrual argument is sufficient reason to affirm.  *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 188-89 (2d Cir. 2014) (finding "no reason to exercise" discretion to consider argument first raised in motion for reconsideration where, instead of offering a justification, party incorrectly insisted argument had been raised in trial-court opposition).  And because "[a]rguments may not be made for the first time in a reply brief," *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993), Plaintiffs' decision to offer no excuses in their opening brief is dispositive.

### B. Because the Demand-and-Refusal Rule Applies, the HEAR Act Does Not Extend the Relevant Statute of Limitations

The demand-and-refusal rule applies unless the defendant acquired the property in question by theft or conduct equivalent to theft.  *See In re Peters v. Sotheby's Inc.*, 34 A.D.3d 29, 36 (1st Dep't 2006); *DeWeerth v. Baldinger*, 836 F.2d 103, 108 (2d Cir. 1987).   New York's narrow application of this "bad-faith

possessor" exception to the demand-and-refusal rule gives (1) most possessors the opportunity to avoid liability for conversion by consenting to a valid demand, *Gillet v. Roberts*, 57 N.Y. 28, 34 (1874), and (2) most claimants a much longer statute of limitations, because the claim does not accrue unless and until the demand is refused, *Solomon R. Guggenheim Found. v. Lubell*, 77 N.Y.2d 311, 318 (1991). Plaintiffs' attempt to water down the meaning of "bad-faith possessor"—to expand the exception and constrict the rule—is wrong on both precedent and policy.

Because the demand-and-refusal rule *extends* the statute of limitations for plaintiffs, making it *easier* for them to bring claims against those in possession of converted property, it is "the rule that affords the most protection to the true owners of stolen property." *Lubell*, 77 N.Y.2d at 318. Presumably that is why Plaintiffs alleged that the rule applied in their Complaint. (*See* A-39-40.) Presumably that is also why Plaintiffs' own counsel tells us that the broad rule "was preserved in part at the request of the federal government to carry out the important federal policy of fighting the traffic in stolen art." Raymond J. Dowd, *Nazi Looted Art and Cocaine: When Museum Directors Take It, Call the Cops*, 14 Rutgers J. L. & Religion 529, 548 (2013). Indeed, the first case applying the rule did so to preserve an otherwise-time-barred claim seeking recovery of a painting looted by Nazis. *See Menzel v. List*, 49 Misc. 2d 300, 302, 304-05 (N.Y. Sup. Ct. 1966). Narrowing of the rule (by

expanding the meaning of "bad-faith possessor") might help Plaintiffs clear one hurdle here, but it would cause most plaintiffs' claims to expire much faster.

Beyond considerations of policy, Plaintiffs are simply wrong on the precedent. And under the established rule, Plaintiffs' allegations do not trigger the exception.

### 1. The Demand-and-Refusal Rule Applies Unless There Is Bad Faith, Which Requires More than Merely Insufficient Diligence

On Plaintiffs' own allegations, the demand-and-refusal rule applies to their claims, because Plaintiffs have not alleged that AIC acquired the artwork by theft or actions akin to theft. (*See* A-39-40.) Plaintiffs' allegations about the application of the demand-and-refusal rule here were consistent with a long line of New York authority, particularly in the context of allegedly stolen artwork, applying the rule to subsequent purchasers of allegedly stolen artwork. Plaintiffs' contrary theory, that AIC's supposed lack of diligence in acquiring the Artwork alone caused the statute to expire long before demand and refusal, runs contrary to this authority and, if adopted, would upend art-recovery litigation in New York.

New York's demand-and-refusal accrual rule begins with a simple premise: in an action for conversion, "the statutory period of limitation of action begins to run when the conversion occurs." *Kamienska v. Westchester Cnty.*, 39 Misc. 2d 750, 753 (N.Y. Civ. Ct. 1963). When the conversion occurs, in turn, depends on how the

defendant came into possession of the property. Under long-standing New York tort law, a party who wrongfully takes property may be liable for conversion immediately, but "an innocent purchaser of personal property from a wrong-doer" has not committed the tort of conversion until he "shall first be informed of the defect in his title, and have an opportunity to deliver the property to the true owner." *Gillet*, 57 N.Y. at 34; *see Cohen v. M. Keizer, Inc.*, 246 A.D. 277, 278 (1st Dep't 1936) (applying same rule to replevin).

Carrying this principle of substantive tort law forward into the statute-of-limitations context, New York courts have distinguished between two classes of defendants: the "thief" and the "good-faith purchaser." "Where replevin is sought against the party who converted the property [*i.e.*, the 'thief'], the action accrues on the date of conversion" but if "the action is brought against a party who purchased the property in good faith, for value and without notice of the conversion, the action accrues only upon the refusal of a demand for its return." *In re Peters*, 34 A.D.3d at 36; *accord Menzel*, 49 Misc. 2d at 304-05. Courts frequently discuss these categories of defendants in shorthand, denominating the first (the tortious acquirer) as the "thief" and the second (whose acquisition is not itself tortious) as the "good-faith purchaser." *E.g.*, *DeWeerth*, 836 F.2d at 108; *Lubell*, 77 N.Y.2d at 317-18.

Courts have taken a narrow view of the first category, finding a claim to have accrued at acquisition only for theft or similar circumstances in which a defendant

took property actually believing it belonged to someone else. *E.g.*, *Lubell*, 77 N.Y.2d at 318 (demand-and-refusal rule does not apply "when the stolen object is in the possession of the thief"); *Close-Barzin ex rel. de Bekessy v. Christie's, Inc.*, 51 A.D.3d 444, 444 (2008) (demand-and-refusal rule did not apply where plaintiff alleged "that defendants knowingly consigned and sold her property"); *Puebla Palomo v. DeMaio*, 403 F. Supp. 3d 42, 56 (N.D.N.Y. 2019) ("When a thief or black-market buyer takes property in bad faith and openly deals with it as her own, such that circumstances show that the defendant knows she has no right to the goods, the claim accrues." (cleaned up)); *Wallace Wood Props. v. Wood*, 117 F. Supp. 3d 493, 498 (S.D.N.Y. 2015) (plaintiffs adequately alleged defendant was not good-faith purchaser where plaintiff "specifically allege[d] that Defendant was aware that she did not have rightful title to the Original Artwork"); *compare Grosz v. Museum of Mod. Art*, 772 F. Supp. 2d 473, 483 (S.D.N.Y.), *aff'd*, 403 F. App'x 575 (2d Cir. 2010) (demand-and-refusal rule applies where complaint "does not allege that any of the works were purchased by the museum with knowledge that they had been stolen").

Plaintiffs' argument here seeks to substantially expand the class of cases subject to the accrual-at-acquisition rule. Under their theory, allegations that AIC did not undertake a sufficiently rigorous "providence investigation" mean that AIC was a "bad faith purchaser in 1966," triggering accrual. (AOB-28; *see* A-26

(alleging AIC "failed to exercise appropriate diligence in acquiring the Artwork").)
Plaintiffs' position is contrary to the extensive cases cited above, and unsupported
by precedent.

As the district court explained, there is "no case that the plaintiffs cite where
courts have interpreted the New York rule to impute bad faith upon current
possessors who failed to conduct sufficient due diligence" (SA-37), rather than upon
possessors who engaged in theft or actually believed the item to be stolen. While
Plaintiffs protest that they "did cite such cases" (AOB-34), they point to none.
Plaintiffs cite only one case applying the bad-faith accrual rule, *Swain v. Brown*, 135
A.D.3d 629 (1st Dep't 2016), but it had nothing to do with diligence or knowledge
of theft (*see* AOB-53-56). Rather, the Appellate Division held that the defendant
acted in bad faith when she refused to turn over artwork following a divorce decree
ordering her to do so. 135 A.D.3d at 631. Her violation of the order, the court
reasoned was a "wrongful taking," triggering accrual. *Id.* Thus, *Swain* is yet another
example of courts interpreting "bad faith" as requiring theft or a near equivalent. *Id.*

Plaintiffs also point to district court cases discussing the standard of care
applicable to merchants seeking protection as a "buyer in the ordinary course of
business" under Section 1-201(9) of the Uniform Commercial Code. (AOB-25-26
(citing *Republic of Turkey v. Christie's Inc.*, 527 F. Supp. 3d 518, 522 (S.D.N.Y.
2021); *Davis v. Carroll*, 937 F. Supp. 2d 390, 422-23 (S.D.N.Y. 2013); *Bakalar IV*,

-34-

819 F. Supp. 2d at 306). Neither this Court nor the controlling authority in New York courts has equated the accrual rules for C.P.L.R. § 214(3) to the standards of N.Y.U.C.C. § 1-201(9). Nor do lower court orders support Plaintiffs' position. In *Bakalar IV*, the court discussed the UCC standard only to respond to one of the claimants' arguments, and then within the context of its laches analysis. 819 F. Supp. 2d at 306. In *Republic of Turkey*, the district court discussed the UCC standard within its unclean-hands analysis. 527 F. Supp. 3d at 521. And *Davis* only discusses the UCC, without any mention of C.P.L.R. § 214. 937 F. Supp. 2d at 422-23.

There is good reason for this dearth of authority to support Plaintiffs' position: C.P.L.R. § 214 *should* be governed by a different standard than the UCC "buyer in the ordinary course" analysis. As noted, the demand-and-refusal rule under C.P.L.R. § 214(3) turns on when the tort of conversion occurs; that is, when the party in possession "commits [a] wrong, as a matter of substantive law," *Lubell*, 153 A.D.2d at 147, not on whether their actions comport with the "usual or customary practices" in a business, N.Y.U.C.C. § 1-201(9).

More importantly, Plaintiffs' broad reading of the bad-faith accrual standard would run contrary to the policy of New York. As discussed above, it would shorten the time for plaintiffs to bring their claims under New York law, contrary to the undisputed purpose of the demand-and-refusal accrual rule. It would also run contrary to the UCC policy of incentivizing diligence. Under Plaintiffs' approach,

a gallery that acquires artwork without conducting a thorough investigation would face suit in New York for only three years, after which claims for recovery of the artwork would be barred. (*See* AOB-28.) But if the gallery *does* perform enough diligence to be a good-faith purchaser, it could be open to suit forever because the statute would not begin to run until a demand is made. *See In re Peters*, 34 A.D.3d at 36 (noting demand-and-refusal rule creates the "potential for a plaintiff to indefinitely extend the statute of limitations").

Far from placing "the burden of investigating the provenance of a work of art on the potential purchaser" (AOB-25), Plaintiffs' proposal would reward non-diligent purchasers with a shorter statute of limitations than applies to diligent purchasers. While a shorter statute of limitations for a thief is inherent to how the tort of conversion has worked in New York for over 150 years, Plaintiffs' proposal to give non-diligent purchasers the same benefit is a novelty that contravenes the policies underlying the demand-and-refusal accrual rule.

Plaintiffs' claims in this case are untimely, not because the district court misapplied New York's claimant-friendly statute-of-limitations law, but because Plaintiffs waited *sixteen years* to pursue their 2006 demand for the Artwork. This Court should not rewrite New York law to undo the effect of Plaintiffs' decision.

### 2. Plaintiffs' Allegations Did Not Reach the Required Level of Bad Faith

The district court correctly determined that Plaintiffs' allegations established that the demand-and-refusal rule applied because AIC was not a thief or equivalent bad-faith purchaser of the artwork.

Plaintiffs have never alleged that AIC stole the Artwork or believed it to be stolen. Just the opposite. As the district court noted, Plaintiffs' "own allegations detail the difficulty of uncovering the provenance of the Artwork and other works that belonged to Grünbaum." (SA-37; *e.g.*, A-21 (alleging difficulty Plaintiffs faced in pursuing claims before "the fall of the Iron Curtain").) Even now, Plaintiffs continue to press the theory—consistent with their Complaint—merely that AIC "failed to investigate provenance issues" (AOB-34; *see* A-26 (alleging AIC merely "failed to exercise appropriate diligence in acquiring the Artwork"); A-2225 (proposed SAC affirmatively alleging "[AIC]'s ignorance of Fritz Grünbaum's … ownership").) These allegations contradict any claim that AIC *actually believed* the Artwork had been stolen from Grunbaum by the Nazis; they allege, at worse, that AIC simply *did not know* the Artwork's alleged history.

What is more, Plaintiffs do not contend that further investigation by AIC would have unearthed actual evidence of theft. Even on appeal, Plaintiffs argue only that AIC *might* have "learned that [the Artwork] belonged to Grünbaum." (AOB-31; *see* A-2224-25 (proposed SAC, suggesting research in Austrian historical

archives might have turned up ownership of Grunbaum's ownership and death in Dachau)).  But in *Bakalar*, Judge Pauley found after a full trial both that the artwork had been owned by Grunbaum and that it "was not looted by the Nazis," a finding this Court rightly affirmed.  *Bakalar IV*, 819 F. Supp. 2d at 299.  As Judge Pauley explained, regardless of a greater provenance inquiry, "it would have been highly unlikely that [a buyer] would have been able to conclude that the Nazis, or anyone else, had taken the [collection] from Grunbaum."  *Bakalar II*, 2008 WL 4067335, at *8.  After all, the parties had failed to unearth such evidence "[a]fter more than two years of discovery … and the benefit of archival research unavailable" in the past, and research by Sotheby's in 2004—including "consultations with two independent art researchers and a genealogist working for a potential Grunbaum heir"—had turned up no evidence of Nazi theft.  *Id.*  "[T]here is no reason to think a more extensive inquiry" by a past buyer—even a sophisticated one—would have led to a conclusion of theft.  *See id.*

Thus, the district court appropriately determined that Plaintiffs' belated attempt to rely on the accrual rule applicable to bad-faith possessors is "contrary to the allegations in the amended complaint."  (SA-36.)

### 3. The District Court Properly Resolved Timeliness on the Pleadings

Finally, the district court did not err in resolving timeliness on the pleadings. (*See* SA-9.)  While Plaintiffs fault the court for doing so, they offer no legal argument

supporting a charge of error. (*See* AOB-54-56.) And Plaintiffs pressed no such argument below, where they instead urged there were no "disputed issues of fact" raised by AIC's motion to dismiss, such that the case was already ripe for summary judgment. (A-1889.) The argument that the court exceeded its authority in resolving the statute of limitations on the pleadings is therefore forfeited. *See Siemens Energy, Inc. v. Petróleos de Venezuela, S.A.*, 82 F.4th 144, 160 (2d Cir. 2023).

Regardless, "[a] court … may dismiss a claim on statute-of-limitations grounds at the pleadings stage 'if [the] complaint clearly shows the claim is out of time.'" *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (citation omitted).

When ruling on these defenses at the pleading stage, "the court 'may also consider matters of which judicial notice may be taken,'" *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (citation omitted), and documents that are "incorporated by reference in the complaint," *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Even if a document is not expressly incorporated by reference, "the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (citation omitted). "Plaintiffs' failure to include matters of which as pleaders they had notice and which were integral to their claim—and that they apparently most wanted to avoid—may not serve as a means of

forestalling the district court's decision on the motion." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991).

Because the demand-and-refusal correspondence between Plaintiffs and AIC was incorporated by reference into the Complaint, the district court did not err in considering the letters filed with AIC's motion to dismiss. (Supp.A-160-326.) The Complaint refers repeatedly to demand-and-refusal between Plaintiffs and AIC (*see* A-39, 44, 46), which it acknowledges as a required step for a "claim for conversion" (A-39). Thus the demand documents are "incorporated by reference" in, and "'integral' to the complaint." *DiFolco*, 622 F.3d at 111; *see, e.g.*, *Williams v. Nat'l Gallery of Art, London*, 2017 WL 4221084, at *10-11 (S.D.N.Y. Sept. 21, 2017), *aff'd*, 749 F. App'x 13 (2d Cir. 2018) (considering demand-and-refusal correspondence because complaint indirectly relied upon it). And as the party who made the demand and received the refusal, Plaintiffs certainly "had notice" of the letters, and cannot evade their effect simply by omitting their date from the complaint. *Cortec*, 949 F.2d at 44.

While Plaintiffs fault the court for referencing "a demand letter outside the pleadings" to determine the demand-and-refusal date (AOB-48), they do not actually dispute the date of demand or the authenticity of the letters between their counsel and AIC (*see* A-1890 (acknowledging that AIC's attachments to motion to dismiss

represent "correspondence between counsel")). As the court noted, Plaintiffs acknowledged the 2006 demand in oral argument. (*See* SA-35-36; Supp.A-408.)

Given that there was no dispute over the time of demand, Plaintiffs' failure to allege the specific date in their complaint should "not serve as a means of forestalling the district court's decision on the motion." *Cortec*, 949 F.2d at 44. The court correctly granted AIC's motion to dismiss.

## C. The HEAR Act Does Not Apply Because the Artwork Was Not Looted by the Nazis

Given that the purpose of the HEAR Act is to help restore "artwork and other property stolen or misappropriated by the Nazis," it applies only to certain claims regarding "property lost … because of Nazi persecution." HEAR Act §§ 3(2), 5(a). The Act repeatedly makes clear that it applies to "Nazi-confiscated and looted art" or "other property stolen or misappropriated by the Nazis." *See id.* §§ 2(1), 2(5), 2(7), 3(1), 3(2). Because Grunbaum's collection was "not looted by the Nazis," *Bakalar IV*, 819 F. Supp. 2d at 299, the HEAR Act cannot help Plaintiffs evade the legal effect of their years of delay in suing AIC.

The district court did not need to reach this issue because it found that Plaintiffs' claims accrued in 2006, such that their claims fell squarely within the

exception contained in HEAR Act § 5(e).[5]  (SA-16-17 & n.7.)   Nevertheless, *Bakalar*'s ruling against Plaintiffs that the Artwork was not looted by the Nazis offers an alternative ground to affirm.

Collateral estoppel applies where the identical issue "'was raised, necessarily decided and material in the first action,' and the party who is being estopped 'had a full and fair opportunity to litigate the issue in the earlier action.'" *Simmons v. Trans Express Inc.*, 37 N.Y.3d 107, 112 (2021) (citation omitted); *accord, e.g.*, *In re Howard v. Stature Elec., Inc.*, 20 N.Y.3d 522, 525 (2013).  Plaintiffs do not and cannot dispute that the issue of Nazi theft was raised, litigated, and actually decided in the *Bakalar* proceedings.  *See Bakalar II*, 2008 WL 4067335, at \*2-5 (analyzing extensive evidentiary evidence concerning ownership and alleged theft).

Plaintiffs attempt to argue that the issues were not identical, and to limit the holding of *Bakalar* to a single painting, but that argument is unavailing because both works were part of the Grunbaum-Kornfield Collection.  *See, e.g.*, *Poindexter v. Cash Money Recs.*, 2014 WL 818955, at \*5 (S.D.N.Y. Mar. 3, 2014) (collateral estoppel applied to litigation over different song governed by same contract as song in prior suit); *Galin v. United States*, 2008 WL 5378387, at \*7 (E.D.N.Y. Dec. 23,

---

[5] Contrary to Plaintiffs' mischaracterization that the district court resolved this issue in AIC's favor (*see* AOB-46-47), the court specifically found it "unnecessary to reach" the question (SA-17 n.7).

2008) (collateral estoppel applied to litigation over different real property where underlying ownership circumstances were same as in prior suit). As Judge Pauley found and this Court affirmed, Kornfeld purchased the Grunbaum-Kornfeld Collection from Lukacs, and her possession of those works indicated that the Nazis had not seized the works; "[the] alternative inference—that the Drawing was looted by the Nazis and then returned to Grunbaum's sister-in-law—is highly unlikely." *Bakalar IV*, 819 F. Supp. 2d at 299, *aff'd Bakalar V*, 500 Fed. App'x at 7-8; *see also Bakalar II*, 2008 WL 4067335, at *8 (finding "Kornfeld purchased the Drawing *and the other Schieles* from Lukacs in 1956" (emphasis added)).

The issue of Nazi theft was also necessarily decided in *Bakalar*, in which the district court expressly found that the Grunbaum-Kornfeld Collection was "not looted by the Nazis," *Bakalar IV*, 819 F. Supp. 2d at 299, which this Court affirmed, *Bakalar V*, 500 F. App'x at *8-9. That is particularly so because *Bakalar* issued a declaratory judgment, and, "regardless of whether alternative grounds *always* have preclusive effect, it is sufficient to say that, at least in a declaratory judgment action, each conclusion provides an independent basis for preclusion." *Herrera v. Wyoming*, 587 U.S. 329, 367 (2019). "'Since the very purpose of declaratory relief is to achieve a final and reliable determination of legal issues, there should be no quibbling about the necessity principle. Every issue that the parties have litigated and that the court has undertaken to resolve is necessary to the judgment, and should

-43-

be precluded.'" *Id.* (quoting 18 Wright & Miller, *Federal Practice and Procedure: Jurisdiction* § 4421 at 630 (3d ed.)).

Further, the finding of no Nazi looting was clearly necessary to the judgment. In analyzing "[w]hether the Drawing was [s]tolen," Judge Pauley divided his analysis among "two competing theories" from Plaintiffs: *first*, that it was looted by the Nazis; *second*, if it was not looted but remained in the family, then Lukacs sold it without having the right to convey title. *Bakalar IV*, 819 F. Supp. 2d at 298. Based on Lukacs's post-war possession, the court rejected the Nazi-looting analysis, and then analyzed the second theory. *See id.* at 298-99. Judge Pauley's rejection of the first Nazi-looting theory was a necessary predicate to reaching (and rejecting) the second theory based on laches.

In affirming Judge Pauley, this Court applied the same structure. It first addressed the district court's no-looting holding, concluding that Plaintiffs did "not come close to showing that the district court's finding was clearly erroneous." *Bakalar V*, 500 F. App'x at 7-8. Only after resolving that predicate point did the Court turn to the second issue—whether good title could be traced to Lukacs's sale of the work—and affirm Judge Pauley's laches determinations. *Id.* at 8-9. In both courts, therefore, the issue of Nazi theft was litigated, resolved, and necessarily decided.

Because Plaintiffs are bound by the finding that the Grunbaum-Kornfeld Collection was not looted by the Nazis, the HEAR Act does not apply, and their claims are untimely. That is true whether the statute ran in 1969 (as Plaintiffs now argue) or 2009 (as the trial court correctly determined).

## II.     Plaintiffs' Claims Are Barred by Laches

Laches independently bars Plaintiffs' claims.[6] "[W]here neglect in promptly asserting a claim for relief causes prejudice to one's adversary, such neglect operates as a bar to a remedy." *Zuckerman*, 928 F.3d at 193 (quoting *In re Stockdale v. Hughes*, 189 A.D.2d 1065, 1067 (3d Dep't 1993)). Here, Plaintiffs did not assert their claims over the Artwork for over 80 years after the events in question—considerably *longer* than the delay sufficient to justify laches for the same claims in *Bakalar*—and 16 years of that delay occurred after Plaintiffs first contacted AIC about the Artwork. The result of these decades of delay is the indisputable loss of critical evidence and witnesses.

### A.     As *Bakalar* Makes Clear, Laches Bars Plaintiffs' Claims

Plaintiffs already litigated and lost the issue of laches in *Bakalar*, and are estopped by its adverse rulings. As discussed, New York law bars re-litigation of an issue when (1) "the identical issue was necessarily decided in the prior action and is

---

[6] The HEAR Act "allows defendants to assert equitable defenses like laches." *Zuckerman*, 928 F.3d at 196.

decisive of the present action" and (2) "the party who is attempting to relitigate the issue had a full and fair opportunity to contest it in the prior action." *In re Howard*, 20 N.Y.3d at 525. Plaintiffs rightly do not dispute (and thus waive) the second prong, but they fare no better on their challenge to the first.[7] (AOB-37.)

The district court correctly concluded that the issue—"whether plaintiffs' claims are barred by laches"—was identical to the issue that this Court resolved against Plaintiffs in *Bakalar*. (SA-21.) Plaintiffs do not dispute that *Bakalar* resolved the laches issue against Plaintiffs as to the Grunbaum-Kornfeld Collection as a whole, which included the Artwork. (SA-22-23 (citing *Bakalar IV*, 819 F. Supp. 2d at 304-05; *Bakalar V*, 500 F. App'x at 9)). Nor do Plaintiffs identify any factual differences between the Artwork and *Torso* that would affect the laches analysis.[8] Indeed, Plaintiffs concede that the Artwork and *Torso* came from "the same source"

---

[7] Although Plaintiffs vaguely suggest that new evidence may circumvent the collateral estoppel effect of a prior ruling (AOB-40), they cite no new evidence that would change the laches analysis, nor do they explain why any such evidence was unavailable during the *Bakalar* litigation. *See Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 504 (1984).

[8] Plaintiffs' vague assertion that "the core issues related to the various works" of Grunbaum "are distinct" (AOB-37 n.3) is based only on Judge Pauley's denial of *Plaintiffs'* motion for class certification. Notably, Plaintiffs' proposed defendant class was far broader than the Grunbaum-Kornfeld Collection. *See Bakalar I*, 237 F.R.D. at 64-65 (putative class membership was based on "more than 450 works, including 81 pieces by Schiele"). Judge Pauley did not address whether discrete subsets of Grunbaum's collection could be adjudicated simultaneously. In any case, Plaintiffs fail to identify any "core issue" here that is "distinct" from *Bakalar*.

and "travel[ed] together." (Supp.A-406.) *Bakalar* thus binds Plaintiffs here. Judge Pauley and this Court both rightly determined that Plaintiffs' unreasonable delay in bringing suit prejudiced the defense against Plaintiffs' claims.

### 1. Plaintiffs Unreasonably Delayed in Bringing Suit

As *Bakalar* makes clear, it is "apparent" that Plaintiffs "inexcusably slept on [their] rights." *Zuckerman*, 928 F.3d at 193. After a full trial, Judge Pauley found that Plaintiffs and their predecessors "were not diligent in pursuing their claims," despite having "knowledge of the [Grunbaum-Kornfeld] collection as a whole" as well as "their potential intestate rights to Grunbaum property," *Bakalar IV*, 819 F. Supp. 2d at 304-06, and this Court affirmed, *Bakalar V*, 500 F. App'x at 8.

The inexcusable delay findings were based on evidence that: (1) Vavra had known since childhood of "his relationship to Grunbaum and Grunbaum's art collecting and eventual death in a concentration camp," but had "made no effort to locate or lay claim to any Grunbaum property" prior to being contacted by an attorney in 1998; (2) Vavra's predecessor had "knowledge of Grunbaum's art collection" but made no efforts to claim that collection despite having made some effort to claim Grunbaum's music royalties in the 1950s and "considered the matter of her Grunbaum inheritance 'settled' in 1952" after she had "learn[ed] of Lukacs"; (3) Fischer "had known since his childhood that one of his grandfather's sisters (i.e., Elisabeth Grunbaum) had perished in the Holocaust"; and (4) Fischer's

predecessors—despite being "aware of these events in greater detail" and having "ample opportunity to inquire about Fritz Grunbaum's property" as they "remained in 'pretty close contact' with Lukacs, and Fischer and his parents even visited her once on a trip to Europe in 1959"—"never made any claims for restitution or reparation for Grunbaum property." *Bakalar IV*, 819 F. Supp. 2d at 296-97, 305.

Against that background, "it is simply not plausible that [Plaintiffs] would not have been able to seek replevin of the [Artwork]" in the more than 80 years that has passed since the events in question. *Zuckerman*, 928 F.3d at 193-94. Courts have found shorter periods of delay indefensible, including in WWII-era cases. *See, e.g.*, *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 72 (2d Cir. 2023) (25 years); *Wertheimer v. Cirker's Hayes Storage Warehouse*, 300 A.D.2d 117, 118 (2002) (50 years); *Zuckerman*, 928 F.3d at 193 (70 years); *In re Peters*, 34 A.D.3d at 38 (70 years); *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999) (70 years).

Indeed, given that the delay in *Bakalar* warranted application of laches, the same is true *a fortiori* here, where Plaintiffs inexcusably waited *16 more years* before bringing suit, despite having made an unsuccessful demand on AIC for the Artwork. *See Zuckerman*, 928 F.3d at 194 ("This is not a case where the identity of the buyer was unknown to the seller or the lost property was difficult to locate."); *In re Peters*,

34 A.D.3d at 38 (finding inexcusable delay where "the painting was exhibited … at prominent museums, galleries, and universities").

### 2. Plaintiffs' Delay Caused Prejudice

The prejudice from Plaintiffs' inexcusable delay is likewise "apparent." *Zuckerman*, 928 F.3d at 193. As in *Bakalar*, Plaintiffs' decades-long delay in bringing this action has deprived AIC of evidence on now "ancient and unascertainable facts" concerning the Artwork's provenance. *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 424 (2d Cir. 1992).

Plaintiffs' delay "resulted in deceased witnesses, faded memories, lost documents, and hearsay testimony of questionable value." *Bakalar IV*, 819 F. Supp. 2d at 306. "There can be no dispute" that this delay "deprived [AIC] of key witnesses" such as "Lukacs and others of her generation," *Bakalar V*, 500 F. App'x at 8, with Lukacs "perhaps the only person who could have elucidated the manner in which she came to possess the [Artwork]," *Bakalar IV*, 819 F. Supp. 2d at 306. Plaintiffs' delay of 16 further years after *Bakalar* would not result in witnesses and memories springing back into existence. Entropy runs in the opposite direction. Indeed, Kornfeld himself is now deceased.[9]

---

[9] Under New York law, the intervening death of a party to the sale at issue constitutes prejudice. *See In re Peters*, 34 A.D.3d at 38 (prejudice "since none of the parties to the original sale of the painting … are alive"); *Zuckerman*, 928 F.3d at 194 (prejudice

(continued...)

Plaintiffs suggest that AIC, as a "sophisticated art institution," could not have been prejudiced. (AOB-38-39.) But AIC's sophistication cannot procure testimony from witnesses who passed away while Plaintiffs and their predecessors delayed.[10] And the Appellate Division's decision in *In re Peters* makes clear that such prejudice is manifest even when nothing is known about the purchaser's sophistication. There, the court affirmed the application of laches to bar "petitioner's cause of action against the *unknown* purchaser at auction." 34 A.D. at 34 (emphasis added). Even though the purchaser was "unknown," the Appellate Division considered it "appropriate to consider the doctrine of laches" and ruled that the plaintiff's delay caused prejudice "since none of the parties to the original sale of the painting … are alive." *Id.* at 34, 38.[11] If a purchaser's sophistication could fundamentally alter the

---

where "[n]o witnesses remain who could testify on behalf of the [defendant] that the [s]ale was voluntary"); *Wertheimer*, 300 A.D.2d at 118 (prejudice where "all persons with direct knowledge of the relevant matters … died long ago"); *Platt ex. rel. Platt Family Artwork Tr. v. Michaan*, 2023 WL 6292770, at *20 (S.D.N.Y. Sept. 27, 2023) (prejudice where "the key witness to the original sale of the Paintings" was deceased).

[10] Plaintiffs do not allege or argue that their delay in bringing suit somehow resulted from AIC's supposed insufficient diligence as a sophisticated buyer, such that there would be the prejudice to *Plaintiffs* necessary to bar the application of laches. *See Wertheimer*, 300 A.D.2d at 118-19.

[11] Although Plaintiffs cite *Republic of Turkey* for the untethered proposition that a museum has a heightened duty to investigate provenance (AOB-26), *Republic of Turkey* did not go so far. After a bench trial, the district court held that the defendant, who was an "ordinary purchaser," did not have a "duty to investigate further after

(continued...)

prejudice caused by witnesses' deaths, the doctrine of laches could not have been applied while the purchaser (and his sophistication) was "unknown." As for Plaintiffs' conclusory assertion that, "[a]s a sophisticated art institution, AIC knew or should have known in 1966 that the Artwork was stolen by the Nazis" (AOB-39), Judge Pauley found it was *not* stolen by the Nazis, even after a trial in which Plaintiffs were able to muster evidence that would not have been available to AIC in 1966. *See Bakalar II*, 2008 WL 4067335, at *8; (*see supra* p. 38).

To the extent that Plaintiffs suggest AIC's status as a museum *precludes* resolution of a laches defense at the pleading stage (AOB-38), that is plainly inconsistent with *Zuckerman*, where this Court ruled at the pleading stage that laches barred the plaintiff's claims against the Met, 928 F.3d at 193-94. Although this Court noted that "the determination of prejudice is ordinarily fact-intensive," it determined from the pleadings that the museum had "been prejudiced by the more than six decades that have elapsed since the end of World War II." *Id.* at 194 (quoting *Lubell*, 153 A.D.2d at 149). This prejudice came from the death of witnesses who could speak to title and possible affirmative defenses. *Id.* at 194-95.

---

being presented with 'red flags' regarding the [disputed object's] provenance" and observed that, in any event, the defendant had made such efforts. *Republic of Turkey v. Christie's, Inc.*, 2021 WL 4060357, at *11 (S.D.N.Y. Sept. 7, 2021). The district court noted without deciding that a duty to investigate might "attach to art dealers, museums, [and] other commercial actors." *Id.* This Court did not address that question in affirming. *Republic of Turkey*, 62 F.4th at 74.

In finding prejudice, this Court did not separately analyze the museum's diligence in investigating the painting's provenance. If anything, the prejudice to AIC is even more "apparent" here, where the prejudice is apparent not just from the complaint but also from the factual findings in *Bakalar*—made after a full trial and affirmed by this Court on appeal—including that the death of Lukacs deprived the defense of the critical testimony.

### 3. The District Court Properly Resolved Laches on the Pleadings

Plaintiffs are simply wrong that the district court was not permitted to make its correct laches ruling at the pleading stage. (AOB-40.) "[L]aches may be decided '*as a matter of law*' when 'the original owner's lack of due diligence and prejudice to the party currently in possession are apparent.'" *Zuckerman*, 928 F.3d at 193 (quoting *In re Peters*, 34 A.D.3d at 38) (applying laches on the pleadings); *see also e.g.*, *In re Keating v. Rogers*, 77 A.D.2d 694, 694 (3d Dep't 1980), *aff'd*, 54 N.Y.2d 646 (1981) (same); *Thomas v. Stone*, 284 A.D.2d 627, 628 (3d Dep't 2001) (same). The court was entitled to consider not only the complaint but also "matters of which judicial notice may be taken." *Zuckerman*, 928 F.3d at 190 (citation omitted). These include the public *Bakalar* documents, which the complaint itself alleges. (A-28-29); *see TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 498 (2d Cir. 2014); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Plaintiffs' contention that discovery is necessary before laches may be resolved in this case is particularly unreasonable given that Plaintiffs litigated the same facts in *Bakalar* for over seven years, with years of discovery, a full trial, and two appeals. *See generally Cortec*, 949 F.2d at 44 (plaintiffs may not avoid matters to "forestall" resolution of motion to dismiss). Moreover, both laches and estoppel are meant to spare defendants the cost of a plaintiff's delayed (laches) and duplicative (estoppel) litigation, costs that would rapidly mount by deferring a ruling until after discovery.

### B.    *Nagy* Was Not Binding on the District Court

Misunderstanding how estoppel and the *Erie* doctrine work, Plaintiffs insist that *Nagy*—rather than *Bakalar*—bound the district court. The district court determined that *Nagy*'s case-specific rulings could not be applied in a suit against AIC, which was not a party to *Nagy*. (SA-24-25.) And the district court also rightly determined that *Nagy* turned on unique factual circumstances, such that its rulings would be inapposite here even if they could be applied against a non-party.

#### 1.    Rulings Against Nagy Cannot Be Imposed on AIC, a Non-Party, Under Principles of Collateral Estoppel

"The Due Process Clause does not permit" AIC to be bound by a "determination [that] was made in a separate proceeding in which [it did not] participate." *United States v. Daugerdas*, 892 F.3d 545, 557 (2d Cir. 2018); *accord Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979). Under New York law,

there likewise can be no estoppel unless "the party who is being estopped 'had a full and fair opportunity to litigate the issue in the earlier action.'" *Simmons*, 37 N.Y.3d at 112 (citation omitted).

### 2. *Erie* Did Not Compel the District Court to Follow *Nagy*'s Case-Specific Rulings

To circumvent bedrock principles of due process and estoppel, Plaintiffs invoke *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), to bind AIC to the ruling against Nagy, but *Erie* cannot do the work they ask of it. For one, Plaintiffs waived their *Erie* argument by not raising it until their reconsideration motion. *See Freeman*, 57 F.4th at 83. In any case, it is baseless.

Under *Erie*, federal courts defer to state courts' substantive construction of state law, but not to their case-specific applications of that law. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996). If it were otherwise, such case-specific rulings would have the preclusive effect that due process forbids in the context of collateral estoppel, and defendants invoking diversity jurisdiction would be deprived of their right to "a *federal* determination of the *factual* questions in the suit." *10012 Holdings, Inc. v. Sentinel Ins. Co., Ltd.*, 21 F.4th 216, 224 n.4 (2d Cir. 2021).

The Founders created federal diversity jurisdiction under the presumption that "state prejudices … might some times obstruct, or control … the regular administration of justice." *Martin v. Hunter's Lessee*, 14 U.S. 304, 347 (1816). To alleviate this potential concern, litigants from different states may elect the "neutral

forum" of federal court "for the more subjective determinations involved in fact-finding and trial administration." *10012 Holdings*, 21 F.4th at 224 n.4. The federal court will defer to "a state determination of state law" but will provide "a *federal* determination of the *factual* questions in the suit." *Id.* (emphasis added) (citation omitted).

*Erie* thus does *not* require federal courts to parrot a state court's *case-specific* "application of a previously established rule" to the particular facts that were before it. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 739 F.3d 45, 48 (2d Cir. 2013) (declining to follow a "mistaken application").

In contending otherwise, Plaintiffs contort the "outcome-determination" test, which classifies a rule as "substantive" if its application would "have so important an effect upon the fortunes of one or both of the litigants that failure to apply it would unfairly discriminate against citizens of the forum State, or be likely to cause a plaintiff to choose the federal court." *Gasperini*, 518 U.S. at 428 (cleaned up). "Whether a state rule of decision is 'substantive' in this sense is a legal inquiry *independent of the facts of a particular case*." *Liberty Synergistics Inc. v. Microflo Ltd.*, 718 F.3d 138, 152 n.15 (2d Cir. 2013) (emphasis added).

The district court correctly followed the distinction between state substantive law ("independent of the facts of a particular case") and case-specific rulings in a state decision (dependent on "determination of the factual questions in the suit").

Consistent with *Erie*, the district court applied New York substantive law governing laches and collateral estoppel. (*See* SA-20-22.) And also consistent with *Erie* and the rule that "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard," *Parklane Hosiery*, 439 U.S. at 327 n.7, the district court did not treat *Nagy*'s case-specific determinations against Nagy as applicable against AIC. (SA-24-25.)

### 3.    The District Court Rightly Deemed *Nagy*'s Reasoning Inapposite Here

Even if the *Nagy* determination were somehow binding, the district court rightly ruled there were numerous "facts in *Nagy*" that rendered it "completely distinguishable from the facts [of] this case." (SA-25.)

First, the Appellate Division in *Nagy* permitted Plaintiffs to evade *Bakalar*'s preclusive effect based on barebones reasoning inapplicable here. Based on the complaint before it, the Appellate Division posited that "the purchaser, the pieces, and the time over which the pieces were held differ significantly," focusing on the circumstances of the *Nagy* defendant's acquisition without analyzing the shared provenance between the *Woman* Artworks and *Torso*. *Nagy I*, 149 A.D.3d at 533. Here, those distinctions between the timing of acquisition are inapplicable, as AIC and Bakalar acquired the works roughly contemporaneously (in 1963 and 1966), long before any litigation over the collection. Unlike in *Nagy*, the Complaint here

alleges the Artwork was displayed in the 1956 Gutekunst Catalogue (A-26), and Plaintiffs do not dispute that the Artwork and *Torso* came from "the same source" and "travel[ed] together" (Supp.A-406). Thus, in the critical period running through Galerie Gutekunst's acquisition, the purchaser and pieces *did not* differ (let alone "differ significantly") for *Torso* and the Artwork.[12]

Second, as to laches, the load-bearing facts in *Nagy* were undisputed: "Nagy was on notice of plaintiffs' claims to the Grunbaum collection prior to the purchase, as he filed a brief in the *Bakalar* action"; he knew of the deceased witnesses and lost evidence that would make defending title more difficult; and he was able to "purchase[] the Artworks at a substantial discount" precisely because of those circumstances. *Nagy III*, 175 A.D.3d at 130-31. Naturally, the equitable doctrine of laches would not let him reap a windfall by protecting him from the lawsuit that promptly followed his contested acquisition. *Id.*

---

[12] *Nagy I*'s passing comment that the works at issue were not "unified in legal interest," 149 A.D.3d at 533, appears to have been shorthand for the fact that the circumstances of the purchasers differed between the works at issue in *Nagy* and *Bakalar*. As explained in the authority *Nagy I* cites for that proposition, the test under New York law is whether the facts underlying claims over different properties are the same. *See Poindexter*, 2014 WL 818955, at *4-5 (citing *Galin*, 2008 WL 5378387, at *7). To the extent Plaintiffs read *Nagy* as requiring more than the same underlying facts, that would be a "mistaken application" of these cases and the law, which was not binding on the district court. *Licci*, 739 F.3d at 48.

Ignoring these dispositive differences, Plaintiffs focus on a single aspect of *Nagy III*: the offhand dictum that "[i]n any event" Lukacs "could not have shown she had good title to the Artworks and her testimony would not have been probative." *Nagy III*, 175 A.D.3d at 131. As discussed above (*supra* pp. 16-17), this passing statement—resting on the notion that Lukacs should be deemed a "thief" for legal purposes—was contradicted by the next paragraph of the opinion, indicating that Lukacs's testimony might indeed be relevant to whether there had been a prior inter vivos gift transfer of the works. *Id.* This is a classic case-specific ruling, *see Simmons*, 37 N.Y.3d at 112, apparently driven by the equities of Nagy's acquisition, and the specifics are different in this case.

As this Court rightly ruled, for a party like Bakalar or AIC that acquired a work in the 1960s, "[t]here can be no serious dispute that the deaths of family members—Lukacs and others of her generation, and the next—have deprived [the possessor] of key witnesses." *Bakalar V*, 500 F. App'x at 8. Their testimony would have explained how and when the collection came into Lukacs's possession, a key step because the Grunbaum-Kornfeld Collection traced back to Lukacs, "who sold it to a gallery in 1956." *Id.* at 7. The inability to prove exactly what Lukacs would have testified is not a reason to *reject* laches; it is the very prejudice that warrants laches. *Id.* These careful findings—made after trial and affirmed on appeal—bind

Plaintiffs, who were the very parties against whom they were made. And, regardless, the *Bakalar* determinations explain why the *Nagy* analysis is inapposite here.

*    *    *

In sum, there was no error in the district court's conclusion that AIC—who, unlike Nagy, had purchased the Artwork decades before Lukacs died—was prejudiced by Plaintiffs' delay in bringing suit, just as Bakalar had been prejudiced by the significantly shorter delay at issue in that case.

## CONCLUSION

This Court should affirm.

Dated: July 2, 2024

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Mark R. Yohalem*

Jessica R. Lonergan
WILSON SONSINI
GOODRICH & ROSATI
Professional Corporation
1301 Avenue of the Americas,
40th Floor
New York, New York 10019

Eric P. Tuttle
WILSON SONSINI
GOODRICH & ROSATI
Professional Corporation
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104

Mark R. Yohalem
Luis Li
Matthew K. Donohue
Julia Hu
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
953 East Third Street, Suite 100
Los Angeles, California 90013

*Counsel for Defendant-Appellee*
*The Art Institute of Chicago*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION

I hereby certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7)(B) as modified by Second Circuit Rule 32.1(a)(4)(A) because it contains 13,999 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman style, 14 point font.

Dated: July 2, 2024              Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Mark R. Yohalem*

Mark R. Yohalem
953 East Third Street, Suite 100
Los Angeles, California 90013

*Counsel for Defendant-Appellee*
*The Art Institute of Chicago*

## CERTIFICATE OF SERVICE

I hereby certify that, on July 2, 2024, an electronic copy of this Brief was filed via the Court's ACMS system.

Dated: July 2, 2024

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

*/s/ Mark R. Yohalem*

Mark R. Yohalem
953 East Third Street, Suite 100
Los Angeles, California 90013

*Counsel for Defendant-Appellee*
*The Art Institute of Chicago*